IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

NOV 0 7 2002

FILED

NOV 0 5 2002
JUDGE JOAN B. GOTTSCHALL
UNITED STATES DISTRICT COURT

| | |
|---|---|
| PREMIER CAPITAL MANAGEMENT, LLC, ) <br> a Virginia Limited Liability Company, ) <br> TMB, LLC, a Virginia Limited Liability Company, ) <br> and XEN INVESTORS, LLC, a Virginia ) <br> Limited Liability Company, ) <br> ) <br>      Plaintiffs, ) <br> ) <br>     vs. ) <br> ) <br> LARRY COHEN, individually, ) <br> BRIAN FLANAGAN, individually, WAN HEE ) <br> KIM, individually, JUNG KOH, individually, ) <br> MICHAEL TURCOTTE, individually, ) <br> RON FALESE, individually, BLAIR ROBINSON, ) <br> individually, NORTHVIEW BANK ) <br> AND TRUST, an Illinois Corporation, and ) <br> XENTEX TECHNOLOGIES, INC., a ) <br> Delaware Corporation, ) <br> ) <br>     Defendants. ) | Case No. 02 C 5368 <br><br> JUDGE GOTTSCHALL <br> MAGISTRATE JUDGE <br> KEYS |

## SECOND AMENDED COMPLAINT AT LAW

NOW COME the Plaintiffs, PREMIER CAPITAL MANAGEMENT, LLC, a

Virginia Limited Liability Company, TMB, LLC, a Virginia Limited Liability Company, and

XEN INVESTORS, LLC, a Virginia Limited Liability Company (hereinafter collectively

referred to as "Plaintiffs"), by and through their attorneys, Richardson and Stasko, LLC, and

complaining against Defendants, LARRY COHEN, individually, BRIAN FLANAGAN,

individually, WAN HEE KIM, individually, JUNG KOH, individually (hereinafter collectively

referred to as "Xentex Defendants"), MICHAEL TURCOTTE, individually, RON FALESE,

individually, BLAIR ROBINSON, individually, NORTHVIEW BANK AND TRUST, an

Illinois Corporation, and XENTEX TECHNOLOGIES, INC., a Delaware Corporation, and state as follows:

PARTIES

1.      Plaintiff, Premier Capital Management, LLC ("Premier"), is a Virginia Limited Liability Company, with its principal place of business at 1080 Laskin Road, Suite 201, Virginia Beach, Virginia 23451.

2.      Plaintiff, TMB, LLC ("TMB"), is a Virginia Limited Liability Company, with its principal place of business at 1080 Laskin Road, Suite 201, Virginia Beach, Virginia 23451.

3.      Plaintiff, Xen Investors, LLC, is a Virginia Limited Liability Company, with its principal place of business at 168 Business Park Drive, Suite 200, Virginia Beach, Virginia 23462.

4.      Xentex Technologies, Inc. ("Xentex") is a Delaware Corporation doing business in Illinois. Xentex has a last known mailing address of 940 Mission Court, Fremont, CA 94539, and its current president is Jeffrey Batio ("Batio"). Xentex is in the business of selling a flip-pad computer known as the Voyager.

5.      Defendant, Larry Cohen ("Cohen") is an individual residing at 12620 Twelve Oaks Road, Minnetonka, Minnesota 55305. Mr. Cohen was a member of the Board of Directors of Xentex Technologies Inc. ("Xentex"), a Delaware Corporation, at all time periods relevant to this Complaint. As a member of the Board of Directors, Mr. Cohen was involved in the management of Xentex.

6.      Defendant, Brian Flanagan ("Flanagan"), is an individual residing at 18342 S. West Creek Drive, Tinley Park, Illinois 60477. Mr. Flanagan was a member of the Board of Directors of Xentex at all time periods relevant to this Complaint. As a member of the Board of

2

Directors, Mr. Flanagan was involved in the management of Xentex.

7.        Defendant, Wan Hee Kim ("Kim"), is an individual with a working address of 1250 Oakmead Parkway, Suite 210 Sunnyvale, California 94085. Dr. Kim was a member of the Board of Directors of Xentex at all time periods relevant to this Complaint. As a member of the Board of Directors, Dr. Kim was involved in the management of Xentex. Dr. Kim was also chairman of the Executive Committee for Xentex and served as a liaison for product development and manufacturing efforts with Xentex's partners during all time periods relevant to this Complaint.

8.        Defendant, Jung Koh ("Koh"), is, on information and belief, an individual residing in Korea. Mr. Koh was a member of the Board of Directors of Xentex at all time periods relevant to this Complaint. As a member of the Board of Directors, Mr. Koh was involved in the management of Xentex.

9.        Defendant, Michael Turcotte ("Turcotte"), is an individual residing at 23087 W. Lochanora Drive, Lake Zurich, Illinois 60047. Mr. Turcotte was Vice President of Accounting and Control of Xentex during time periods relevant to this Complaint. As Vice President of Accounting and Control, Mr. Turcotte was involved in the management of Xentex. Upon information and belief, Mr. Turcotte is a Certified Public Accountant and performed accounting services for Xentex during time periods relevant to this Complaint.

10.       Defendant, Ron Falese ("Falese"), is an individual residing at 120 S. Wyngate, Barrington, Illinois 60010. Mr. Falese is the President of FAFIA/Windfall, whose address is 202 James Street, Barrington, Illinois 60010. At all relevant time periods to this Complaint, Mr. Falese was a shareholder of Xentex.

11.       Defendant, Blair Robinson ("Robinson"), is an individual residing at 244 Eaton

3

Street, Winnetka, Illinois 60093. Mr. Robinson is the President of Northview Financial Corporation. At all relevant time periods to this Complaint, Mr. Robinson was a shareholder of Xentex.

12.     Defendant, Northview Financial Corporation ("Northview"), is an Illinois corporation with its principal place of business at 245 Waukegan Road, Northfield, Illinois 60093.

## JURISDICTION AND VENUE

13.     The Court has federal question jurisdiction over this matter under 28 U.S.C. § 1331 because the Complaint is brought under the Securities Act of 1933, 15 U.S.C. § 77a et seq. and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.

14.     The Court also has diversity jurisdiction over this matter under 28 U.S.C. § 1332 as all Plaintiffs are incorporated and do business in Virginia, and all individuals that make up the Plaintiffs reside in Virginia, while the majority of the Defendants are individuals residing in Illinois or Illinois corporations, and none of the Defendants reside or are incorporated in Virginia. In addition, the amount in controversy exceeds $75,000.

15.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over any state statutory claims and common law claims alleged.

16.     Venue is appropriate in the federal district court for the Northern District of Illinois, Eastern Division, because at least one of the Defendants reside in this District and a substantial portion of the acts, practices, and courses of business occurred in this District. *See*, 15 U.S.C. § 77v, 15 U.S.C. § 78aa and 28 U.S.C. § 1391.

## COUNT I
(Violation of the Securities Act By Xentex)

4

17. Plaintiffs reallege, reaffirm and incorporate paragraphs 1-16 above as if fully set forth herein.

18. On or about November 1, 2000, the Plaintiffs were approached by Xentex, by and through its CEO Jeff Batio ("Batio") and the Vice Chairman and Executive Vice President of Xentex, Douglas Tucker ("Tucker"), and presented with an offer to invest in Xentex. At this time, both Mr. Batio and Mr. Tucker were members of the Xentex Board of Directors. This meeting occurred in Virginia Beach, Virginia.

19. At said meeting, prior to the Plaintiffs investment in Xentex, the corporation's Board of Directors provided documentation to the Plaintiffs, Mathieu Reyna and Todd Copeland, including information and documentation relevant to a product called the Voyager Double Screen Portable Computer ("Voyager").

20. At said meeting the Plaintiffs also were given an "Information Statement" from Xentex dated November 1, 2000 which represented that:

a. That Xentex had Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets, including Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling;

b. That Korean Data Systems ("KDS"), a computer manufacturer, agreed to open a Silicon Valley service depot to provide warranty and repair services to Voyager units.

c. That Xentex was in a position whereby it expected to launch the Voyager Computer in the fourth quarter of 2000. This written statement was supplemented by oral representations at said meeting that Xentex had made the necessary preparations and was in a position to proceed in such a manner.

d. That Xentex had received product financing of approximately Forty Million Dollars ($40,000,000.00) million from KDS.

e. That KDS had agreed to pay for all remaining product development and tooling costs associated with the Voyager computer.

21. The representation contained within said Information Sheet that Xentex had over Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets was a false statement of material fact. The Defendant never had assets of Five Million Three Hundred Thousand Dollars ($5,300,000.00).

22. The representation contained within said Information Sheet that Xentex had Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) was a false statement of material fact. The Defendant has never had Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) and said Information Sheet overstates the value of tooling owned by Xentex by millions of dollars. The representation contained within said Information Sheet that Korean Data Systems ("KDS"), a computer manufacturer, agreed to open a Silicon Valley service depot to provide warranty and repair services to Voyager units was a false misrepresentation of material fact.

23. The representation contained within said Information Sheet that Xentex was in a position whereby it expected to launch the Voyager Computer in the fourth quarter of 2000 was a false statement of material fact. At that time, the Defendant was in a position wherein said launch was impossible.

24. The representation contained within said Information Sheet that Xentex KDS had agreed to pay for all remaining product development and tooling costs associated with the Voyager computer was a false statement of material fact.

6

25.     The Defendant, Xentex, made the above-referenced false and misleading statements, through its Board of Directors, corporate officers and employees, although it knew they were false, untrue and misleading.

26.     The Defendant, Xentex, made said misrepresentations for the purpose of inducing the Plaintiffs to invest in Xentex as such investment was necessary because the Defendant had misappropriated and squandered the corporation's money, including funds tendered by previous investors.

27.     The Defendant, Xentex, made said misrepresentations in an effort to alleviate the companies extreme financial difficulties thus enabling members of the Xentex Board of Directors, its corporate officers and corporation employees to continue to loot the corporation for their personal gain.

28.     In reliance on the above-referenced misrepresentations of the Defendant, the Plaintiffs purchased stock in Xentex and invested in excess of Three Million three Hundred Thousand Dollars ($3,300,000) into the company.

29.     The Xentex stock sold to Plaintiffs in this transaction are "securities" within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1). The sale of said securities constituted a public offering.

30.     As a direct result of the misrepresentations and untrue statements set forth above, the Plaintiffs have sustained damages in that the company is insolvent, has produced no computers and is unable to pay for the production of said computers. Accordingly, the Plaintiffs have lost the value of their investment into said company.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment against Xentex, in an amount not less than Four Million Dollars ($4,000,000), or

7

alternatively, enter an Order rescinding their purchase of the Xentex securities, their costs and any further relief that this Court deems warranted.

## COUNT II
(Violation of Exchange Act By Xentex-Initial Stock Purchase)

31.     Plaintiffs reallege, reaffirm and incorporate paragraphs 1-30 of this Complaint as if fully set forth herein.

32.     The Xentex stock purchased by the Plaintiffs is a "security" within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. §78c(a)(10).

33.     In connection with the initial sale of securities to Plaintiffs in November 2002, Xentex knowing made the misrepresentations set forth in Count I of this Complaint and incorporated herein in said Information Sheet.

34.     In the November 1, 2000 meeting in which said Information Sheet was tendered to the Plaintiffs, Mathieu Reyna, Todd Copeland and Bobby Copeland, principals of Plaintiffs' companies, were present. At said meeting, Xentex, through Board members and corporate officers Mr. Batio and Mr. Tucker, made the following oral representations to said Plaintiffs:

a.      That Xentex had made all necessary production arrangements with KDS for the mass production of Voyager computer;

b.      That KDS had completed the tooling required to mass-produce the Voyager computers;

c.      That all conditions precedent for the production of said computers had been completed and that any money sought by the Defendants were for the purposes of marketing only;

d.      Presented a computer to the Plaintiffs and stated said computer had been manufactured and produced by KDS;

8

e.     Expressly advised the Plaintiffs that there were no lawsuits pending against Xentex.

35.     The oral representation that Xentex had made all necessary production arrangements with KDS for the mass production of Voyager computers was a false statement of material fact. These arrangements have never be completed and the computers have never been mass-produced.

36.     The oral representation that KDS had completed all tooling required to mass produce the Voyager computers was a false statement of material fact.

37.     The oral representations that all conditions precedent for the production of said computers had been completed and that any money sought by the Defendant was for the sole purpose of marketing were false statements of material fact. The funds acquired by Xentex through Plaintiffs' investment was not used for marketing, but to pay off unrelated past debt and to purchase automobiles for Mr. Batio, pay his rent, fund his vacations and for other inappropriate purposes.

38.     The oral representation that the computer Mr. Tucker and Mr. Batio presented to the Plaintiffs was produced by KDS was a false statement of material fact. The computer produced at that time was made by another computer manufacturer whom Defendant had never paid.

39.     The oral representation that there were no lawsuits pending against Xentex was a false statement of material fact.

40.     At the time of said meeting, there were at least two lawsuits pending against the Defendant.

41.     The Defendant also tendered corporate books and records, including

financial statements to the Plaintiffs, which contained false statements of material facts and omitted material facts for the purpose of deceiving the Plaintiffs.

42.     The misrepresentations contained within the Information Statement, the corporate books and records and the oral misrepresentations of the Defendant, through its Board of Directors and corporate officers, were made for the purpose of inducing the Plaintiffs to invest in said corporation and purchase stock in said company.

43.     The Defendant made said misrepresentations for the purpose of inducing the Plaintiffs to invest in Xentex as such investment was necessary because the Defendant had misappropriated and squandered the corporations money, including funds tendered by previous investors.

44.     The Defendant made said misrepresentations in an effort to alleviate the corporation's extreme financial difficulties, thus enabling members of the Xentex Board of Directors, its corporate officers and corporation employees to continue to loot the corporation for their personal gain.

45.     In violation of the Exchange Act, Xentex used manipulative and deceptive devices in connection with the sale of the Xentex securities to Plaintiffs.

46.     Xentex, through its Board of Directors and corporate officers, made the above-referenced false and misleading statements and/or omissions, although the Board of Directors and said corporate officers knew them to be false, untrue and misleading.

47.     The Plaintiffs relied upon said Information Sheet, corporate books and records and the oral statements of the Defendants Board of Directors and corporate officers in investing in Xentex and purchasing stock in said corporation.

48.     As a direct result of the misrepresentations and untrue statements and/or
omissions set forth above, the Plaintiffs have sustained damages in that the company is insolvent,
has produced no computers and is unable to pay for the production of said computers.
Accordingly, the Plaintiffs have lost the value of their investment into said company.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter
judgment against Xentex, in an amount not less than Four Million Dollars ($4,000,000), or
alternatively, enter an Order rescinding their purchase of the Xentex securities, their costs and
any further relief that this Court deems warranted.

COUNT III

(Violation of the Exchange Act by Xentex – Promissory Note)

49.     Plaintiffs reallege, reaffirm and incorporate paragraphs 1-48 of this complaint as
if fully set forth herein.

50.     On June 4, 2001, Plaintiffs loaned Defendant Six Hundred Fifty Thousand
Dollars ($650,000.00) in consideration for a promissory note executed between the parties.

51.     Pursuant to said promissory note, the Plaintiffs earned interest on
the funds tendered to the Defendant and also acquired additional stock in said company.

52.     Said promissory note is a "security" within the meaning of Section 3(a)(10) of the
Exchange Act, 15 U.S.C. §78c(a)(10).

53.     In an effort to induce the Plaintiffs to execute said promissory note, Xentex, by its
Board of Directors and corporate officers, advised the Plaintiffs that Xentex was financially
sound and that the company was in the position to mass produce Voyagers at that time.

54.     In an effort to induce the Plaintiffs to execute said promissory note,

Xentex, through Wah Hee Kim, tendered to Mathieu Reyna, a principal of TMB and Premiere, a March 21, 2001 production schedule which made the representation that the Defendant had the ability to mass-produce Voyager computers at that time.

55.    In an effort to induce the Plaintiffs to execute said promissory note, Xentex, through its corporate officer Doug Tucker, tendered Plaintiffs an April 5, 2001 written memorandum representing that Xentex had made all arrangements to possess seventy prototypes of the Voyager computer from Asia within three weeks from the date of said correspondence.

56.    In an effort to induce the Plaintiffs to execute said promissory note, Xentex, through its agent Mr. Batio, informed Plaintiffs that the Voyager computers were essentially complete and assembled in May 2001.

57.    In an effort to induce the Plaintiffs to execute said promissory note, Xentex, through Board member Brian Flanagan, advised the Plaintiff that the company was able to pay its bills and was not financially depleted.

58.    In an effort to induce the Plaintiffs to execute said promissory note, Xentex, through Board member Brian Flanagan, advised the Plaintiff that no engineering or mechanical defects existed with regard to the Voyager computers and that Xentex was being properly managed by its Board of Directors, corporate officers and employees.

59.    In an effort to induce the Plaintiffs to execute said promissory note, Xentex, through Mr. Batio, advised that the money tendered by said promissory note would be used for marketing purposes only, as the computers were assembled and complete.

60.    The Defendant's representation that it was financially sound, through its

Board of Directors and corporate officers, was a false statement of material fact as the corporation was deeply in debt, under funded and the subject of numerous lawsuits based on the failure of Xentex to pay its bills.

61.     The Defendant's representation, through its Board of Directors and corporate officers, that it was capable of mass-producing Voyager computers at the time Defendant made said misrepresentation was a false statement of material fact. To date, the Defendant has never mass-produced Voyager computers.

62.     The production schedule tendered by Wan Hee Kim to Mathieu Reyna was a false statement of material fact which failed to accurately disclose Xentex ability to mass-produce the Voyager computers.

63.     The written memorandum tendered by Xentex, through Mr. Tucker, to the Plaintiffs stating that Xentex had made all arrangements to possess seventy prototypes of the Voyager Computer within three weeks was a false statement of material fact.

64.     Xentex's representation, through its Board of Directors and corporate officers, that the Voyager computers were essentially complete and assembled in May 2001 was a false representation of material fact.

65.     Xentex's representation, through Brian Flanagan, that the Defendant was able to pay its bills and was not financially depleted was a false statement of material fact.

66.     Xentex's representations, through Brian Flanagan, that no engineering or mechanical defects existed with regard to the Voyager computers and that Xentex was being properly managed by its Board of Directors and corporate officers was a false statement of material fact.

67.     Xentex's statement, through Mr. Batio, that the Six Hundred Fifty Thousand Dollars ($650,000.00) tendered by the Plaintiffs was sought only for the purposes of marketing was a false statement of material fact. Xentex has utilized that money to pay past due bills, Mr. Batio's living expenses, automobile payments and vacations.

68.     The misrepresentations set forth herein were made for the purpose of inducing the Plaintiffs to execute said promissory note and tender Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex.

69.     In violation of the Exchange Act, Xentex used manipulative and deceptive devices in connection with the sale of the Xentex securities to Plaintiffs.

70.     The Defendant made the above-referenced false and misleading statements and/or omissions, through its Board of Directors and corporate officers, although it knew them to be false, untrue and misleading.

71.     The Defendant made said misrepresentations for the purpose of inducing the Plaintiffs to invest in Xentex as such investment was necessary because the Defendant had misappropriated and squandered the corporations money, including funds tendered by previous investors.

72.     The Defendant made said misrepresentations in an effort to alleviate the corporation's extreme financial difficulties thus enabling members of the Xentex Board of Directors, its corporate officers and corporation employees to continue to loot the corporation for their personal gain.

73.     In reasonable reliance on the misrepresentations set forth above, and further misrepresentations of Xentex, through its Board of Directors and corporate officers, the Plaintiffs

14

tendered Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex in consideration for said promissory note.

74. As a result of the false and fraudulent statements set forth above, the Plaintiffs sustained actual damages in that the Defendant is insolvent, unable to satisfy its financial obligations, unable to produce computers and currently in a condition of default on said promissory note. Accordingly, the Plaintiffs have sustained damages over and above the amount tendered to the Defendant pursuant to said promissory note.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment against Xentex, in an amount not less than Four Million Dollars ($4,000,000), plus the costs incurred in bringing said action and for any other relief this Court deems fair and just.

## COUNT IV
(Violation of Virginia Securities Act by Xentex – Initial Stock Purchase)

75. Plaintiffs reallege, reaffirm and incorporate paragraphs 1-74 above as if fully set forth herein.

76. The Xentex stock sold to Plaintiffs on November 15, 2000 is a "security" as that term is defined by Virginia Code Ann. §13.1-501 and said securities were sold to Plaintiffs in Virginia.

77. In connection with the initial sale of said securities to Plaintiffs at the November 1, 2000 meeting, Xentex, by its Board of Directors and corporate officers, furnished the Plaintiffs, Mr. Reyna and Mr. Copeland, an Information Sheet which contained the material misrepresentations and/or omissions set forth in Count I of this Complaint at Law.

78. In connection with the initial sale of said securities to Plaintiffs, Xentex, through its Board of Directors and corporate officers, orally misrepresented material facts as set forth in Count II of this Complaint at Law.

15

79.   In connection with the initial sale of said securities to Plaintiffs, Xentex, through its Board of Directors and corporate officers, tendered Xentex books and records which contained material misrepresentations as set forth in Count II of this Complaint.

80.   Xentex made the above-referenced false and misleading representations and/or omissions of material fact, through its Board of Directors and corporate officers, in an effort to induce the Plaintiffs to invest funds in said corporation.

81.   The Defendant made the above-referenced false and misleading statements and/or omissions, through its Board of Directors and corporate officers, although it knew them to be false, untrue and misleading.

82.   The Defendant made said misrepresentations for the purpose of inducing the Plaintiffs to invest in Xentex because the Defendant had misappropriated and squandered the corporation's money, including funds tendered by previous investors.

83.   The Defendant made said misrepresentations in an effort to alleviate the Corporation's extreme financial difficulties thus enabling members of the Xentex Board of Directors and its corporate officers to continue to loot the corporation for their personal gain.

84.   In reasonable reliance on the above-referenced misrepresentations of the Defendant, the Plaintiffs purchased stock in Xentex and invested in excess of Three Million Three Hundred Thousand Dollars ($3,300,000.00) into the company.

85.   As a direct result of the misrepresentations and untrue statements set forth above, the Plaintiffs have sustained damages on account of the fact the company is insolvent, has produced no computers and is unable to pay for the production of said computers. Accordingly, the Plaintiffs have lost the value of their investment into said company.

WHEREFORE, the Plaintiffs respectfully request that this Honorable

Court enter judgment against Xentex, in an amount not less than Four Million Dollars ($4,000,000), or alternatively, enter an Order rescinding their purchase of the Xentex securities, their costs and any further relief that this Court deems warranted.

COUNT V

(Violation of Virginia Securities Act By Xentex - Promissory Note)

86.     Plaintiffs reallege, reaffirm and incorporate paragraphs 1-85 above as if fully set forth herein.

87.     On June 4, 2001, Plaintiffs loaned Defendant Six Hundred Fifty Thousand Dollars ($650,000.00) in consideration for a promissory note executed between the parties.

88.     Pursuant to said promissory note, the Plaintiffs earn interest on the funds tendered to the Defendant and also acquired additional stock in said company.

89.     In an effort to induce the Plaintiffs to execute said promissory note and tender said funds to Xentex, the Defendant, through its Board of Directors and corporate officers, made the material misrepresentations and/or omissions set forth in Count III of this Complaint.

90.     The Defendant made said false and misleading statements and/or omissions, through its Board of Directors and corporate officers, although it knew them to be false, untrue and misleading.

91.     The Defendant made said misrepresentations for the purpose of inducing the Plaintiffs to invest in Xentex because the Defendant had misappropriated and squandered the corporations money, including funds tendered by previous investors.

92.     The Defendant made said misrepresentations in an effort to alleviate the companies extreme financial difficulties thus enabling members of the Xentex Board of Directors and its corporate officers to continue to loot the corporation for their personal gain.

93. In reasonable reliance on the misrepresentations set forth above, and further misrepresentations of Xentex, through its Board of Directors and corporate officers, the Plaintiffs tendered Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex in consideration for said promissory note.

94. As a result of the false and fraudulent statements set forth above, the Plaintiffs sustained actual damages in that the Defendant is insolvent, unable to satisfy its financial obligations, unable to produce computers and is currently in a condition of default on said promissory note. Accordingly, the Plaintiffs have sustained damages over and above the amount tendered to the Defendant pursuant to said promissory note.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment against Xentex, in an amount in excess of Four Million Dollars ($4,000,000.00) plus the costs incurred in bringing said action and for any other relief this Court deems fair and just.

## COUNT VI
(Common Law Fraud Against Xentex – Initial Stock Purchase)

95. Plaintiffs reallege, reaffirm and incorporate paragraphs 1-94 above as if fully set forth herein.

96. On or about November 1, 2000, the Plaintiffs were approached by Xentex, through its Board of Directors and corporate officers Jeffrey Batio and Douglas Tucker, who presented the Plaintiffs with an offer to invest in Xentex.

97. In an effort to induce the Plaintiffs to purchase shares of stock and invest in Xentex, the Defendant made the following false representations to principals of the Plaintiffs, including Matheiu Reyna, Todd Copeland and Bob Copeland:

18

a. In an Information Sheet tendered to the Plaintiffs, the Defendant represented that it had over Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets, including Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling;

b. In said Information Sheet, the Defendant represented that Korean Data Systems ("KDS"), a computer manufacturer, agreed to open a Silicon Valley service depot to provide warranty and repair services to Voyager units.

c. In said Information Sheet, the Defendant represented that Xentex was in a position whereby it expected to launch the Voyager Computer in the fourth quarter of 2000. This written statement was supplemented by oral representations at said meeting that Xentex had made the necessary preparations and was in a position to proceed in such a manner.

d. In said Information Sheet, the Defendant represented that it had received product financing of approximately Forty Million Dollars ($40,000,000.00) from KDS.

e. In said Information Sheet, the Defendant represented that KDS had agreed to pay for all remaining product development and tooling costs associated with the Voyager computer.

f. Made the oral representation, through members of its Board of Directors and corporate officers, that the Defendant had made all necessary production arrangements with KDS for the mass production of Voyager computer;

g. Made the oral representation that KDS had completed the tooling required to mass-produce the Voyager computers;

h. Made the oral representation that all conditions precedent for the production of said computers had been completed and that any money sought by the Defendant were for the purposes of marketing only;

19

i.      Presented a computer to the Plaintiffs and orally stated that said computer had been manufactured and produced by KDS;

j.      Expressly advised the Plaintiffs that there were no lawsuits pending against Xentex.

98.      The Defendant also provided the Plaintiffs with corporate books and records in which further misrepresentations were contained regarding the financial condition of the company.

99.      The Defendant's representation that it had over Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets was a false statement of material fact. This representation overstates the Defendant's assets by millions of dollars.

100.      The Defendant's representation that it owned Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling was a false statement of material fact. The Defendant never had Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) and said figure overstates the value of Defendants tooling by millions of dollars.

101.      Defendant's representation that KDS agreed to open a Silicon Valley service depot to provide warranty and repair services to Voyager units was a false statement of material fact.

102.      Defendant's representation that it was in a position whereby it expected to launch the Voyager Computer in the fourth quarter of 2000 was a false statement of material fact. At that time, the Defendant's financial condition rendered it impossible to launch the computer at said time.

20

103. Defendant's representation that KDS had agreed to pay for all remaining product development and tooling costs associated with the Voyager computer was a false statement of material fact.

104. The oral representation that Xentex had made all necessary production arrangements with KDS for the mass production of Voyager computers a false statement of material fact. These arrangements have never be completed and the computers have never been mass-produced.

105. The oral representation that KDS had completed all tooling required to mass production the Voyager computers was a false statement of material fact.

106. The oral representations that all conditions precedent for the production of said computers had been completed and that any money sought by the Defendant was for the purpose of marketing only were false statements of material fact. The funds acquired by Xentex through Plaintiffs' investment was not used for marketing, but to pay off unrelated past debt and to purchase automobiles for Mr. Batio, pay his rent, fund his vacations and for other inappropriate purposes.

107. The oral representation that the computer Tucker and Batio presented to the Plaintiffs was produced by KDS was a false statement of material fact. The computer produced at that time was made by another computer manufacturer whom Defendant had never paid.

108. The oral representation that there were no lawsuits pending against Xentex was a false statement of material fact.

109.    The corporate books and records tendered to the Plaintiffs contained untrue statements of material facts with regard to the assets of Xentex and the financial status of said corporation.

110.    The Defendant made all the above-referenced false and misleading statements, through its Board of Directors and corporate officers, although it knew they were false, untrue and misleading.

111.    The Defendant, Xentex, made said misrepresentations for the purpose of inducing the Plaintiffs to invest in Xentex because the Defendant had misappropriated and squandered the corporations money, including funds tendered by previous investors.

112.    The Defendant, Xentex, made said misrepresentations in an effort to alleviate the corporation's extreme financial difficulties, thus enabling members of the Xentex Board of Directors, its corporate officers and corporation employees to continue to loot the corporation for their personal gain.

113.    In reasonable reliance on the above-referenced misrepresentations of the Defendant, the Plaintiffs purchased stock in Xentex and invested in excess of Three Million Three Hundred Thousand Dollars ($3,300,000) into the company.

114.    As a direct result of the misrepresentations and untrue statements set forth above, the Plaintiffs have sustained damages in that the company is insolvent, has produced no computers and is unable to pay for the production of said computers. Accordingly, the Plaintiffs have lost the value of their investment into said company.

115.    That Defendant made the above-referenced misrepresentations willfully, wantonly and with reckless disregard for the rights of the Plaintiffs in that said representations were made for the explicit purpose of defrauding the Plaintiff.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in their favor in an amount in excess of Four Million Dollars ($4,000,000.00), plus punitive damages, the costs incurred in this matter and any further relief this Court deems fair and just.

COUNT VII

(Common Law Fraud Against Xentex – Promissory Note)

116.    Plaintiffs reallege, reaffirm and incorporate paragraphs 1-115 above as if fully set forth herein.

117.    Prior to June 4, 2001, the Defendant approached the Plaintiffs, by and through their principals Mathieu Reyna, Todd Copeland and Bobby Copeland, and offered to tender an interest bearing promissory note to the Plaintiffs in exchange for Six Hundred Fifty Thousand Dollars ($650,000.00). Said promissory note also provided that the Plaintiffs would receive stock in exchange for said note.

118.    Xentex, through Wah Hee Kim, tendered to Mathieu Reyna, a principal of TMB and Premiere, a March 21, 2001 production schedule which made the representation that the Defendant had the ability to mass-produce Voyager computers at that time.

119.    In an effort to induce the Plaintiffs to execute said promissory note, Xentex, through its corporate officer Doug Tucker, tendered Plaintiffs an April 5, 2001 written memorandum representing that Xentex had made the requisite arrangements to possess seventy prototypes of the Voyager computer from Asia within three weeks from the date of said correspondence.

120.    In an effort to induce the Plaintiffs to execute said promissory note, Xentex, through its agent Mr. Batio, informed Plaintiffs that the Voyager computers were essentially complete and assembled in May 2001.

121. In an effort to induce the Plaintiffs to execute said promissory note, Xentex, through Board member Brian Flanagan, advised the Plaintiff that the company was able to pay its bills and was not financially depleted.

122. In an effort to induce the Plaintiffs to execute said promissory note, Xentex, through Board member Brian Flanagan, advised the Plaintiff that no engineering or mechanical defects existed with regard to the Voyager computers and that Xentex was being properly managed by its Board of Directors, corporate officers and employees.

123. In an effort to induce the Plaintiffs to execute said promissory note, Xentex, through Mr. Batio, advised that the money tendered by said promissory note would be used for marketing purposes only, as the computers were assembled and complete.

124. The Defendant's representation that it was financially stable, through its Board of Directors and corporate officers, was a false statement of material as the corporation was deeply in debt, under funded and the subject of numerous law suits based on the failure of Xentex to pay its bills.

125. The Defendant's representation, through its Board of Directors and corporate officers, that it was capable of mass-producing Voyager computers at the time was a false statement of material fact. To date, the Defendant has never mass-produced Voyager computers.

126. The production schedule tendered by Wan Hee Kim to Mathieu Reyna was a false statement of material fact, which failed to accurately disclose the ability of the Defendant to mass-produce the Voyager computers.

127. The written memorandum tendered by Xentex, through Mr. Tucker, to the Plaintiffs stating that Xentex had made all arrangements to possess seventy prototypes of the Voyager Computer within three weeks was a false statement of material fact.

128.    The Defendant's representation, through its Board of Directors and corporate officers, that the Voyager computers were essentially complete and assembled in May 2001 was a false representation of material fact.

129.    The Defendant's representation, through Brian Flanagan, that the Defendant was able to pay its bills and was not financially depleted was a false statement of material fact.

130     The Defendant's representation, through Brian Flanagan, that no engineering or mechanical defects existed with regard to the Voyager computers and that Xentex was being properly managed by its Board of Directors and corporate officers was a false statement of material fact.

131.    The Defendant's representation, through Mr. Batio, that the $650,000.00 tendered by the Plaintiffs was sought only for marketing was a false statement of material fact. Xentex has utilized that money to pay past due bills, Mr. Batio's living expenses, automobile payments and vacations.

132.    The misrepresentations set forth herein were made for the purpose of inducing the Plaintiffs to execute said promissory note and tender Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex.

133.    The Defendant made the above-referenced false and misleading statements and/or omissions, through its Board of Directors and corporate officers, although it knew them to be false, untrue and misleading.

134.    The Defendant made said misrepresentations for the purpose of inducing the Plaintiffs to invest in Xentex because the Defendant had misappropriated and squandered the corporation's money, including funds tendered by previous investors.

135.    The Defendant made said misrepresentations in an effort to alleviate the corporation's extreme financial difficulties thus enabling members of the Xentex Board of Directors, its corporate officers and corporation employees to continue to loot the corporation for their personal gain.

136.    In reasonable reliance on the misrepresentations set forth above, and further misrepresentations of the Defendant, through its Board of Directors and corporate officers, the Plaintiffs executed said promissory note and tendered Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex in consideration for an interest bearing promissory note on June 4, 2001. The Plaintiff was also entitled to stock in consideration for said loan.

137.    As a result of the false and fraudulent statements set forth above, the Plaintiffs sustained actual damages in that the Defendant is insolvent, unable to satisfy its financial obligations, unable to produce computers and currently in a condition of default on said promissory note. Accordingly, the Plaintiffs have sustained damages over and above the amount tendered to the Defendant pursuant to said promissory note.

138.    The Defendant made these misrepresentations with willful and wanton disregard for the rights of the Plaintiffs for the explicit purpose of defrauding the Plaintiffs of said money.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment against Xentex, in an amount in excess of Four Million Dollars ($4,000,000.00), plus punitive damages, the costs incurred in bringing said action and for any other relief this Court deems fair and just.

### COUNT VIII
(Violation of The Securities Act By Michael Turcotte – Initial Stock Purchase)

139.    Plaintiffs reallege, reaffirm and incorporate paragraphs 1-138 above as if fully set forth herein.

26

140.    Xentex sold stock to the Plaintiffs in November of 2000 and said stock is a "security" within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1). The sale of said stock is a public offering.

141.    The Defendant, by reason of his position as Vice-President of Accounting and Control at Xentex, exercised control over the corporation's money, including but not limited to, payment of expenses and salaries.

142.    The Defendant, by reason of said position, had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

143.    The Defendant, by reason of said position, attended management and Board of Directors' meetings wherein he had the opportunity to, and did address, the Board of Directors regarding the financial status at Xentex.

144.    The Defendant, by reason of his position, had continuous access to the books and records of said corporation, including those books and records provided to the Plaintiffs.

145.    The Defendant was a controlling person in said corporation for the purpose for the frauds set forth herein.

146.    Prior to the time Plaintiffs invested large sums of money into Xentex in return for stock in said company, Xentex provided the Plaintiffs, Mr. Reyna and Mr. Copeland, an "Information Sheet" which contained financial statements purporting to set forth the assets and liabilities of said company.

147. These financial statements were prepared by the Defendant, Michael Turcotte, in his capacity as Vice-President of Accounting and Control and were tendered to the Plaintiffs prior to the time in which they invested in said corporation on November 1, 2000.

148. These financial statements represented that Xentex owned tooling worth over Four Million Two Hundred and Fifty Thousand Dollars ($4,250,000.00).

149. These financial statements represented that Xentex possessed assets in the sum of over Five Million Three Hundred Thousand Dollars ($5,300,000.00).

150. Despite the representations set forth within said financial statements, Xentex did not own, and has never owned, Four Million Two Hundred Fifty Dollars in tooling.

151. Despite the representations set forth within said financial statements, Xentex did not possess, and has never possessed, over Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets.

152. On December 31, 2000, approximately two months after the Plaintiffs invested in Xentex, the Defendant created a subsequent financial statement which represented the value of Xentex tooling at One Million Five Hundred Thousand Dollars ($1,500,000.00), nearly three million dollars less than the figure which was initially represented to the Plaintiffs.

153. On December 31, 2000, approximately two months after the Plaintiffs invested in Xentex, the Defendant created a subsequent financial statement which represented that Xentex possessed only Four Million Three Hundred Thousand Dollars ($4,300,000.00) in assets, nearly a million less then the figure set forth to Plaintiffs prior to their investment in Xentex.

154. The financial statements tendered to the Plaintiffs on November 1, 2000 contained

28

false statements of material fact, including the value of said tooling and the assets owned by Xentex.

155.    Despite the representation therein, Xentex owned well under $1,000,000.00 in tooling at the time said financial statement was tendered to the Plaintiffs.

156.    The Defendant, Michael Turcotte, knew the above-referenced material misrepresentations were false and misleading.

157.    The Defendant tendered said financial statements and the material misrepresentations contained therein because Xentex had misappropriated and squandered the money tendered by previous investors.

158.    The Defendant tendered said financial statements and the material misrepresentations contained therein because Xentex was unable to pay its bills and drastically needed funding so that individuals on the Board of Directors could continue to loot the company.

159.    The Defendant tendered said financial statements and the material misrepresentations contained therein to properly secure his inflated salary and ensure he was compensated by other means.

160.    Defendant's misrepresentations were material and the Plaintiffs reasonably relied on same in purchasing stock and investing large sums of money into Xentex.

161.    In reliance on the above-referenced misrepresentations of the Defendant, the Plaintiffs purchased stock and invested in excess of Three Million Three Hundred Thousand Dollars ($3,300,000.00) into said entity.

162.    As a direct result of the misrepresentations and untrue statements set forth above, the Plaintiffs have sustained damages in that the company is insolvent, has produced no

computers and is unable to pay for the production of said computers. Accordingly, the Plaintiffs have lost the value of their investment into said company.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment against Turcotte, in an amount not less than Four Million Dollars ($4,000,000), or alternatively, enter an Order rescinding their purchase of the Xentex securities, their costs and any further relief that this Court deems warranted.

## COUNT IX
(Violation Of Exchange Act By Michael Turcotte – Initial Stock Purchase)

163.    Plaintiffs reallege, reassert and incorporate paragraphs 1-162 as if fully set forth herein.

164.    Xentex sold stock to the Plaintiffs in November of 2000 and said stock is a "security" within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1). The sale of said stock was a public offering.

165.    The Defendant, by reason of his position as Vice-President of Accounting and Control at Xentex, and the duties and rights prescribed to him as set forth in Count VIII, paragraphs 141-144 of this Complaint, was a controlling person for the purpose of the frauds set forth herein.

166.    Prior to the time Plaintiffs invested large sums of money into Xentex in return for stock in said company, Xentex provided the Plaintiffs, Mr. Reyna and Mr. Copeland, an "Information Sheet" which contained financial statements purporting to set forth the assets and liabilities of said company.

167.    These financial statements were prepared by the Defendant, Michael Turcotte, in his capacity as Vice-President of Accounting and Control and were tendered to the Plaintiffs prior to the time in which they invested in said corporation on November 1, 2000.

168. Said financial statements represented that Xentex owned tooling worth Four Million Two Hundred and Fifty Thousand Dollars ($4,250,000.00).

169. Said financial statements represented that Xentex possessed assets in the sum of over Five Million Three Hundred Thousand Dollars ($5,300,000.00).

170. Despite the representations set forth within said financial statements, Xentex did not own, and has never owned, Four Million Two Hundred Fifty Dollars ($4,250,000.00) in tooling.

171. Despite the representations set forth within said financial statements, Xentex did not possess, and has never possessed, over Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets.

172. On December 31, 2000, approximately two months after the Plaintiffs invested in Xentex, the Defendant created a subsequent financial statement which represented the value of Xentex tooling at One Million Five Hundred Thousand Dollars ($1,500,000.00), nearly three million dollars less than the figure which was represented to the Plaintiffs.

173. On December 31, 2000, approximately two months after the Plaintiffs invested in Xentex, the Defendant created as subsequent financial statement which represented that Xentex possessed only Four Million Three Hundred Thousand Dollars ($4,300,000.00) in assets, nearly one million less then the figure set forth to Plaintiffs prior to their investment in Xentex.

174. On March 15, 2001, in an effort to induce the Plaintiffs to execute a promissory note and tender additional sums of money to Xentex, Michael Turcotte prepared yet another financial statement whereby he raised the purported value of Xentex tooling to back to Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00).

175. The financial statements tendered to the Plaintiff on November 1, 2000 contained false statements of material fact, including the value of said tooling and the assets owned by Xentex.

176. Despite the misrepresentations contained within said financial statement with regard to tooling owned by Xentex, the corporation owned less then One Million Dollars ($1,000,000.00) in tooling at the time said financial statement was tendered to the Plaintiff.

177. Despite the misrepresentations contained within said financial statement with regard to the assets owned by Xentex, the corporation owned millions less than the the figure set forth on said financial statement.

178. The Defendant, Michael Turcotte, knew the above-referenced material misrepresentations set forth in the financial statement tendered to the Plaintiffs prior to their purchase of stock in Xentex were false and misleading..

179. The Defendant tendered said financial statements and the material misrepresentations contained therein because Xentex had misappropriated and squandered the money tendered by previous investors.

180. The Defendant tendered said financial statements and the material misrepresentations contained therein because Xentex was unable to pay its bills and drastically needed funding so that individuals on the Board of Directors could continue to loot the company.

181. The Defendant tendered said financial statements and the material misrepresentations contained therein to properly secure his inflated salary and ensure he was compensated by other means.

182. The Defendant prepared and utilized said financial statements in a

manipulative and deceptive manner for the purpose of inducing the Plaintiff to invest and purchase stock in Xentex.

183.    The Defendant also violated the various provisions of GAAP ("Generally Accepted Accounting Procedures"), which pursuant to 17 C.F.R. § 210.10-01(a), requires that annual reports and interim financial statements comply with GAAP and creates a presumption that financial statements not in compliance with GAAP are misleading and inaccurate.

184.    In preparing and providing the Plaintiffs with said financial statements, the Defendant violated the following provisions of GAAP:

a.      The principal that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, par. 24);

b.      The principal that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, Par. 40);

c.      The principal that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, par. 58-59).

d.      The principal of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, par. 79); and

33

e.      The principal that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2 par. 95, 97).

185.      In reliance on the above-referenced misrepresentations of the Defendant, the Plaintiffs purchased stock and invested in excess of Three Million Three Hundred Thousand Dollars ($3,300,000.00) into said entity.

186.      As a direct result of the misrepresentations and untrue statements set forth above, the Plaintiffs have sustained damages in that the company is insolvent, has produced no computers and is unable to pay for the production of said computers. Accordingly, the Plaintiffs have lost the value of their investment into said company.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment against Mr. Turcotte, in an amount not less than Four Million Dollars ($4,000,000), or alternatively, enter an Order rescinding their purchase of the Xentex securities, their costs and any further relief that this Court deems warranted.

COUNT X
(Michael Turcotte's Violations of Exchange Act -- Promissory Note)

187.      Plaintiffs repeat, reallege and incorporate the allegations set forth in paragraphs 1–186 as though fully set forth herein.

188.      The Defendant, by reason of his position as Vice-President of Accounting and Control at Xentex, and the duties and rights prescribed to him as set forth in Count IX of this Complaint, was a controlling person for the purpose of the frauds set forth herein.

189.      That promissory note is a "security" within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. §78c(a)(10).

190. In an effort to induce the Plaintiffs to execute said promissory note and tender said money to Xentex, the Defendant made numerous misrepresentations of material fact to the Plaintiff and employed various manipulative and deceptive devices in connection with his duties as Vice President of Accounting and Control at Xentex.

191. In an effort to induce the Plaintiffs to execute said promissory note and tender said money to Xentex, the Defendant disregarded his duties of full disclosure and to promptly disseminate truthful information pursuant to SEC regulations, including providing accurate and truthful information with respect to the Company's operations, financial condition and management.

192. In an effort to ensure that the Plaintiffs executed said promissory note and tendered said money to Xentex, the Defendant engaged in and participated in a continuous course of conduct to conceal adverse material information regarding the financial status of Xentex.

193. The Defendant created financial statements and tendered same to Plaintiffs in an effort to induce them to execute said promissory note. In that regard, he made the following misrepresentations of material fact to, and concealed the following material facts from the Plaintiffs:

a. Failed to disclose to the Plaintiffs, and deliberately concealed, that the company was drastically under funded, unable to pay its bills and headed for bankruptcy;

b. Prepared and tendered financial statements which overstated the value of tooling Xentex owned by millions of dollars;

c. Prepared and tendered financial statements which overstated the corporations assets by millions of dollars;

d. Prepared projections to be tendered to the Plaintiffs which misrepresented the condition of Xentex at the time said projections were produced;

e. Failed to disclose to the Plaintiffs, and deliberately concealed, that Xentex had been sued by numerous individuals and entities because Defendant did not have funds to pay its bills;

f. Failed to disclose to the Plaintiffs, and deliberately concealed, that the Defendant was releasing large sums from the corporation to Jeffrey Batio so that Mr. Batio could buy luxury vehicles, pay rent, pay utilities, vacation, pay his families medical expenses and misappropriate said funds for further use.

g. Allowed Mr. Batio to draw upon the companies accounts at will, and then fraudulently characterized said misappropriations as loans to Mr. Batio although the Defendant knew said loans would never be repaid.

194. The Defendant, Michael Turcotte, had actual knowledge that the misrepresentations and/or omissions of material fact set forth above were fraudulent, false and misleading.

195. Defendant's material misrepresentations and/or omissions were made for the purpose of inducing the Plaintiffs to execute said promissory note and tender money to Xentex pursuant to said note.

196. The Defendant made said misrepresentations and concealed said material facts because Xentex had misappropriated and squandered the money tendered by previous investors.

197. The Defendant made said misrepresentations and concealed said material

36

facts because Xentex was unable to pay its bills and drastically needed funding so that individuals on the Board of Directors could continue to loot the company.

198.     The Defendant made said misrepresentations and concealed said material facts to properly secure his inflated salary and ensure he was compensated by other means.

199.     In reliance on the above-referenced misrepresentations of the Defendant, the Plaintiffs executed said promissory note and tendered Six Hundred Fifty Thousand Dollars ($650,000.00) to the Defendants.

200.     As a direct result of the misrepresentations and omissions of material fact set forth above, the Plaintiffs have sustained damages in that the company is insolvent, has produced no computers, is in a condition of default on said promissory note and is unable to pay for the production of said computers. Accordingly, the Plaintiffs have lost the value of their investment into said company.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against the Defendant for a sum in excess of Four Million Dollars ($4,000,000.00), or alternatively, for an order rescinding their purchase of the Xentex securities, the costs associated with this action and for any further relief this Honorable Court deems fair and just.

### COUNT XI
(Violation of the Virginia Securities Code by Michael Turcotte-Initial Stock Purchase)

201.     Plaintiffs reallege, reassert and incorporate paragraphs 1-200 above as if fully set forth herein.

202.     The Xentex stock sold to Plaintiffs on November 15, 2000 is a "security" as that term is defined by Virginia Code Ann. § 13.1-501. The sale of said stock is a public offering.

203. The securities were sold to Plaintiffs in Virginia.

204. The Defendant, by reason of his position as Vice-President of Accounting and Control at Xentex, and the duties and rights prescribed to him as set forth in Count IX, of this Complaint, was a "controlling person" for the purpose of the frauds set forth herein.

205. At all time periods relevant to this Complaint, the Defendant, Michael Turcotte, was a "controlling person" within the meaning of § 13.1-522(C) of the Virginia Securities Act, and is therefore "jointly and severally" liable for the conduct alleged in this Complaint.

206. Prior to Plaintiffs' decision to invest large sums of money into Xentex in return for shares in said company, Xentex provided the Plaintiffs, Mr. Reyna and Mr. Copeland, an "Information Sheet" which contained financial statements purporting to set forth the assets and liabilities of said company.

207. These financial statements were prepared by Michael Turcotte in his capacity as Vice-President of Accounting and control at Xentex. These balance sheets were tendered to the Plaintiffs on November 1, 2000.

208. The financial statements, tendered to the Plaintiffs on November 1, 2000 for the purpose of inducing their purchase Xentex stock, represented that Xentex owned tooling worth approximately Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00). These balance sheets also stated that Xentex had approximately Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets.

209. Despite the representations contained within said financing statements, Xentex never owned Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling nor did it ever have Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets.

210. On December 31, 2000, approximately two months after the Plaintiffs invested,

the Defendant created another balance sheet which set forth the value of Xentex tooling at One Million Five Hundred Thousand Dollars ($1,500,000.00), nearly three million dollars less than the figure which was represented to the Plaintiffs.

211.    On March 15, 2001, in an effort to induce the Plaintiffs to execute a promissory note and tender additional sums of money to Xentex, Michael Turcotte prepared yet another financial statement whereby he raised the purported value of Xentex tooling to back to Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00).

212.    The financial statements tendered to the Plaintiffs on November 1, 2000 contained false statements of material fact, including the value of said tooling and the assets owned by Xentex.

213.    Despite the representations of the Defendant that Xentex owned approximately Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling in November of 2000, the company never owned more than One Hundred Thousand Dollars ($100,000.00) in tooling.

214.    Despite the representations of the Defendant that Xentex had Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets, that number is fraudulently overstated in the actual value of said assets were millions of dollars less than represented by the Defendant.

215.    The Defendant, Michael Turcotte, had actual knowledge that the misrepresentations and/or omissions of material fact set forth above were fraudulent, false and misleading.

216.    Defendant's material misrepresentations and/or omissions were made for the purpose of inducing the Plaintiffs to invest millions of dollars in Xentex in return for shares in said corporation.

217. The Defendant made said material misrepresentations because Xentex had misappropriated and squandered the money tendered by previous investors.

218. The Defendant made said misrepresentations because Xentex was unable to pay its bills and drastically needed funding and so that individuals on the Board of Directors could continue to loot the company.

219. The Defendant made said misrepresentations to properly secure his inflated salary and ensure he was compensated by other means.

220. The Defendant prepared and utilized said financial statements in a manipulative and deceptive manner for the purpose of inducing the Plaintiffs to invest and purchase stock in Xentex.

221. The Defendant also violated the various provisions of GAAP ("Generally Accepted Accounting Procedures"), which pursuant to 17 C.F.R. § 210.10-01(a), requires that annual reports and interim financial statements comply with GAAP and creates a presumption that financial statements not in compliance with GAAP are misleading and inaccurate.

222. In preparing and providing the Plaintiffs with said financial statements, the Defendant violated the following provisions of GAAP:

a. The principal that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, par. 24);

b. The principal that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, Par. 40);

40

c.      The principal that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, par. 58-59).

d.      The principal of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, par. 79); and

e.      The principal that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2 par. 95, 97).

223.    In reasonable reliance on the above-referenced misrepresentations of the Defendant, the Plaintiffs purchased stock in Xentex and invested in excess of Three Million Three Hundred Thousand Dollars ($3,300,000) into the company.

224.    As a direct result of the misrepresentations and untrue statements set forth above, the Plaintiffs have sustained damages in that the company is insolvent, has produced no computers and is unable to pay for the production of said computers. Accordingly, the Plaintiffs have lost the value of their investment into said company.

WHEREFORE, Plaintiffs pray for judgment against Mr. Turcotte in the amount of their actual damages not less than Four Million Dollars ($4,000,000), plus interest, costs, and reasonable attorney's fees pursuant to Virginia Code § 13.1-522(A).

COUNT XII
(Violation of the Virginia Securities Act by Michael Turcotte-Promissory Note)

225.    Plaintiffs reallege, reassert and incorporate paragraphs 1-224 as if fully set forth herein.

226. On June 4, 2001, the Plaintiffs tendered Six Hundred Fifty Thousand Dollars ($650,000.00) in consideration for an interest bearing promissory note which also allocated additional stock to the Plaintiffs.

227. That promissory note is a "security" as that term is defined by Virginia Code Ann. § 13.1-501. The sale of said stock was a public offering.

228. The securities were sold to Plaintiffs in Virginia.

229. The Defendant, by reason of his position as Vice-President of Accounting and Control at Xentex, and the duties and rights prescribed to him as set forth in Count IX, paragraphs 141-144 of this Complaint, was a controlling person for the purpose of the frauds set forth herein.

230. At all time periods relevant to this Complaint, Turcotte was a "controlling person" within the meaning of § 13.1-522(C) of the Virginia Securities Act, and is therefore "jointly and severally" liable for the conduct alleged in this Complaint.

231. On June 4, 2001, Plaintiffs tendered Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex in consideration for an interest bearing promissory note which also allocated the Plaintiffs additional stock in said company.

232. That promissory note is a "security" within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. §78c(a)(10).

233. In an effort to induce the Plaintiffs to execute said promissory note and tender said money to Xentex, the Defendant made numerous misrepresentations of material fact to the Plaintiffs and employed various manipulative and deceptive devices in connection with his duties as Vice-President of Accounting and Control at Xentex.

234. In an effort to induce the Plaintiffs to execute said promissory note and tender

said money to Xentex, the Defendant disregarded his duties of full disclosure and to promptly disseminate truthful information pursuant to SEC regulations, including providing accurate and truthful information with respect to the Company's operations, financial condition and management.

235. In an effort to ensure that the Plaintiffs executed said promissory note and tendered said money to Xentex, the Defendant engaged in and participated in a continuous course of conduct to conceal adverse material information regarding the financial status of Xentex.

236. The Defendant created financial statements and tendered same to Plaintiffs in an effort to induce the them to execute said promissory note. In that regard, the Defendant made misrepresentations of material fact and concealed material facts from the Plaintiffs, as set forth below:

a. Failed to disclose to the Plaintiffs, and deliberately concealed, that the company was drastically under-funded, unable to pay its bills and headed for bankruptcy;

b. Prepared and tendered financial statements which overstated the value of tooling Xentex owned by millions of dollars;

c. Prepared and tendered financial statements which overstated the corporations assets by millions of dollars;

d. Prepared projections to be tendered to the Plaintiffs which misrepresented the condition of Xentex at the time said projections were produced;

e. Failed to disclose to the Plaintiffs, and deliberately concealed, that Xentex had been sued by numerous individuals and entities because Defendant did not have funds to pay its bills;

43

f.      Failed to disclose to the Plaintiffs, and deliberately concealed, that the Defendant was releasing large sums from the corporation to Jeffrey Batio so that Mr. Batio could buy luxury vehicles, pay rent, pay utilities, vacation, pay his families medical expenses and misappropriate said funds for further use.

g.      Allowed Mr. Batio to draw upon the companies accounts at will, and then fraudulently characterized said misappropriations as loans to Mr. Batio, although the Defendant knew said loans would never be repaid.

237.    The Defendant, Michael Turcotte, had actual knowledge that the misrepresentations and/or omissions of material fact set forth above were fraudulent, false and misleading.

238.    Defendant's material misrepresentations and/or omissions were made for the purpose of inducing the Plaintiffs to execute said promissory note and tender money to Xentex pursuant to said note.

239.    The Defendant made said misrepresentations and concealed said material facts because Xentex had misappropriated and squandered the money tendered by previous investors.

240.    The Defendant made said misrepresentations and concealed said material facts because Xentex was unable to pay its bills and drastically needed funding and so that individuals on the Board of Directors could continue to loot the company.

241.    The Defendant made said misrepresentations and concealed said material facts to properly secure his inflated salary and ensure he was compensated by other means.

242.    In reliance on the above-referenced misrepresentations of the Defendant, the Plaintiffs executed said promissory note and tendered Six Hundred Fifty Thousand Dollars ($650,000.00) to the Defendant.

243.    As a direct result of the misrepresentations and omissions of material fact set forth above, the Plaintiff has sustained damages in that the company is insolvent, has produced no computers, is in a condition of default on said promissory note and is unable to pay for the production of said computers. Accordingly, the Plaintiffs have lost the value of their investment into said company.

WHEREFORE, the Plaintiffs respectfully request that this Honorable court enter judgment in their favor in a sum in excess of Four Million Dollars ($4,000,000.00), plus interest, costs and reasonable attorney fees pursuant to Virginia Code § 13.1-522(A).

## COUNT XIII
(Common Law Fraud by Michael Turcotte)

244.    Plaintiffs reallege, reaffirm and incorporate paragraphs 1 - 243 above as if fully set forth herein.

245.    The Defendant, by reason of his position as Vice-President of Accounting and Control at Xentex, and the duties and rights prescribed to him as set forth in Count IX, of this Complaint.

246.    Prior to Plaintiffs' decision to invest large sums of money into Xentex in return for shares in said company, Xentex provided the Plaintiffs an "Information Sheet" which contained financial statements purporting to set forth the assets and liabilities of said company.

247.    These financial statements were prepared by Michael Turcotte in his capacity as Vice President of Accounting and control at Xentex. These financial statements were tendered to the Plaintiffs on November 1, 2000.

248.    Said financial statements, tendered to the Plaintiffs, Mr. Reyna and Mr. Copeland, on November 1, 2000 for the purpose of inducing their purchase Xentex stock, represented that Xentex owned tooling worth approximately Four Million Two Hundred Fifty Thousand Dollars

($4,250,000.00). These financial statements also stated that Xentex had approximately Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets.

249.	Despite the representations contained within said financing statements, Xentex never owned Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling nor did it ever have Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets.

250.	On December 31, 2000, approximately two months after the Plaintiffs invested, the Defendant created another balance sheet which set forth the value of Xentex tooling at $1,500,000.00, nearly three million dollars less than the figure which was represented to the Plaintiffs.

251.	On December 31, 2000, approximately two months after the Plaintiffs invested, the Defendant created another balance sheet which set forth the value of Xentex assets as Four Million Three Hundred Thousand Dollars ($4,300,000.00), one million dollars less than the figure previously represented to the Plaintiffs.

252.	On March 15, 2001, in an effort to induce the Plaintiffs to execute a promissory note and tender additional sums of money to Xentex, Michael Turcotte prepared yet another financial statement whereby he raised the purported value of Xentex tooling to back to Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00).

253.	The financial statements tendered to the Plaintiff on November 1, 2000 and March 15, 2001 contained material misrepresentations of fact in that they fraudulently overstated that value of the tooling and assets owned by Xentex.

254.	The Defendant further made material misrepresentations to the Plaintiffs and engaged in a continuous course of conduct to conceal adverse material information from the Plaintiffs in an effort to induce the Plaintiffs to invest an additional Six Hundred Fifty Thousand

46

Dollars ($650,000.00) into Xentex in consideration for a promissory note. The Defendant's material misrepresentations and omissions in this respect are as follows:

a.      Failed to disclose to the Plaintiffs, and deliberately concealed, that the company was drastically under funded, unable to pay its bills and on the verge of bankruptcy;

b.      Prepared and tendered financial statements which overstated the value of tooling Xentex owned by millions of dollars;

c.      Prepared and tendered financial statements which overstated the corporations assets by millions of dollars;

d.      Prepared projections to be tendered to the Plaintiffs which misrepresented the condition of Xentex at the time said projections were produced;

e.      Failed to disclose to the Plaintiffs, and deliberately concealed, that Xentex had been sued by numerous individuals and entities because Defendant did not have funds to pay its bills;

f.      Failed to disclose to the Plaintiffs, and deliberately concealed, that the Defendant was releasing large sums from the corporation to Jeffrey Batio so that Mr. Batio could buy luxury vehicles, pay rent, pay utilities, vacation, pay his families medical expenses and misappropriate said funds for further use.

g.      Allowed Batio to draw upon the companies accounts at will, and then fraudulently characterized said misappropriations as loans to Batio although the Defendant knew said loans would never be repaid.

255.    The Defendant, Michael Turcotte, had actual knowledge that the misrepresentations and/or omissions of material fact set forth above were fraudulent, false and misleading.

256. Defendant's material misrepresentations and/or omissions were made for the purpose of inducing the Plaintiffs to execute said promissory note and tender money to Xentex pursuant to said note.

257. The Defendant made said misrepresentations and concealed said material facts because Xentex had misappropriated and squandered the money tendered by previous investors.

258. The Defendant made said misrepresentations and concealed said material facts because Xentex was unable to pay its bills and drastically needed funding so that individuals on the Board of Directors could continue to loot the company.

259. The Defendant made said misrepresentations and concealed said material facts to properly secure his inflated salary and ensure he was compensated by other means.

260. The Plaintiffs reasonably relied on the misrepresentations referenced herein in deciding to purchase stock in Xentex and invest in said company and did in fact purchase stock and invest in Xentex.

261. As a direct result of the material misrepresentations and untrue statements set forth above, the Plaintiffs have sustained damages in that the company is insolvent, has produced no computers and is unable to pay for the production of said computers. Accordingly, the Plaintiffs have lost the value of their investment into said company.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in their favor in an amount in excess of Four Million Dollars ($4,000.000.00), plus punitive damages, costs and any further relief this Court deems fair and just.

## COUNT XIV
(Negligent Misrepresentation Against Michael Turcotte)

262. Plaintiffs reallege, reaffirm and incorporate paragraphs 1-261 above as if fully set forth herein.

263.    As the accountant and financial advisor for Xentex, Turcotte, in the course of his business and employment with Xentex, was in the business of supplying information for the guidance of others in their business dealings.

264.    As the Vice-President of Accounting and Control at Xentex, the Defendant had a duty to exercise reasonable care and competence in providing financial information to shareholders and potential investors of the corporation.

265.    In breach of the Defendant's duty to exercise reasonable care and competence in the dissemination of financial data, the Defendant negligently and carelessly made the following false misrepresentations to the Plaintiffs:

a.    Negligently prepared and tendered to Plaintiffs a September 30, 2000 financial statement and March 15, 2001 financial statement that represented that Xentex owned Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling;

b.    Negligently prepared and tendered to Plaintiffs said financial statements although they dramatically overstated that assets owned by Xentex;

c.    Negligently prepared various projections for the corporations income and expenditures which were based on false and inaccurate information regarding the condition and capabilities at the time said projections were prepared.

d.    Failed to disclose to the Plaintiffs in financial statements that the Board of Directors and Batio were expending the corporations money to fund Jeffrey Batio's purchase of luxury vehicles, to pay his rent, to pay Batio's utilities, to fund Batio's recreational activities, to pay medical expenses for Batio's family and for other inappropriate purposes.

266.    As a proximate result of the afore-mentioned misrepresentations, the Plaintiffs have lost large sums of money which they invested in Xentex and further lost money

the Plaintiffs tendered in consideration for a promissory note executed between the Plaintiffs and Xentex.

WHEREFORE, Plaintiffs pray for judgment against Turcotte for their actual damages in excess of Four Million Dollars ($4,000,000), plus their costs and filing fees incurred, and for any other such relief that this Court deems

## COUNT XV
### (Accounting Malpractice Against Michael Turcotte)

267.    The Plaintiffs reallege, reaffirm and incorporate paragraphs 1- 266 above as if set forth fully herein.

268.    The Defendant, Michael Turcotte, by reason of his position as Vice- President of Accounting and Control at Xentex, exercised control over the corporation's money, including but not limited to, payment of expenses and salaries. The Defendant had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

269.    The Defendant attended management and Board of Director meetings wherein he had the opportunity to, and did address, the Board of Directors regarding the monetary conditions at Xentex. The Defendant had continuous access to the books and records of said corporation, including those books and records provided to the Plaintiffs.

270.    The Defendant was the chief financial officer at Xentex and the corporation's accountant and internal auditor.

271.    At all times mentioned herein, the Defendant, Michael Turcotte, held himself out to the Xentex Board of Directors and Shareholders as a Certified Public Accountant that specialized in the practice of corporate accounting.

50

272.    In Defendant's capacity as Vice-President of Accounting and Control at Xentex, and on account of the duties associated with said position as set forth above, the Defendant owed the Plaintiffs a duty to exercise reasonable care and caution in the protection of Plaintiffs' interests and to be possessed of the ordinary professional skill, competence and knowledge to perform the services for which he was retained by Xentex.

273.    The Defendant had a duty to exercise reasonable care in performing accounting services for Xentex.

274.    The Defendant had a duty to exercise reasonable care with regard to the production and dissemination of financial statements, the handling of Xentex accounts and money, in paying the corporation's bills in a timely manner and in accurately advising the Xentex Board and Directors and shareholders of the financial condition of the corporation.

275.    The Defendant had a duty to exercise reasonable care in providing accounting services to Xentex and thereby had the duty to comply with generally accepted corporate accounting procedures for the protection of Xentex shareholders.

276.    Notwithstanding the aforementioned duties Defendant owed the Plaintiffs, the Defendant did commit the following careless and negligent acts of misconduct to wit.

a.      Failed to pay the corporations bills in a timely manner, or at all, causing numerous law suits to be filed against Xentex;

b.      Failed to control the corporations accounts and the money contained therein;

c.      Depleted Xentex accounts by allowing the Board of Directors, and Batio in particular, to loot the company;

d.     Released money to Batio so that Batio could make automobile payments, pay rent, vacation, cover medical bills for his family and squander the corporation's money in other inappropriate ways;

e.     Failed to pay vendors, providers, corporate officers and employees, attorney fees and other sums owed by Xentex to various individuals and/or entities;

f.     Prepared financial statements that were grossly inaccurate with regard to the assets, liabilities and financial condition of Xentex;

g.     Failed to take measures to prevent Batio from utilizing debit cards, check books and company credit cards to loot Xentex and drive the company into bankruptcy;

h.     Allowed the Board of Directors to misappropriate money and convert it to their own personal use;

i.     Failed to provide proper accounting or control services to Xentex which ultimately resulted in the company filing chapter 11 bankruptcy;

j.     Failed to disclose to the Plaintiffs, either orally or in writing, that Batio and other members of the Board of Directors had misappropriated large sums of money from said company;

k.     Drafted numerous checks without sufficient funds in the corporation's accounts to providers, manufacturers employees, officers and other individuals and entities with important relationships to Xentex;

l.     Characterized misappropriated funds as loans;

m.     Was otherwise careless and negligent.

277.     As a direct and proximate result of the Defendant's negligent acts and/or omissions, and through the Defendant's breach of his duties in this regard, the Plaintiffs

sustained significant damages in that the Voyager computers were unable to be funded, the companies money was depleted and Plaintiffs investments squandered.

278.     As a direct and proximate result of the Defendant's negligent acts and/or omissions, and his breach of his duties in that regard, the Plaintiffs sustained damages in excess of Four Million dollars ($4,000,000.00)

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against the Defendant in a sum in excess of Four Million Dollars ($4,000,000.00) plus the costs incurred in this matter and any further relief this Court deems fair and just.

<u>COUNT XVI</u>
(Breach of Fiduciary Duty Against Turcotte)

279.     Plaintiffs reallege, reassert and reaffirm paragraphs 1-278 above as if fully set forth herein.

280.     The Defendant, Michael Turcotte, by virtue of his position as Vice- President of Accounting and Control at Xentex, owed a fiduciary duty to act honestly, loyally and in good faith and fairness toward the Plaintiffs.

281.     In September of 2000, the Defendant prepared an "Information Sheet" which stated that Xentex owned 4.25 million dollars in tooling and Five Million Three Hundred Thousand Dollars ($5,300,000.00) in total assets.

282.     In November of 2000, in an effort to induce the Plaintiffs to invest money and purchase stock in Xentex, the Defendant allowed for the tender of said Information Sheet to Plaintiffs, Mr. Reyna and Mr. Copeland, although the Defendant knew that Xentex did not own Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling and the corporations assets were overstated therein.

283. In said Information Sheet, the Defendant set forth numerous misrepresentations regarding the tooling owned by Xentex and drastically overstated the companies assets.

284. In December of 2000, subsequent to Plaintiffs' investment of large sums of money into Xentex, the Defendant created another balance sheet which dramatically reduced the companies tooling to One Million Four Hundred Thousand Dollars ($1,400,000.00) and total assets to Four Million Three Hundred Thousand Dollars ($4,300,000.00).

285. In a March 15, 2001 financial statement, in an effort to induce the Plaintiffs to tender Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex in exchange for promissory note and stock, the Defendant, Michael Turcotte, again inflated the value of said tooling to 4.25 million dollars and facilitated the tender of said financial statement to the Plaintiffs.

286. On June 4, 2001, the Plaintiffs tendered Six Hundred Fifty Thousand Dollars ($650,000.00) pursuant to a promissory note executed by the parties in reliance on the financial statement provided to the Plaintiffs. This false financial statement corroborated the statements of various other Xentex Board members in which they represented that they owned said tooling.

287. Xentex never has, and does not, own tooling in the sums set forth on any financial statement produced by the Defendant and on information and belief, never owned any tooling for the Voyager computers at all.

288. The September, 2000 financial statement and the March 15, 2001 financial statement tendered to the Plaintiffs for the purpose of inducing them to invest money into Xentex also failed to disclose that Xentex Board members, and Batio in particular, were removing funds from Xentex for personal use which when confronted with bankruptcy, which Defendant characterized as loans from the company to Batio.

289.    The misrepresentations made in said financial statements were false, misleading and made for the purpose of inducing the Plaintiffs to invest in Xentex and purchase stock in said company. The Defendant breached his duty of honestly, loyalty, good faith and fairness to the Plaintiffs in rendering such misrepresentations in said financial statements.

290.    The Defendant, Michael Turcotte's, breach of his fiduciary duty caused the Plaintiffs substantial damages in that they invested money into the company as a potential shareholder and investor and tendered money pursuant to said promissory note.

291.    Michael Turcotte has already been brought into involuntary bankruptcy once and on information and belief, is essentially insolvent.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in favor of the Plaintiffs and against the Defendant, Xentex, in an amount in excess of Four Million Dollars ($4,000,000.00) plus costs incurred in this suit and any further relief this Honorable Court deems fair and just.

## COUNT XVII
### (Brian Flanagan's Violation of Securities Act)

292.    Plaintiffs reallege, reassert and incorporate paragraphs 1-291 above as if fully set forth herein.

293.    The Defendant, Brian Flanagan, tendered Five Hundred Thousand Dollars ($500,000) to Xentex pursuant to a promissory note entered into between executed between those parties.

294.    The promissory note entered into between the Defendant and Xentex provided that should Xentex default on said promissory note at the time it was due, Brian Flanagan would earn twenty percent interest on the note, have the right to join the corporations Board of Directors and take a security interest in all the assets of the corporation.

295. On October 5, 2000, the date on which said promissory note was due, Xentex defaulted. Brian Flanagan became a member of the Xentex Board of Directors on October 5, 1999.

296. On or about November 1, 2000, the Plaintiffs, through Mr. Reyna and Mr. Copeland, were approached by Xentex, by and through its Board of Directors and corporate Officers, and presented an offer to the Plaintiffs to invest in Xentex. This meeting occurred in Virginia Beach, Virginia.

297. The Plaintiffs purchased stock and invested in Xentex, said stock being a "security" within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77(b)(a)(1) and said sale constituting a public offering.

298. At that time, Brian Flanagan was on the Xentex Board of Directors and had an absolute right to call on his note for any reason whatsoever. Xentex did not have the funds to satisfy of said note as is evidenced by its willingness to pay twenty percent interest on said note in lieu of making payment.

299. Brian Flanagan was a controlling person under said statute by his absolute right to call his note due for any reason and the Defendant actively participated in and controlled decisions of the Board of Directors.

300. In November 2000, Xentex, through its Board of Directors and corporate Officers tendered a Information Statement to Mr. Reyna and Mr. Copeland which contained numerous misrepresentations of fact.

301. This Information Sheet stated in part that:

a. Xentex had Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets, including Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling;

b.      KDS agreed to provide Xentex a service depot warranty and repair services for Xentex.

c.      That Xentex was in the present condition to begin shipping Voyagers in the first quarter of 2001.

d.      That Xentex was in a position whereby it expected to initiate a public offering in September 2001.

e.      KDS agreed to pay for all remaining product development and tooling costs associated with the Voyager computer.

302.    The above-referenced statements contained within said Information Sheet were false and misleading in that Xentex did not have Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets and 4.25 million in tooling, KDS did not agree to provide a service depot for warranty and repair services, Xentex was not presently in a position whereby it was conceivable that that it could begin shipping Voyagers in the first quarter of 2001, Xentex was not in a position whereby it could initiate a public offering in September 2001 and KDS had not agreed to pay the remaining product development and tooling costs associated with the Voyager computer.

303.    The Defendant, Brian Flanagan, played a role in the preparation of said Information Sheet and/or had reviewed said Information Sheet in his capacity as a member of the Xentex Board of Directors with a substantial financial interest in said corporation.

304.    The Defendant, Brian Flanagan, made, contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations which induced them to invest and purchase shares in Xentex. The Defendant knew that the representations set forth herein were false and intended for the Plaintiffs to rely on said statements and invest in the corporation.

57

305. In reliance on the above-referenced misrepresentations in said information sheet, the Plaintiffs purchased stock in Xentex and invested in large sums of money in that regard.

306. As a direct result of the misrepresentations and false statements set forth above, the Plaintiffs have lost large sums of money invested into said corporation as the corporation has once been placed into involuntary bankruptcy by the Defendant, Brian Flanagan, and on information and belief is essentially insolvent.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment against the Defendant in an amount in excess of Four Million Dollars ($4,000,000.00), or in the alternative, rescind their purchase of the Xentex securities, award Plaintiffs the costs incurred in this suit and enter any further relief this Court deems fair and just.

## COUNT XVIII
(Violation Of The Exchange Act By Brian Flanagan – Initial Stock Purchase)

307. Plaintiffs reallege, reassert and incorporate paragraphs 1-306 above as if fully set forth herein.

308. The Xentex stock sold to Plaintiffs in November 2000 is a "security" within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10) and the purchase of said stock was a public offering.

309. Brian Flanagan was a controlling person for purposes of said statute pursuant to the reasons set forth in count XVII of this complaint.

310. In an effort to induce the Plaintiffs to invest in Xentex in November 2000, the Defendant rendered the misrepresentations set forth in Count XVII of this Complaint.

311. In an effort to induce the Plaintiffs to invest in Xentex at said time, the Defendant used deceptive and manipulative devices, including tendering said Information Sheet which contained the material misrepresentations set forth above.

58

312. In reasonable reliance on the Defendant's misrepresentations set forth in Count XVII of said complaint, the Plaintiffs did invest large sums of money in Xentex and purchase stock in said company.

313. As a direct result of said misrepresentations, the Plaintiffs have sustained damages in that they have lost the funds they invested into Xentex given that that Xentex is essentially insolvent and unable to produce computers. The Plaintiffs have sustained damages in excess of Four Million Dollars ($4,000,000.00) as a result of said misrepresentations.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against the Defendant in excess of Four Million Dollars ($4,000,000.00), or alternatively, for an Order rescinding their purchase of the Xentex securities, their costs and for any other relief this Court deems fair and just.

## COUNT XIX
(Violation Of The Exchange Act Against Brian Flanagan – Promissory Note)

314. Plaintiffs reallege, reaffirm and incorporate paragraphs 1-313 as if fully set fort herein.

315. On June 4, 2001, Plaintiffs tendered Xentex Six Hundred Fifty Thousand Dollars ($650,000.00) in exchange for a promissory note and stock in Xentex.

316. The promissory note is a "security" within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

317. Brian Flanagan was a controlling person for purposes of this statute pursuant to the reasons set forth in Count XVII of this Complaint.

318. Shortly prior to the time period by which the Plaintiffs were induced to tender funds pursuant to said promissory note, Matheiu Reyna and Todd Copeland, principals of the Plaintiff, had a telephone conversation with Brian Flanagan.

319. In said conversation, Mr. Reyna and Mr. Copeland discussed the condition of Xentex with Brian Flanagan in an effort to ascertain whether they should invest said Six Hundred Fifty Thousand Dollars ($650,000.00) in the company.

320. In said conversation, Brian Flanagan advised Mr. Reyna and Mr. Copeland that Xentex management was stable and effective, production of the Voyager computers were on schedule, the company was not under funded and he did not know the reason that the CEO of the company had quit.

321. Brian Flanagan attended Board meetings, had frequent conversations with the former CEO of Xentex, Joe Negler, reviewed documentation and otherwise knew that the above-referenced statements and/or omissions were false and misleading.

322. The Defendant made said misrepresentations for the purpose of inducing the Plaintiffs to invest additional funds in Xentex. The Defendant was holding a promissory note for a large sum of money which he knew that Xentex was unable to pay should he call it. Accordingly, Defendant rendered said misrepresentations so that when he called his note, there would be money by which his debt, earning 20% interest, could be satisfied.

323. The Plaintiffs reasonably relied on Defendant's misrepresentations and tendered said money to the company in exchange for said promissory note.

324. In violation of the Exchange Act, Xentex used manipulative and deceptive devices in connection with the sale of the Xentex securities to Plaintiffs.

325. The Defendant did in fact call his note and forced Xentex into bankruptcy. Plaintiffs have been damaged in that the company is insolvent, unable to manufacture computers and without funding. The Plaintiffs have lost the value of their investment.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in favor of the Plaintiffs and against the Defendant in a sum in excess of Four Million Dollars ($4,000,000.00), or in the alternative, rescind their purchase of the Xentex securities, their costs incurred in this matter and for any further relief this Court deems fair and just.

## COUNT XX
(Violation of the Virginia Securities Code By Brian Flanagan – Initial Stock Purchase)

326. Plaintiffs reallege, reassert and incorporate paragraphs 1-325 above as if fully set forth herein.

327. The Xentex stock sold to Plaintiffs on November 15, 2000 is a "security" as that term is defined by Virginia Code Ann. § 13.1-501. The sale of said stock was a public offering.

328. The securities were sold to Plaintiffs in Virginia.

329. At all time periods relevant to this Complaint, Flanagan was a "controlling person" within the meaning of § 13.1-522(C) of the Virginia Securities Act, and is therefore "jointly and severally" liable for the conduct alleged in this Complaint.

330. The Defendant, by reason of his position on the board of directors, had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

331. The Defendant attended management and Board of Director meetings wherein he had the opportunity to, and did address, the Board of Directors regarding the monetary and management conditions at Xentex. The Defendant had continuous access to the books and records of said corporation, including those books and records provided to the Plaintiffs. The Defendant was a controlling person for the purpose for the frauds set forth herein.

61

332. The Defendant, while he was on the Xentex Board of Directors, had an absolute right to call on his note for any reason whatsoever. Xentex did not have the funds to pay of said note as is evidenced by its willingness to pay twenty percent interest on said note in lieu of making payment. Brian Flanagan was therefore a controlling person under said statute by his absolute right to call his note due for any reason and the Defendant exercised said control over the decisions of the Board of Directors.

333. As a controlling person, who is jointly and severally liable for the actions of the other members of the board of directors and officers of Xentex, Flanagan is liable for the other actions complained of in this Complaint.

334. The Defendant, Brian Flanagan, made, contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations that induced them to invest and purchase shares in Xentex. The Defendant knew that the representations set forth herein were false and intended for the Plaintiffs to rely on said statements and invest in the corporation.

335. In reliance on the above-referenced misrepresentations in said information sheet, the Plaintiffs purchased stock in Xentex and invested large sums of money in that regard.

336. As a direct result of the material misrepresentations and false statements set forth above, the Plaintiffs have lost large sums of money invested into said corporation as the corporation has been placed into involuntary bankruptcy by the Defendant, Brian Flanagan, and on information and belief, is essentially insolvent.

337. In violation of the Virginia Securities Act, Flanagan obtained money from Plaintiffs by means of using an untrue statement of material fact or omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

WHEREFORE, the Plaintiffs respectfully request that this Honorable court enter judgment in their favor in a sum in excess of Four Million Dollars ($4,000,000.00), plus interest, costs and reasonable attorney fees pursuant to Virginia Code § 13.1-522(A).

COUNT XXI
(Violation of the Virginia Securities Code By Brian Flanagan – Promissory Note)

338.    Plaintiffs reallege, reassert and incorporate paragraphs 1-337 above as if fully set forth herein.

339.    On June 4, 2001, the Plaintiffs, loaned Xentex Six Hundred Fifty Thousand Dollars ($650,000.00) in consideration for a promissory note that provided for interest on said note and additional stock in Xentex.

340.    That promissory note is a "security" as that term is defined by Virginia Code Ann. § 13.1-501. The sale of said stock was a public offering.

341.    The securities were sold to Plaintiffs in Virginia.

342.    At all time periods relevant to this Complaint, Flanagan was a "controlling person" within the meaning of § 13.1-522(C) of the Virginia Securities Act, and is therefore "jointly and severally" liable for the conduct alleged in this Complaint.

343.    The Defendant, by reason of his position on the board of directors, had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

344.    The Defendant attended management and Board of Director meetings wherein he had the opportunity to, and did address, the Board of Directors regarding the monetary and management conditions at Xentex.  The Defendant had continuous access to the books and

63

records of said corporation, including those books and records provided to the Plaintiffs. The Defendant was a controlling person for the purpose for the frauds set forth herein.

345. The Defendant, while he was on the Xentex Board of Directors, had an absolute right to call on his note for any reason whatsoever. Xentex did not have the funds to pay said note, as is evidenced by its willingness to pay twenty percent interest on said note in lieu of making payment. Brian Flanagan was therefore a controlling person under said statute by his absolute right to call his note due for any reason and the Defendant exercised control over the decisions of the Board of Directors.

346. In connection with the execution of said promissory note, Flanagan, through the agents of Xentex, advised the Plaintiffs that Xentex was financially sound and that the company was in the position to mass-produce Voyagers at that time.

347. As a controlling person, who is jointly and severally liable for the actions of the other members of the board of directors and officers of Xentex, Flanagan is liable for the other actions complained of in this Complaint.

348. Shortly prior to the time period by which the Plaintiffs were induced to tender funds pursuant to said promissory note, Matheiu Reyna and Todd Copeland, principals of the Plaintiffs, had a telephone conversation with Brian Flanagan.

349. In said conversation, Mr. Reyna and Mr. Copeland discussed the condition of Xentex with Brian Flanagan in an effort to ascertain whether they should invest said $650,000.00 in the company.

350. In said conversation, Brian Flanagan advised Mr. Reyna and Mr. Copeland that Xentex management was stable and effective, production of the Voyager computers were on

schedule, the company was not under funded and he did not know the reason that the CEO of the company had quit.

351. In an effort to induce the Plaintiffs to execute said promissory note, Mr. Flanagan advised the Plaintiff that the company was not financially challenged and that there were no engineering, mechanical or management problems associated with Xentex.

352. Xentex was not financially sound at the time it solicited said promissory note and the company has never been in a position to mass-produce Voyagers.

353. The representation, through Brian Flanagan, that Xentex was not financially challenged and that there were no engineering, mechanical or management problems with Xentex was a misrepresentation of material fact.

354. The misrepresentations contained set forth and throughout the Complaint, were material to the Plaintiffs, and were made for the purpose of inducing the Plaintiffs to execute said promissory note and tender Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex.

355. These false and misleading statements were made, although known to be false, untrue and misleading. As the Defendant had misappropriated and squandered money invested by previous investors, the agents of Xentex rendered said representations because of the extreme financial difficulties the company faced and to allow the Board members to continue to loot the entity.

356. In reasonable reliance on the misrepresentations set forth above, and other misrepresentations set forth by Xentex Board members, agents and employees, the Plaintiffs tendered Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex in consideration for said promissory note.

357. As a result of the misrepresentations and untrue statements set forth above, the Plaintiffs sustained actual damages in excess of Six Hundred Fifty Thousand Dollars ($650,000.00) as Xentex is currently in default on said loan.

358. The Plaintiffs reasonably relied on the misrepresentations referenced herein in deciding to give Xentex the promissory note at issue.

359. As a result of the misrepresentations and untrue statements referenced herein, the Plaintiffs suffered damages in excess of Four Million Dollars ($4,000,000.00).

WHEREFORE, the Plaintiffs respectfully request that this Honorable court enter judgment in their favor a sum in excess of Four Million Dollars ($4,000,000.00), plus interest, costs and reasonable attorney fees pursuant to Virginia Code § 13.1-522(A).

## COUNT XXII
(Breach of Fiduciary Duty By Brian Flanagan)

360. Plaintiffs reallege, reassert and incorporate paragraphs 1-359 above as if fully set forth herein.

361. The Defendant, Brian Flanagan, by virtue of his position on the Board of Directors of Xentex, owed a fiduciary duty to act honestly, loyally and in good faith and fairness toward the Plaintiffs.

362. In September of 2000, the Defendant took part in the preparation of an "Information Sheet" which stated that Xentex owned Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling and Five Million Three Hundred Thousand Dollars ($5,300,000.00) in total assets.

363. In November of 2000, in an effort to induce the Plaintiffs to invest money and purchase stock in Xentex, the Defendant allowed for the tender of said Information Sheet to the Plaintiffs although the Defendant knew or should have known that Xentex did not own Four

66

Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling and the corporation's assets were overstated therein.

364.    In said Information Sheet, there were numerous misrepresentations regarding the tooling owned by Xentex and drastically overstated the company's assets.

365.    This Information Sheet stated in part that:

a.    Xentex had Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets, including Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling;

b.    KDS agreed to provide Xentex a service depot warranty and repair services for Xentex.

c.    That Xentex was in the present condition to begin shipping Voyagers in the first quarter of 2001.

d.    That Xentex was in a position whereby it expected to initiate a public offering in September 2001.

e.    KDS agreed to pay for all remaining product development and tooling costs associated with the Voyager computer.

366.    Brian Flanagan failed to act honestly, loyally and in good faith and fairness toward the Plaintiffs, as the above-referenced statements contained within said Information Sheet were false and misleading in that Xentex did not have Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets and Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling, KDS did not agree to provide a service depot for warranty and repair services, Xentex was not presently in a position whereby it was conceivable that that it could begin shipping Voyagers in the first quarter of 2001, Xentex was not in a position whereby it

67

could initiate a public offering in September 2001 and KDS had not agreed to pay the remaining product development and tooling costs associated with the Voyager computer.

367. The Defendant, Brian Flanagan, played a role in the preparation of said Information Sheet and/or had reviewed said Information Sheet in his capacity as a member of the Xentex Board of Directors with a substantial financial interest in said corporation.

368. The Defendant, Brian Flanagan, failed to act honestly, loyally and in good faith and fairness toward the Plaintiffs when he made, contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations that induced them to invest and purchase shares in Xentex. The Defendant knew that the representations set forth herein were false and intended for the Plaintiffs to rely on said statements and invest in the corporation.

369. Shortly prior to the time period by which the Plaintiffs were induced to tender funds pursuant to said promissory note, Mathieu Reyna and Todd Copeland, principals of the Plaintiff, had a telephone conversation with Brian Flanagan.

370. In said conversation, Mr. Reyna and Mr. Copeland discussed the condition of Xentex with Brian Flanagan in an effort to ascertain whether they should invest said $650,000.00 in the company.

371. In said conversation, Brian Flanagan advised Mr. Reyna and Mr. Copeland that Xentex management was stable and effective, production of the Voyager computers were on schedule, the company was not under funded and he did not know the reason that the CEO of the company had quit.

372. In said conversation, Brian Flanagan failed to disclose the fact that Xentex was drastically under funded, was incapable of producing Voyager computers, was the subject of

several law suits for failure to pay its bills and that the management of Xentex was such that the Defendant himself would not invest his stock options until Xentex "gets their act together."

373.    Brian Flanagan attended Board meetings, had frequent conversations with the former CEO of Xentex, Joe Negler, reviewed documentation and otherwise knew that the above-referenced statements and/or omissions were false and misleading.

374.    The Defendant made said misrepresentations for the purpose of inducing the Plaintiffs to invest additional funds in Xentex. The Defendant was holding a promissory note for a large sum of money which he knew that Xentex was unable to pay should his note be called. Accordingly, the Defendant rendered said misrepresentations so that when he called his note, there would be money by which his debt, earning 20% interest, could be satisfied.

375.    The Defendant did in fact call his note and forced Xentex into bankruptcy.

376.    The Defendant, Brian Flanagan, failed to act honestly, loyally and in good faith and fairness toward the Plaintiffs by not calling on his note for a year and half while he was on the board, and thereby collecting a large amount of interest.

377.    The Defendant, Brian Flanagan, failed to act honestly, loyally and in good faith and fairness toward the Plaintiffs by not informing the Plaintiffs of the financial problems that Xentex was in prior to their promissory note, and actively misrepresented that Xentex was not in financial difficulty.

378.    Brian Flanagan's, breach of fiduciary duty caused the Plaintiffs substantial damages in that it invested money into the company as a potential shareholder and investor, continued to invest additional funds and purchase shares of Xentex after Plaintiffs initial investment and tendered money pursuant to said promissory note. Plaintiffs have been further

69

damaged in that the company is insolvent, unable to manufacture computers and without funding. The Plaintiffs have lost the value of said investment.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in their favor in an amount in excess of Four Million Dollars ($4,000.000.00) plus costs and any further relief this Court deems fair and just.

COUNT XXIII<br>(Common Law Fraud By Brian Flanagan)

379. Plaintiffs reallege, reaffirm and incorporate paragraphs 1- 378 above as if fully set forth herein.

380. In September of 2000, the Defendant took part in the preparation of an "Information Sheet" which stated that Xentex owned Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling and Five Million Three Hundred Thousand Dollars ($5,300,000.00) in total assets.

381. In November of 2000, in an effort to induce the Plaintiffs to invest money and purchase stock in Xentex, the Defendant allowed for the tender of said Information Sheet to the Plaintiffs although the Defendant knew or should have known that Xentex did not own 4 Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling and the corporations' assets were overstated therein.

382. In said Information Sheet, there were numerous misrepresentations regarding the tooling owned by Xentex and drastically overstated the companies assets.

383. This Information Sheet stated in part that:

a. Xentex had Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets, including Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling;

70

b.   KDS agreed to provide Xentex a service depot warranty and repair services for Xentex.

c.   That Xentex was in the present condition to begin shipping Voyagers in the first quarter of 2001.

d.   That Xentex was in a position whereby it expected to initiate a public offering in September 2001.

e.   KDS agreed to pay for all remaining product development and tooling costs associated with the Voyager computer.

384.   The above-referenced statements contained within said Information Sheet were false and misleading in that Xentex did not have Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets and Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling, KDS did not agree to provide a service depot for warranty and repair services, Xentex was not presently in a position whereby it was conceivable that that it could begin shipping Voyagers in the first quarter of 2001, Xentex was not in a position whereby it could initiate a public offering in September 2001 and KDS had not agreed to pay the remaining product development and tooling costs associated with the Voyager computer.

385.   The Defendant, Brian Flanagan, played a role in the preparation of said Information Sheet and/or had reviewed said Information Sheet in his capacity as a member of the Xentex Board of Directors with a substantial financial interest in said corporation.

386.   The Defendant, Brian Flanagan, contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations which induced them to invest and purchase shares in Xentex. The Defendant knew that the representations set forth herein were false and intended the Plaintiffs to rely on said statements and invest in the corporation.

71

387. Shortly prior to the time period by which the Plaintiffs were induced to tender funds pursuant to said promissory note, Mathieu Reyna and Todd Copeland, principals of the Plaintiffs, had a telephone conversation with Brian Flanagan.

388. In said conversation, Mr. Reyna and Mr. Copeland discussed the condition of Xentex with Brian Flanagan in an effort to ascertain whether they should invest said Six Hundred Fifty Thousand Dollars ($650,000.00) in the company.

389. In said conversation, Brian Flanagan advised Mr. Reyna and Mr. Copeland that Xentex management was stable and effective, production of the Voyager computers were on schedule, the company was not under funded and he did not know the reason that the CEO of the company had quit.

390. In said conversation, Brian Flanagan failed to disclose the fact that Xentex was drastically under funded, was incapable of producing Voyager computers, was the subject of several law suits for failure to pay its bills and that the management of Xentex was such that the Defendant himself would not invest his stock options until Xentex "gets their act together."

391. Brian Flanagan attended Board meetings, had frequent conversations with the former CEO of Xentex, Joe Negler, reviewed documentation and otherwise knew that the above-referenced statements and/or omissions were false and misleading.

392. The Defendant made said misrepresentations for the purpose of inducing the Plaintiffs to invest additional funds in Xentex. The Defendant was holding a promissory note for a large sum of money that he knew that Xentex was unable to pay should his note be called. Accordingly, Defendant rendered said misrepresentations so that when he called his note, there would be money by which his debt, earning 20% interest, could be satisfied.

393. The Defendant did in fact call his note and forced Xentex into bankruptcy.

394.    The Defendant, Brian Flanagan, contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations prior to the promissory note by not informing the Plaintiffs of the financial problems that Xentex was in and/or actively misrepresented that Xentex was not having financial difficulties.

395.    The Defendant's misrepresentations were material and the Plaintiffs relied on same in deciding to purchase stock and invest large sums of money into Xentex. In reliance on the above-referenced misrepresentations of the Defendant, the Plaintiffs purchased stock and invested in excess of Three Million Three Hundred Thousand Dollars ($3,300,000.00) into said entity.

396.    The Defendant, Brian Flanagan, affirmatively knew that the above-referenced statements contained within said financial statements and the oral statements to Plaintiffs were false and Defendant rendered those statements consciously and recklessly.

397.    Plaintiffs were unaware of the untrue nature of the representations made by Mr. Flanagan and were further unaware of Defendant's deliberate omissions with regard to the above-referenced matters. The Plaintiffs could not have become aware of these misrepresentations and omissions in the exercise of reasonable care.

398.    As a result of the fraud by the Defendant, Brian Flanagan, the Plaintiffs have suffered substantial damages in that they invested money into the company as potential shareholders and investors, continued to invest additional funds and purchase shares of Xentex after Plaintiffs initial investment and tendered money pursuant to said promissory note. Plaintiffs have been further damaged in that the company is insolvent, unable to manufacture computers and without funding. The Plaintiffs have lost the value of said investment.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in their favor in an amount in excess of Four Million Dollars ($4,000,000.00), plus punitive damages, costs and any further relief this Court deems fair and just.

## COUNT XXIV
(Violation of the Securities Act by Wan Hee Kim-Initial Stock Purchase)

399.   Plaintiffs reallege, reassert and incorporate paragraphs 1-398 above as if fully set forth herein.

400.   The Defendant, by reason of his position on the Board of Directors, and on the Executive Committee of Xentex, exercised control over the corporation's money, including but not limited to, payment of expenses and salaries. The Defendant had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

401.   The Defendant attended management and Board of Director meetings wherein he had the opportunity to, and did address, the Board of Directors regarding the monetary conditions at Xentex. The Defendant had continuous access to the books and records of said corporation, including those books and records provided to the Plaintiffs. The Defendant was a controlling person for the purpose of the frauds set forth herein.

402.   Dr. Kim was also a controlling person as he was the conduit for Xentex's dealings with KDS, and as he had stated, without him, Xentex would not have any relationship with their largest manufacturer.

403.   Dr. Kim had knowledge of said mismanagement through a correspondence he tendered to Mr. Tucker and Mr. Batio on March 16, 2000.

404.   Dr. Kim knew that there was mismanagement, and that there was a possibility that the computers would not be done in time, prior to the Plaintiffs' decision to invest in Xentex, by

74

way of being carbon copied on a correspondence from Mr. Tucker to Jung Koh, the President of KDS.

405. In November 2000, Xentex, through its Board of Directors and corporate Officers tendered an Information Statement to the Plaintiffs that contained numerous misrepresentations of fact.

406. This Information Sheet stated in part that:

a. Xentex had Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets, including Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling;

b. KDS agreed to provide Xentex a service depot warranty and repair services for Xentex.

c. That Xentex was in the present condition to begin shipping Voyagers in the first quarter of 2001.

d. That Xentex was in a position whereby it expected to initiate a public offering in September 2001.

e. KDS agreed to pay for all remaining product development and tooling costs associated with the Voyager computer.

407. That above-referenced statements contained within said Information Sheet were false and misleading in that Xentex did not have Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets and Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling, KDS did not agree to provide a service depot for warranty and repair services, Xentex was not presently in a position whereby it was conceivable that that it could begin shipping Voyagers in the first quarter of 2001, Xentex was not in a position whereby it

75

could initiate a public offering in September 2001 and KDS had not agreed to pay the remaining product development and tooling costs associated with the Voyager computer.

408. The Defendant, Dr. Kim, played a role in the preparation of said Information Sheet and/or had reviewed said Information Sheet in his capacity as a member of the Xentex Board of Directors with a substantial financial interest in said corporation.

409. Dr. Kim attended Board meetings, had frequent conversations with the reviewed documentation and otherwise knew that the above-referenced statements and/or omissions were false and misleading.

410. The Defendant, Dr. Kim, made, contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations that induced them to invest and purchase shares in Xentex. The Defendant knew that the representations set forth herein were false and intended for the Plaintiffs to rely on said statements and invest in the corporation.

411. In reliance on the above-referenced misrepresentations in said Information Sheet, the Plaintiffs purchased stock in Xentex and invested in large sums of money in that regard.

412. As a direct result of the misrepresentations and false statements set forth above, the Plaintiffs have lost large sums of money invested into said corporation because the corporation, on information and belief, is essentially insolvent.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment against the Defendant in an amount in excess of Four Million Dollars ($4,000,000.00), or alternative, rescind their purchase of the Xentex securities, award Plaintiffs the costs incurred in this suit and enter any further relief this Court deems fair and just.

### COUNT XXV
(Violation of the Exchange Act by Wan Hee Kim-Initial Stock Purchase)

413.     Plaintiffs reallege, reassert and incorporate paragraphs 1-412 above as if fully set forth herein.

414.     The Xentex stock sold to Plaintiffs in November 2000 is a "security" within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10) and the purchase of said stock was a public offering.

415.     The Defendant, by reason of his position on the Board of Directors, and on the Executive Committee of Xentex, exercised control over the corporation's money, including but not limited, payment of expenses and salaries.  The Defendant had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

416.     The Defendant attended management and Board of Director meetings wherein he had the opportunity to, and did address, the Board of Directors regarding the monetary conditions at Xentex.  The Defendant had continuous access to the books and records of said corporation, including those books and records provided to the Plaintiffs.  The Defendant was a controlling person for the purpose of the frauds set forth herein.

417.     Dr. Kim was also a controlling person as he was the conduit for Xentex's dealings with KDS, and as he has stated, without him, Xentex would not have any relationship with their largest manufacturer.

418.     Prior to the Plaintiffs' decision to invest in Xentex, Dr. Kim knew that upper-level personnel at Xentex were involved in the mismanagement of the affairs of Xentex.

419.     Dr. Kim had knowledge of said mismanagement through a correspondence he tendered to Mr. Tucker and Mr. Batio on March 16, 2000.

420. Dr. Kim knew that there was mismanagement, and that there was a possibility that the computers would not be done in time, prior to the Plaintiffs' decision to invest in Xentex, by way of being carbon copied on a correspondence from Mr. Tucker to Jung Koh, the President of KDS.

421. In November 2000, Xentex, through its Board of Directors and corporate Officers tendered an Information Statement to the Plaintiffs that contained numerous misrepresentations of fact.

422. This Information Sheet stated in part that:

a. Xentex had Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets, including Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling;

b. KDS agreed to provide Xentex a service depot warranty and repair services for Xentex.

c. That Xentex was in the present condition to begin shipping Voyagers in the first quarter of 2001.

d. That Xentex was in a position whereby it expected to initiate a public offering in September 2001.

e. KDS agreed to pay for all remaining product development and tooling costs associated with the Voyager computer.

423. That above-referenced statements contained within said Information Sheet were false and misleading in that Xentex did not have Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets and Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling, KDS did not agree to provide a service depot for warranty and repair services, Xentex was not presently in a position whereby it was conceivable that that it could

78

begin shipping Voyagers in the first quarter of 2001, Xentex was not in a position whereby it could initiate a public offering in September 2001 and KDS had not agreed to pay the remaining product development and tooling costs associated with the Voyager computer.

424.   The Defendant, Dr. Kim, played a role in the preparation of said Information Sheet and/or had reviewed said Information Sheet in his capacity as a member of the Xentex Board of Directors with a substantial financial interest in said corporation.

425.   In early November, 2000, Dr. Kim had a conversation with the Plaintiffs, Mr. Reyna and Mr. Copeland, as they came to California to tour the Mission Court Property.

426.   In said conversation, Dr. Kim failed to disclose the fact that Xentex was drastically under funded, was incapable of producing Voyager computers and was the subject of several lawsuits for failure to pay its bills.

427.   Dr. Kim attended Board meetings, had frequent conversations with the reviewed documentation and otherwise knew that the above-referenced statements and/or omissions were false and misleading.

428.   The Defendant, Dr. Kim, made, contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations that induced them to invest and purchase shares in Xentex. The Defendant knew that the representations set forth herein were false and intended for the Plaintiffs to rely on said statements and invest in the corporation.

429.   In reliance on the above-referenced misrepresentations in said Information Sheet, the Plaintiffs purchased stock in Xentex and invested in large sums of money in that regard.

430.   The Plaintiffs reasonably relied on Defendant's misrepresentations and tendered said money to the company in exchange for said stock.

431.     In violation of the Exchange Act, Kim used manipulative and deceptive devices in connection with the sale of the Xentex securities to Plaintiffs.

432.     As a direct result of the misrepresentations and false statements set forth above, the Plaintiffs have lost large sums of money invested into said corporation because the corporation, on information and belief, is essentially insolvent.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment against the Defendant in an amount in excess of Four Million Dollars ($4,000,000.00), or alternative, rescind their purchase of the Xentex securities, award Plaintiffs the costs incurred in this suit and enter any further relief this Court deems fair and just.

COUNT XXVI
(Violation of the Exchange Act by Wan Hee Kim-Promissory Note)

433.     Plaintiffs reallege, reassert and incorporate paragraphs 1-432 above as if fully set forth herein.

434.     On June 4, 2001, the Plaintiffs tendered to Xentex Six Hundred Fifty Thousand Dollars ($650,000.00) in exchange for a promissory note and stock in Xentex.

435.     The promissory note is a "security" within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

436.     The Defendant, by reason of his position on the Board of Directors, and on the Executive Committee of Xentex, exercised control over the corporations money, including but not limited, payment of expenses and salaries. The Defendant had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

437.     The Defendant attended management and Board of Director meetings wherein he had the opportunity to, and did address, the Board of Directors regarding the monetary

80

conditions at Xentex. The Defendant had continuous access to the books and records of said corporation, including those books and records provided to the Plaintiffs. The Defendant was a controlling person for the purpose for the frauds set forth herein.

438. Dr. Kim was also a controlling person as he was the conduit for Xentex's dealings with KDS, and as he had stated, without him, Xentex would not have any relationship with their largest manufacturer.

439. Dr. Kim knew in March, 2001, prior to the time when Xentex gave the promissory note to the Plaintiffs, that there were serious problems with the manufacturing process of the Voyager computers.

440. In March, 2001, Dr. Kim, along with Mr. Tucker, flew to Korea to investigate the problems with Korea, and found that the design of the motherboard was holding up production of the computers.

441. In an effort to induce the Plaintiffs to execute said promissory note, Dr. Kim tendered to Mathieu Reyna, a principal of TMB, LLC and Premiere Capital Management, a March 21, 2001 production schedule which represented the companies present position and ability to mass produce Voyager computers, stated that Voyager computers would start to be produced in October, 2001.

442. On May 29, 2001, prior to TMB, LLC giving Xentex the promissory note, Dr. Kim attended a Board of Directors Meeting.

443. At said Board Meeting, Dr. Kim was present as lawsuits pending in California and in Illinois for failure to pay the bills of Xentex were discussed.

81

444. At no time prior to the TMB's investment in Xentex in May, 2001, did Dr. Kim disclose the fact that Xentex was drastically under funded, was incapable of producing Voyager computers and was the subject of several lawsuits for failure to pay its bills.

445. Dr. Kim attended Board meetings, had frequent conversations with Mr. Tucker and Mr. Batio, reviewed documentation and otherwise knew that the above-referenced statements and/or omissions were false and misleading.

446. The Defendant made said misrepresentations for the purpose of inducing the Plaintiffs to invest additional funds in Xentex.

447. In violation of the Exchange Act, Kim used manipulative and deceptive devices in connection with the sale of the Xentex securities to the Plaintiffs.

448. The Plaintiffs reasonably relied on the Defendant's misrepresentations and tendered said money to the company in exchange for said promissory note.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in favor of the Plaintiffs and against the Defendant in a sum in excess of Four Million Dollars ($4,000,000.00), or in the alternative, rescind their purchase of the Xentex securities, their costs incurred in this matter and for any further relief this Court deems fair and just.

## COUNT XXVII
(Violation of the Virginia Securities Code by Wan Hee Kim-Initial Stock Purchase)

449. The Plaintiffs reallege, reassert and incorporate paragraphs 1- 448 above as if fully set forth herein.

450. The Xentex stock sold to Plaintiffs on November 15, 2000 is a "security" as that term is defined by Virginia Code Ann. § 13.1-501. The sale of said stock was a public offering.

451. The securities were sold to Plaintiffs in Virginia.

452.    At all time periods relevant to this Complaint, Kim was a "controlling person" within the meaning of § 13.1-522(C) of the Virginia Securities Act, and is therefore "jointly and severally" liable for the conduct alleged in this Complaint.

453.    The Defendant, by reason of his position on the Board of Directors, and on the Executive Committee of Xentex, exercised control over the corporations money, including but not limited to, payment of expenses and salaries. The Defendant had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

454.    The Defendant attended management and Board of Director meetings wherein he had the opportunity to, and did address, the Board of Directors regarding the monetary and management conditions at Xentex. The Defendant had continuous access to the books and records of said corporation, including those books and records provided to the Plaintiffs. The Defendant was a controlling person for the purpose for the frauds set forth herein.

455.    Dr. Kim was also a controlling person as he was the conduit for Xentex's dealings with KDS, and as he has stated, without him, Xentex would not have any relationship with their largest manufacturer.

456.    The Defendant, by reason of his position on the Board of Directors, and on the Executive Committee, had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

457.    Dr. Kim knew that there was mismanagement, and that there was a possibility that the computers would not be done in time, prior to the Plaintiffs' decision to invest in Xentex, by

way of being carbon copied on a correspondence from Mr. Tucker to Jung Koh, the President of KDS.

458. As a controlling person, who is jointly and severally liable for the actions of the other members of the board of directors and officers of Xentex, Dr. Kim is liable for the other actions complained of in this Complaint.

459. The Defendant, Kim, made, contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations which induced them to invest and purchase shares in Xentex. The Defendant knew that the representations set forth herein were false and intended for the Plaintiffs to rely on said statements and invest in the corporation.

460. In reliance on the above-referenced misrepresentations in said Information Sheet, the Plaintiffs purchased stock in Xentex and invested in large sums of money in that regard.

461. As a direct result of the material misrepresentations and false statements set forth above, the Plaintiffs have lost large sums of money invested into said corporation as the corporation is essentially insolvent.

462. In violation of the Virginia Securities Act, Dr. Kim obtained money from Plaintiffs by means of using an untrue statement of material fact or omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

WHEREFORE, the Plaintiffs respectfully request that this Honorable court enter judgment in their favor in a sum in excess of Four Million Dollars ($4,000,000.00), plus interest, costs and reasonable attorney fees pursuant to Virginia Code § 13.1-522(A).

### COUNT XXVIII
(Violation of the Virginia Securities Code by Wan Hee Kim-Promissory Note)

463.	Plaintiffs reallege, reassert and incorporate paragraphs 1- 462 above as if fully set forth herein.

464.	On June 4, 2001, the Plaintiffs loaned Xentex Six Hundred Fifty Thousand Dollars ($650,000.00) in consideration for a promissory note which provided the Plaintiffs with interest on said note and additional stock in said company.

465.	That promissory note is a "security" as that term is defined by Virginia Code Ann. § 13.1-501. The sale of said stock was a public offering.

466.	The securities were sold to Plaintiffs in Virginia.

467.	At all time periods relevant to this Complaint, Kim was a "controlling person" within the meaning of § 13.1-522(C) of the Virginia Securities Act, and is therefore "jointly and severally" liable for the conduct alleged in this Complaint.

468.	The Defendant, by reason of his position on the board of directors, had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

469.	The Defendant attended management and Board of Director meetings wherein he had the opportunity to, and did address, the Board of Directors regarding the monetary and management conditions at Xentex. The Defendant had continuous access to the books and records of said corporation, including those books and records provided to the Plaintiff. The Defendant was a controlling person for the purpose for the frauds set forth herein.

470.	Dr. Kim was also a controlling person as he was the conduit for Xentex's dealings with KDS, and as he has stated, without him, Xentex would not have any relationship with their largest manufacturer.

471.    As a controlling person, who is jointly and severally liable for the actions of the other members of the board of directors and officers of Xentex, Kim is liable for the other actions complained of in this Complaint.

472.    In connection with the execution of said promissory note, Dr. Kim, through the agents of Xentex, and himself, advised the Plaintiffs that Xentex was financially sound and that the company was in the position to mass-produce Voyagers at that time.

473.    In an effort to induce the Plaintiffs to execute said promissory note, Dr. Kim tendered to Mathieu Reyna, a principal of TMB and Premiere, a March 21, 2001 production schedule which represented the companies present position and ability to mass-produce Voyager computers.

474.    Xentex was not financially sound at the time it solicited said promissory note and the company has never been in a position to mass produce Voyagers.

475.    The production schedule tendered by Wan Hee Kim to Mathieu Reyna was false and did not accurately present Xentex ability at the time to mass-produce the Voyager computers.

476.    The representation that the Voyager computers were essentially complete and assembled in May 2001 was a false misrepresentation of material fact.

477.    The misrepresentations set forth above were made for the purpose of inducing the Plaintiffs to execute said promissory note and tender Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex.

478.    These false and misleading statements were made, although known to be false, untrue and misleading. As the Defendant had misappropriated and squandered money invested by previous investors, the agents of Xentex rendered said representations because of the extreme

86

financial difficulties the company faced and to allow the Board members to continue to loot the entity.

479. In reasonable reliance on the misrepresentations set forth above, and other misrepresentations set forth by Xentex Board members, agents and employees, the Plaintiffs tendered Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex in consideration for said promissory note.

480. As a result of the misrepresentations and untrue statements set forth above, the Plaintiffs sustained actual damages in excess of Six Hundred Fifty Thousand Dollars ($650,000.00) as Xentex is currently in default on said loan.

481. The Plaintiffs reasonably relied on the misrepresentations referenced herein in deciding to purchase stock in Xentex and invest in said company and did in fact purchase stock and invest in Xentex.

482. As a result of the misrepresentations and untrue statements referenced herein, the Plaintiffs suffered damages in excess of Four Million Dollars ($4,000,000.00).

WHEREFORE, the Plaintiffs respectfully request that this Honorable court enter judgment in their favor in a sum in excess of Four Million Dollars ($4,000,000.00), plus interest, costs and reasonable attorney fees pursuant to Virginia Code § 13.1-522(A).

<u>COUNT XXIX</u>
(Breach of Fiduciary Duty-Wan Hee Kim)

483. Plaintiffs reallege, reassert and incorporate paragraphs 1- 482 above as if fully set forth herein.

484. The Defendant, Wan Hee Kim, by virtue of his position on the Board of Directors of Xentex, owed a fiduciary duty to act honestly, loyally and in good faith and fairness toward the Plaintiffs.

485.    Dr. Kim knew that there was mismanagement, and that there was a possibility that the computers would not be done in time, prior to the Plaintiffs' decision to invest in Xentex, by way of being carbon copied on a correspondence from Mr. Tucker to Jung Koh, the President of KDS.

486.    In September of 2000, the Defendant took part in the preparation of an "Information Sheet" which stated that Xentex owned 4.25 million dollars in tooling and Five Million Three Hundred Thousand Dollars ($5,300,000.00) in total assets.

487.    In November of 2000, in an effort to induce the Plaintiffs to invest money and purchase stock in Xentex, the Defendant allowed for the tender of said Information Sheet to the Plaintiffs although the Defendant knew or should have known that Xentex did not own Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling and the corporation's assets were overstated therein.

488.    In said Information Sheet, there were numerous misrepresentations regarding the tooling owned by Xentex and drastically overstated the company's assets.

489.    This Information Sheet stated in part that:

a.    Xentex had Four Million Three Hundred Thousand Dollars ($4,300,000.00) in assets, including Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling;

b.    KDS agreed to provide Xentex a service depot warranty and repair services for Xentex.

c.    That Xentex was in the present condition to begin shipping Voyagers in the first quarter of 2001.

d.    That Xentex was in a position whereby it expected to initiate a public offering in September 2001.

e.     KDS agreed to pay for all remaining product development and tooling costs associated with the Voyager computer.

490.     Dr. Kim failed to act honestly, loyally and in good faith and fairness toward the Plaintiffs, as the above-referenced statements contained within said Information Sheet were false and misleading in that Xentex did not have Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets and Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling, KDS did not agree to provide a service depot for warranty and repair services, Xentex was not presently in a position whereby it was conceivable that that it could begin shipping Voyagers in the first quarter of 2001, Xentex was not in a position whereby it could initiate a public offering in September 2001 and KDS had not agreed to pay the remaining product development and tooling costs associated with the Voyager computer.

491.     The Defendant, played a role in the preparation of said Information Sheet and/or had reviewed said Information Sheet in his capacity as a member of the Xentex Board of Directors with a substantial financial interest in said corporation.

492.     The Defendant, failed to act honestly, loyally and in good faith and fairness toward the Plaintiffs when he made, contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations which induced them to invest and purchase shares in Xentex. The Defendant knew that the representations set forth herein were false and intended for the Plaintiffs to rely on said statements and invest in the corporation.

493.     Dr. Kim attended Board meetings, had frequent conversations with the Mr. Batio and Mr. Tucker, reviewed documentation and otherwise knew that the above-referenced statements and/or omissions were false and misleading.

494.     The Defendant made said misrepresentations for the purpose of inducing the Plaintiffs to invest additional funds in Xentex.

495.     The Defendant, Dr. Kim, failed to act honestly, loyally and in good faith and fairness toward the Plaintiffs by not informing the Plaintiffs of the financial problems that Xentex was in prior to their promissory note, and actively misrepresented that Xentex was not in financial difficulty.

496.     Dr. Kim's, breach of fiduciary duty caused the Plaintiffs substantial damages in that they invested money into the company as a potential shareholder and investor, continued to invest additional funds and purchase shares of Xentex after Plaintiffs' initial investment and tendered money pursuant to said promissory note. Plaintiffs have been further damaged in that the company is insolvent, unable to manufacture computers and without funding. The Plaintiffs have lost the value of said investment.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in their favor in an amount in excess of Four Million Dollars ($4,000.000.00) plus costs and any further relief this Court deems fair and just.

### COUNT XXX
(Common Law Fraud Against Wan Hee Kim)

497.     Plaintiffs reallege, reassert and incorporate paragraphs 1- 496 above as if fully set forth herein.

498.     In September of 2000, the Defendant took part in the preparation of an "Information Sheet" which stated that Xentex owned Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling and Five Million Three Hundred Thousand Dollars ($5,300,000.00) in total assets.

499. In November of 2000, in an effort to induce the Plaintiffs to invest money and purchase stock in Xentex, the Defendant allowed for the tender of said Information Sheet to the Plaintiffs, Mr. Reyna and Mr. Copeland, although the Defendant knew or should have known that Xentex did not own Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling and the corporations' assets were overstated therein.

500. In said Information Sheet, there were numerous misrepresentations regarding the tooling owned by Xentex and drastically overstated the company's assets.

501. This Information Sheet stated in part that:

a. Xentex had Four Million Three Hundred Thousand Dollars ($4,300,000.00) in assets, including Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling;

b. KDS agreed to provide Xentex a service depot warranty and repair services for Xentex.

c. That Xentex was in the present condition to begin shipping Voyagers in the first quarter of 2001.

d. That Xentex was in a position whereby it expected to initiate a public offering in September 2001.

e. KDS agreed to pay for all remaining product development and tooling costs associated with the Voyager computer.

502. The above-referenced statements contained within said Information Sheet were false and misleading in that Xentex did not have Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets and Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling, KDS did not agree to provide a service depot for warranty and repair services, Xentex was not presently in a position whereby it was conceivable that that it could

91

begin shipping Voyagers in the first quarter of 2001, Xentex was not in a position whereby it could initiate a public offering in September 2001 and KDS had not agreed to pay the remaining product development and tooling costs associated with the Voyager computer.

503. The Defendant, Dr. Kim, played a role in the preparation of said Information Sheet and/or had reviewed said Information Sheet in his capacity as a member of the Xentex Board of Directors with a substantial financial interest in said corporation.

504. The Defendant, Dr. Kim contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations which induced them to invest and purchase shares in Xentex. The Defendant knew that the representations set forth herein were false and intended for the Plaintiffs to rely on said statements and invest in the corporation.

505. Dr. Kim knew in March, 2001, prior to the time in which TMB, LLC. gave Xentex the promissory note, that there were serious problems with the manufacturing process of the Voyager computers.

506. In March, 2001, Dr. Kim, along with Mr. Tucker, flew to Korea to investigate the problems with Korea, and found that the design of the motherboard was holding up production of the computers.

507. In an effort to induce the Plaintiffs to execute said promissory note, Dr. Kim tendered to Mathieu Reyna, a principal of TMB, LLC and Premiere Capital Management, a March 21, 2001 production schedule which represented the companies present position and ability to mass produce Voyager computers, which stated that Voyager computers would start to be produced in October, 2001.

508. On May 29, 2001, prior to Xentex giving TMB, LLC the promissory note, Dr. Kim attended a Board of Directors Meeting.

509. At said Board Meeting, Dr. Kim was present as lawsuits pending in California and in Illinois for a failure to pay the bills of Xentex were discussed.

510. At no time prior to the TMB's investment in Xentex in May, 2001, did Dr. Kim disclose the fact that Xentex was drastically under funded, was incapable of producing Voyager computers and was the subject of several lawsuits for failure to pay its bills.

511. Dr. Kim attended Board meetings, had frequent conversations with Mr. Tucker and Mr. Batio, reviewed documentation and otherwise knew that the above-referenced statements and/or omissions were false and misleading.

512. The Defendant made said misrepresentations for the purpose of inducing the Plaintiffs to invest additional funds in Xentex.

513. The Defendant, Dr. Kim, contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations prior to the promissory note by not informing the Plaintiffs of the financial problems that Xentex was in and/or actively misrepresented that Xentex was not having financial difficulties.

514. The Defendant's misrepresentations were material and the Plaintiffs relied on same in deciding to purchase stock and invest large sums of money into Xentex. In reliance on the above-referenced misrepresentations of the Defendant, the Plaintiffs purchased stock and invested in excess of Three Million Three Hundred Thousand Dollars ($3,300,000.00) into said entity.

515. The Defendant, Dr. Kim, affirmatively knew that the above-referenced statements contained within said financial statements and the oral statements to Plaintiffs were false and the Defendant rendered those statements consciously and recklessly.

516.   Plaintiffs were unaware of the untrue nature of the representations and made by Dr. Kim and were further unaware of Defendant's deliberate omissions with regard to the above-referenced matters. The Plaintiffs could not have become aware of these misrepresentations and omissions in the exercise of reasonable care.

517.   As a result of the fraud by the Defendant, the Plaintiffs have suffered substantial damages in that they invested money into the company as potential shareholders and investors, continued to invest additional funds and purchase shares of Xentex after the Plaintiffs initial investment and tendered money pursuant to said promissory note. Plaintiffs have been further damaged in that the company is insolvent, unable to manufacture computers and without funding. The Plaintiffs have lost the value of said investment.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter judgment in their favor in an amount in excess of Four Million Dollars ($4,000.000.00) plus punitive damages, costs and any further relief this Court deems fair and just.

## COUNT XXXI
(Violation of the Virginia Securities Code by Jung Koh-Initial Stock Purchase)

518.   Plaintiffs reallege, reassert and incorporate paragraphs 1- 517 above as if fully set forth herein.

519.   The Xentex stock sold to Plaintiffs on November 15, 2000 is a "security" as that term is defined by Virginia Code Ann. § 13.1-501. The sale of said stock was a public offering.

520.   The securities were sold to Plaintiffs in Virginia.

521.   At all time periods relevant to this Complaint, Jung Koh was a "controlling person" within the meaning of § 13.1-522(C) of the Virginia Securities Act, and is therefore "jointly and severally" liable for the conduct alleged in this Complaint.

94

522. The Defendant, by reason of his position on the Board of Directors of Xentex, had the ability to exercise control over the corporations money, including but not limited, payment of expenses and salaries. The Defendant had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

523. The Defendant, by reason of his position on the Board of Directors of Xentex had continuous access to the books and records of said corporation, including those books and records provided to the Plaintiffs. The Defendant was a controlling person for the purpose for the frauds set forth herein.

524. Mr. Koh was also a controlling person as he was a person occupying a similar status to Mr. Batio, Mr. Tucker, Dr. Kim, Mr. Flanagan and Mr. Cohen, as members of the Board of Directors.

525. As a controlling person, who is jointly and severally liable for the actions of the other members of the board of directors and officers of Xentex, MR. Koh is liable for the other actions complained of in this Complaint.

526. The Defendant, by reason of his position on the Board of Directors, had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

527. Mr. Koh knew that there was mismanagement, and that there was a possibility that the computers would not be done in time, prior to the Plaintiffs' decision to invest in Xentex, by way of a correspondence from Tucker to himself.

528.    In reliance on the misrepresentations in said Information Sheet referenced throughout this Complaint, the Plaintiffs purchased stock in Xentex and invested in large sums of money in that regard.

529.    As a direct result of the material misrepresentations and false statements set forth above, the Plaintiffs have lost large sums of money invested into said corporation as the corporation is essentially insolvent.

530.    In violation of the Virginia Securities Act, Dr. Koh, through the Board of Directors, obtained money from the Plaintiffs by means of using an untrue statement of material fact or omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

WHEREFORE, the Plaintiffs respectfully request that this Honorable court enter judgment in their favor in a sum in excess of Four Million Dollars ($4,000,000.00), plus interest, costs and reasonable attorney fees pursuant to Virginia Code § 13.1-522(A).

### COUNT XXXII
(Violation of the Virginia Securities Code by Jung Koh-Promissory Note)

531.    Plaintiffs reallege, reassert and incorporate paragraphs 1- 530 above as if fully set forth herein.

532.    On June 4, 2001, Plaintiffs loaned Xentex Six Hundred Fifty Thousand Dollars ($650,000.00) in consideration for a promissory note which provided the Plaintiffs interest on said note and additional stock in said company.

533.    That promissory note is a "security" as that term is defined by Virginia Code Ann. § 13.1-501. The sale of said stock was a public offering.

534.    The securities were sold to Plaintiffs in Virginia.

535. At all time periods relevant to this Complaint, Mr. Koh was a "controlling person" within the meaning of § 13.1-522(C) of the Virginia Securities Act, and is therefore "jointly and severally" liable for the conduct alleged in this Complaint.

536. The Defendant, by reason of his position on the board of directors, had continual access to and knowledge of Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

537. The Defendant had continuous access to the books and records of said corporation, including those books and records provided to the Plaintiffs. The Defendant was a controlling person for the purpose for the frauds set forth herein.

538. Mr. Koh was also a controlling person as he was a person occupying a similar status to Mr. Batio, Mr. Tucker, Mr. Kim, Mr. Flanagan and Mr. Cohen, as members of the Board of Directors.

539. Koh was also a controlling person, as he was also the President of KDS, the manufacturer for the Voyager computers, and he had the ability to impede or advance production of the computer.

540. As a controlling person, who is jointly and severally liable for the actions of the other members of the board of directors and officers of Xentex, Mr. Koh is liable for the other actions complained of in this Complaint.

541. In connection with the execution of said promissory note, Mr. Koh through the agents of Xentex, and himself, advised the Plaintiffs that Xentex was financially sound and that the company was in the position to mass-produce Voyagers at that time.

542.  Xentex was not financially sound at the time it solicited said promissory note and the company has never been in a position to mass produce Voyagers.

543.  The misrepresentations set forth and throughout the Complaint, were material to the Plaintiffs, and were made for the purpose of inducing the Plaintiffs to execute said promissory note and tender Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex.

544.  The misrepresentations set forth above were made for the purpose of inducing the Plaintiffs to execute said promissory note and tender Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex.

545.  Although known to be false, untrue and misleading, these false and misleading statements were made.  As the Defendant had misappropriated and squandered money that had been invested by previous investors, the agents of Xentex rendered said representations because of the extreme financial difficulties the company faced and to allow the Board members to continue to loot the entity.

546.  In reasonable reliance on the misrepresentations set forth above, and other misrepresentations set forth by Xentex Board members, agents and employees, the Plaintiffs tendered Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex in consideration for said promissory note.

547.  As a result of the misrepresentations and untrue statements set forth above, the Plaintiffs sustained actual damages in excess of Six Hundred Fifty Thousand Dollars ($650,000.00) as Xentex is currently in default on said loan.

548.  The Plaintiffs reasonably relied on the misrepresentations referenced herein in deciding to purchase stock in Xentex and invest in said company and did in fact purchase stock and invest in Xentex.

549.     As a result of the misrepresentations and untrue statements referenced herein, the Plaintiffs suffered damages in excess of Four Million Dollars ($4,000,000.00).

WHEREFORE, the Plaintiffs respectfully request that this Honorable court enter judgment in their favor in a sum in excess of Four Million Dollars ($4,000,000.00), plus interest, costs and reasonable attorney fees pursuant to Virginia Code § 13.1-522(A).

## COUNT XXXIII
(Violation of the Virginia Securities Code by Larry Cohen-Initial Stock Purchase)

550.     Plaintiffs reallege, reassert and incorporate paragraphs 1- 549 above as if fully set forth herein.

551.     The Xentex stock sold to Plaintiffs on November 15, 2000 is a "security" as that term is defined by Virginia Code Ann. § 13.1-501. The sale of said stock was a public offering.

552.     The securities were sold to Plaintiffs in Virginia.

553.     At all time periods relevant to this Complaint, Larry Cohen was a "controlling person" within the meaning of § 13.1-522(C) of the Virginia Securities Act, and is therefore "jointly and severally" liable for the conduct alleged in this Complaint.

554.     The Defendant, by reason of his position on the Board of Directors of Xentex, had the ability to exercise control over the corporation's money, including but not limited to, payment of expenses and salaries. The Defendant had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

555.     The Defendant attended management and Board of Director meetings wherein he had the opportunity to, and did address, the Board of Directors regarding the monetary conditions at Xentex. The Defendant, by reason of his position on the Board of Directors of Xentex had continuous access to the books and records of said corporation, including those

books and records provided to the Plaintiff. The Defendant was a controlling person for the purpose for the frauds set forth herein.

556.    Mr. Cohen was also a controlling person as he was a person occupying a similar status to Mr. Batio, Mr. Tucker, Dr. Kim, Mr. Flanagan and Mr. Koh, as members of the Board of Directors.

557.    As a controlling person, who is jointly and severally liable for the actions of the other members of the board of directors and officers of Xentex, Mr. Cohen is liable for the other actions complained of in this Complaint.

558.    The Defendant, by reason of his position on the Board of Directors, had continual access to, and knowledge of, Xentex's private corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.

559.    In November 2000, Xentex, through its Board of Directors and corporate Officers tendered an Information Statement to the Plaintiffs which contained numerous misrepresentations of fact.

560.    This Information Sheet stated in part that:

a.      Xentex had Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets, including Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling;

b.      KDS agreed to provide Xentex a service depot warranty and repair services for Xentex.

c.      That Xentex was in the present condition to begin shipping Voyagers in the first quarter of 2001.

d.     That Xentex was in a position whereby it expected to initiate a public offering in September 2001.

e.     KDS agreed to pay for all remaining product development and tooling costs associated with the Voyager computer.

561.   The above-referenced statements contained within said Information Sheet were false and misleading in that Xentex did not have Five Million Three Hundred Thousand Dollars ($5,300,000.00) in assets and Four Million Two Hundred Fifty Thousand Dollars ($4,250,000.00) in tooling, KDS did not agree to provide a service depot for warranty and repair services, Xentex was not presently in a position whereby it was conceivable that that it could begin shipping Voyagers in the first quarter of 2001, Xentex was not in a position whereby it could initiate a public offering in September 2001 and KDS had not agreed to pay the remaining product development and tooling costs associated with the Voyager computer.

562.   The Defendant, Mr. Cohen, through the other members of the Board of Directors, prepared said Information Sheet and/or had reviewed said Information Sheet in his capacity as a member of the Xentex Board of Directors with a substantial financial interest in said corporation.

563.   The Defendant, Mr. Cohen, made, contributed to and/or failed to disclose to the Plaintiffs the material misrepresentations which induced them to invest and purchase shares in Xentex. The Defendant knew that the representations set forth herein were false and intended for the Plaintiffs to rely on said statements and invest in the corporation.

564.   In reliance on the above-referenced misrepresentations in said information sheet, the Plaintiffs purchased stock in Xentex and invested in large sums of money in that regard.

565.    As a direct result of the material misrepresentations and false statements set forth above, the Plaintiffs have lost large sums of money invested into said corporation as the corporation is essentially insolvent.

566.    In violation of the Virginia Securities Act, Mr. Cohen, through the Board of Directors, obtained money from Plaintiffs by means of using an untrue statement of material fact or omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

WHEREFORE, the Plaintiffs respectfully request that this Honorable court enter judgment in their favor a sum in excess of Four Million Dollars ($4,000,000.00), plus interest, costs and reasonable attorney fees pursuant to Virginia Code § 13.1-522(A).

## COUNT XXXIV
(Violation of the Virginia Securities Code by Larry Cohen-Promissory Note)

567.    Plaintiffs reallege, reassert and incorporate paragraphs 1- 566 above as if fully set forth herein.

568.    On June 4, 2001, Plaintiffs loaned Xentex Six Hundred Fifty Thousand Dollars ($650,000.00) in consideration for a promissory note which provided the Plaintiffs interest on said note and additional stock in said company.

569.    That promissory note is a "security" as that term is defined by Virginia Code Ann. § 13.1-501. The sale of said stock was a public offering.

570.    The securities were sold to Plaintiffs in Virginia.

571.    At all time periods relevant to this Complaint, Mr. Cohen was a "controlling person" within the meaning of § 13.1-522(C) of the Virginia Securities Act, and is therefore "jointly and severally" liable for the conduct alleged in this Complaint.

572.    The Defendant, by reason of his position on the board of directors, had continual access to and knowledge of Xentex's private, corporate and business information, including adverse non-public information concerning Xentex's services, financial condition and future prospects.   .

573.    The Defendant had continuous access to the books and records of said corporation, including those books and records provided to the Plaintiffs. The Defendant was a controlling person for the purpose for the frauds set forth herein.

574.    Mr. Cohen was also a controlling person as he was a person occupying a similar status to Mr. Batio, Mr. Tucker, Dr. Kim, Mr. Flanagan and Mr. Koh, as members of the Board of Directors.

575.    As a controlling person, who is jointly and severally liable for the actions of the other members of the board of directors and officers of Xentex, Mr. Cohen is liable for the other actions complained of in this Complaint.

576.    In connection with the execution of said promissory note, Cohen through the agents of Xentex, and himself, advised the Plaintiffs that Xentex was financially sound and that the company was in the position to mass-produce Voyagers at that time.

577.    Xentex was not financially sound at the time it solicited said promissory note and the company has never been in a position to mass produce Voyagers at that time.

578.    The misrepresentations contained set forth and throughout the Complaint, were material to the Plaintiffs, and were made for the purpose of inducing the Plaintiffs to execute said promissory note and tender Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex.

579. The misrepresentations set forth above were made for the purpose of inducing the Plaintiffs to execute said promissory note and tender Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex.

580. These false and misleading statements were made, although known to be false, untrue and misleading. As the Defendant had misappropriated and squandered money invested by previous investors, the agents of Xentex rendered said representations because of the extreme financial difficulties the company faced and to allow the Board members to continue to loot the entity.

581. In reasonable reliance on the misrepresentations set forth above, and other misrepresentations set forth by Xentex Board members, agents and employees, the Plaintiffs tendered Six Hundred Fifty Thousand Dollars ($650,000.00) to Xentex in consideration for said promissory note.

582. As a result of the misrepresentations and untrue statements set forth above, the Plaintiff sustained actual damages in excess of Six Hundred Fifty Thousand Dollars ($650,000.00) as Xentex is currently in default on said loan.

583. The Plaintiffs reasonably relied on the misrepresentations referenced herein in deciding to purchase stock in Xentex and invest in said company and did in fact purchase stock and invest in Xentex.

584. As a result of the misrepresentations and untrue statements referenced herein, the Plaintiffs suffered damages in excess of Four Million Dollars ($4,000,000.00).

WHEREFORE, the Plaintiffs respectfully request that this Honorable court enter judgment in their favor a sum in excess of Four Million Dollars ($4,000,000.00), plus interest, costs and reasonable attorney fees pursuant to Virginia Code § 13.1-522(A).

## COUNT XXXV
(Aiding and Abetting a Breach of Fiduciary Duty-Ron Falese)

585. Plaintiffs reallege, reassert and incorporate paragraphs 1- 584 above as if fully set forth herein.

586. On August 29, 2000, Mr. Falese sold One Million Five Hundred Thousand Dollars ($1,500,000) in furniture to Xentex and received Xentex stock in exchange for the sale.

587. Included in the sale of the furniture to Xentex was a security agreement in which Falese was to take a security interest in the furniture that was sold to Xentex.

588. Shortly before Xentex filed for bankruptcy in March, 2002, Mr. Falese, Mr. Batio and Xentex's attorney, Marvin Benn ("Mr. Benn") conversed regarding a method to cloud the title to the patents of Xentex, thereby rendering a judicial sale of the patents nearly impossible.

589. Mr. Benn, acting as an agent for Mr. Batio and Xentex, telephoned Mr. Falese and suggested that he convert his legitimate security interest in the furniture into an unauthorized security interest in the assets of Xentex.

590. At the time in which Mr. Falese, Mr. Batio and Mr. Benn conversed, it was known to all the aforementioned parties that Xentex was in financial distress and was unable to pay all of its bills as they were becoming due.

591. Days before Xentex filed for bankruptcy protection, Mr. Batio, with the knowledge and acquiescence of Mr. Benn, without the consent from the Xentex Board of Directors, and contrary to the written agreement between Mr. Falese and Xentex, replaced the stock provided to Mr. Falese with a security interest in the assets of Xentex, including the patents for the Voyager.

592.     Mr. Batio, as an officer and director of Xentex, owed a duty to the Plaintiffs, as shareholders and creditors of Xentex, to deal fairly, honestly, openly and with the utmost good faith.

593.     Mr. Falese knew that Mr. Batio was an officer and a director of Xentex, and that he had a duty to shareholders and creditors to deal fairly, honestly, openly and with the utmost good faith.

594.     The transfer of Xentex's assets to shareholder, Mr. Falese, without adequate consideration and without the knowledge of the Xentex Board of Directors was fraudulent as to Plaintiffs and other creditors.

595.     Mr. Falese knew, or should have known, that the actions of obtaining an unauthorized security interest in the assets of Xentex was fraudulent, as he was told by Mr. Benn, Xentex's attorney, that Xentex was about to file for bankruptcy protection.

596.     Mr. Falese aided and abetted Mr. Batio's failure to deal fairly, honestly, openly and with the utmost good faith towards Plaintiffs, who were shareholders and creditors of Xentex, when he took an unauthorized security interest in the assets of Xentex days before Xentex was to file for bankruptcy protection.

597.     As a result of this breach, Plaintiffs, who were shareholders of Xentex, suffered damages as the unauthorized security interest in the assets prevented Xentex from paying the subcontractors who were building the computer at issue, effectively obstructing the construction of said computer.

598.     As a result of this breach, Plaintiffs, who were shareholders of Xentex, suffered damages from the unauthorized security interest in the assets of Xentex which truncated the value of the shares owned by the Plaintiffs.

WHEREFORE, Plaintiffs respectfully pray for Judgment against Mr. Falesc, for their actual damages in an amount not less than Four Million Dollars ($4,000,000), plus their costs and filing fees incurred, and any other such relief that this Court deems warranted.

## COUNT XXXVI
(Violation of 735 ILCS 5/2-1402(f)(1)-Blair Robinson)

599. Plaintiffs reallege, reassert and incorporate paragraphs 1- 598 as if fully set forth herein.

600. On April 5, 2002, Plaintiffs, filed a motion for judgment in the State of Virginia, against Mr. Batio alleging various grievances regarding the Six Hundred Fifty Thousand Dollars ($650,000.00) promissory note.

601. On June 6, 2002, judgment was entered in the State of Virginia against Mr. Batio and in favor of the Plaintiffs in the amount of Seven Hundred Sixty-Six Thousand, Nine Hundred and Sixty Two Dollars ($766,962.00).

602. On June 28, 2002, one of Plaintiff's attorneys registered this judgment in the Circuit Court of Cook County, Municipal Department, First District.

603. On June 28, 2002, at 1:30 p.m., one of Plaintiffs' attorneys, through a special process server, served Northview with a Citation to Discover Assets to Third Party ("citation"). The citation was issued for all bank accounts belonging to Mr. Batio and any other accounts related to Mr. Batio at Northview.

604. Blair Robinson is the President of Northview.

605. The citation was also personally served upon Mr. Batio via first class mail.

606. The citation stated that Northview was "prohibited from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which he/she may be entitled or which may

107

be acquired by or become due to him/her, until further order of court or termination of the proceeding. You are not required to withhold the payment of any money beyond double the amount of the judgment."

607. The citation was served upon Anne F. Johnson, the Assistant Vice President of Northview. Service was effected at 1:30 p.m. by Barnett S. Kolton, a special process server.

608. The citation was subject to a Rider which provided the social security number for Mr. Batio as well as eight (8) account numbers. The Rider further stated that it related to "any other accounts relating to this Defendant."

609. Later that afternoon, on June 28, 2002, Mr. Reyna spoke with a representative of Northview who assured him that there were sufficient assets in Mr. Batio's accounts to satisfy the judgment and that all of Mr. Batio's accounts had been frozen pursuant to the citation.

610. In the morning of July 1, 2002, Mr. Reyna contacted Northview again and spoke with a representative who confirmed that the Mr. Batio's bank accounts were still frozen.

611. In the afternoon of July 1, 2002, Northview's President, Robinson, called one of Plaintiff's attorneys, David Freidberg, and told Mr. Freidberg that there was no money in any of Mr. Batio's accounts.

612. Upon information and belief, Robinson transferred at least Eight Hundred Thousand Dollars ($800,000.00) out of Batio's accounts after being served with the citation.

613. The money was transferred into the account of Mars Equities, Inc. a/k/a Mercury Partners, Inc., Xentex's largest secured creditor, owned by Mr. Flanagan.

614. Section 1402(f)(1) of the Code of Civil Procedure for Illinois states in pertinent part:

"a citation may prohibit the party to whom it is directed from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of a judgment therefrom, * * * belonging to the judgment debtor * * *, and from paying over or otherwise disposing of any moneys not so exempt which are due or to become due to the judgment debtor, until the further order of the court or the termination of the proceeding, whichever occurs first. The court may not be obligated to withhold the payment of any moneys beyond double the amount of the balance due sought to be enforced by the judgment creditor. The court may punish any party who violates the restraining provision of a citation as and for a contempt, or if the party is a third party may enter judgment against him or her in the amount of the unpaid portion of the judgment * * *, or in the amount of the value of the property transferred, whichever is lesser." 735 ILCS 5/2-1401(f)(1).

615. On June 28, 2002, Plaintiffs, by and through their attorney, served the citation upon Northview.

616. By allowing the disposition and transfer of funds that were subject to the citation, Robinson violated the citation and pursuant to 735 ILCS 5/2-1402(d)(1) are in contempt of court.

WHEREFORE, Plaintiffs respectfully pray for Judgment against Robinson, in an amount over Four Million Dollars ($4,000,000.00), and for any other such relief that this Court deems warranted.

## COUNT XXXVII
(Violation of 735 ILCS 5/2-1402(f)(1)-Northview Bank & Trust)

617. Plaintiffs reallege, reassert and incorporate paragraphs 1- 616 as if fully set forth herein.

618. On April 5, 2002, the Plaintiffs, filed a motion for judgment in the State of Virginia, against Batio alleging various grievances regarding the Six Hundred Fifty Thousand Dollar ($650,000) promissory note.

619. On June 6, 2002, judgment was entered in the State of Virginia against Batio and in favor of TMB in the amount of Seven Hundred Sixty-Six Thousand, Nine Hundred Sixty-Two Dollars ($766,962.00).

620. On June 28, 2002, one of the Plaintiff's attorneys registered this judgment in the Circuit Court of Cook County, Municipal Department, First District.

621. On June 28, 2002, at 1:30 p.m., one of Plaintiffs' attorneys, through a special process server, served Northview with a Citation to Discover Assets to Third Party ("citation"). The citation was issued for all bank accounts belonging to Mr. Batio and any other accounts related to Mr. Batio at Northview.

622. The citation was also personally served upon Mr. Batio via first class mail.

623. The citation stated that Northview was "prohibited from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which he/she may be entitled or which may be acquired by or become due to him/her, until further order of court or termination of the proceeding. You are not required to withhold the payment of any money beyond double the amount of the judgment."

624. The citation was served upon Anne F. Johnson, the Assistant Vice President of Northview. Service was effected at 1:30 p.m. by Barnett S. Kolton, a special process server.

625. The citation was subject to a Rider which provided the social security number for Mr. Batio as well as eight (8) account numbers. The Rider further stated that it related to "any other accounts relating to this Defendant."

626. Later that afternoon, on June 28, 2002, Mr. Reyna spoke with a representative of Northview who assured him that there were sufficient assets in Mr. Batio's accounts to satisfy the judgment and that all of Mr. Batio's accounts had been frozen pursuant to the citation.

627. In the morning of July 1, 2002, Mr. Reyna contacted Northview again and spoke with a representative who confirmed that the Mr. Batio bank accounts were still frozen.

628. In the afternoon of July 1, 2002, Northview's President, Mr. Robinson, called one of TMB's attorneys, David Freidberg, and told Mr. Freidberg that there was no money in any of Mr. Batio's accounts.

629. Upon information and belief, Mr. Robinson and Northview transferred at least $800,000 out of Mr. Batio's accounts after being served with the citation.

630. The money was transferred into the account of Mars Equities, Inc. a/k/a Mercury Partners, Inc., Xentex's largest secured creditor, owned by Mr. Flanagan.

631. Section 1402(f)(1) of the Code of Civil Procedure for Illinois states in pertinent part:

"a citation may prohibit the party to whom it is directed from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of a judgment therefrom, * * * belonging to the judgment debtor * * *, and from paying over or otherwise disposing of any moneys not so exempt which are due or to become due to the judgment debtor, until the further order of the court or the termination of the proceeding, whichever occurs first. The court may not be obligated to

111

withhold the payment of any moneys beyond double the amount of the balance due sought to be enforced by the judgment creditor. The court may punish any party who violates the restraining provision of a citation as and for a contempt, or if the party is a third party may enter judgment against him or her in the amount of the unpaid portion of the judgment * * *, or in the amount of the value of the property transferred, whichever is lesser." 735 ILCS 5/2-1401(f)(1).

632.    On June 28, 2002, Plaintiffs, by and through their attorney, served the citation upon Northview.

633.    By allowing the disposition and transfer of funds that were subject to the citation, Northview violated the citation and pursuant to 735 ILCS 5/2-1402(d)(1) are in contempt of court.

WHEREFORE, Plaintiffs respectfully pray for Judgment against Northview, in an amount over Four Million Dollars ($4,000,000.00) and for any other such relief that this Court deems warranted.

COUNT XXXVIII

(Aiding and Abetting a Breach of Fiduciary Duty-Blair Robinson)

634.    Plaintiffs reallege, reassert and incorporate paragraphs 1- 633 as if fully set forth herein.

635.    At all relevant times to this Complaint, Blair Robinson was the President of Northview Bank & Trust.

636.    At all relevant times to this Complaint, Northview Bank & Trust controlled numerous bank accounts for Xentex Technologies, Inc.

637.    Mr. Batio, as an officer and director of Xentex, owed a duty to the Plaintiffs, as

shareholders and creditors of Xentex, to deal fairly, honestly, openly and with the utmost good faith.

638.    Blair Robinson knew or should have known that Mr. Batio was acting in a manner adverse to Xentex, as he had direct knowledge that Mr. Batio had forged a letter of credit with Mr. Robinson's signature which caused significant damage to Xentex.

639.    Mr. Robinson knew or should have known that Mr. Batio was withdrawing large sums of money from the corporations account for purposes unrelated to the business and/or activities of Xentex.

640.    Mr. Robinson aided and abetted Mr. Batio's breach of his duty to deal fairly, honestly, openly and with the utmost good faith towards Plaintiffs by allowing Mr. Batio to, on numerous occasions, overdraw on the accounts at Northview Bank & Trust.

641.    Robinson aided and abetted Mr. Batio's failure to deal fairly, honestly, openly and with the utmost good faith towards Plaintiffs, who were shareholders and creditors of Xentex, by allowing Mr. Batio to freely move money in and out of accounts in violation of a court order and a citation to discover assets in violation of 735 ILCS 5/2-1402(d)(1).

642.    Mr. Robinson aided and abetted Mr. Batio's failure to deal fairly, honestly, openly and with the utmost good faith towards Plaintiffs, who were shareholders and creditors of Xentex, by allowing Mr. Batio to overdraft the corporations accounts by large sums of money and then convert said overdrafts into loan agreements which he knew, or should have known, would not be repaid.

643.    Mr. Robinson aided and abetted Mr. Batio's failure to deal fairly, honestly, openly and with the utmost good faith towards Plaintiffs, who were shareholders and creditors of Xentex, by taking a security interest in all the assets of Xentex days before the corporation filed

for bankruptcy protection based on a fraudulent overdraft loans given to Mr. Batio by Northern Bank and Trust.

644.    As a result of these breaches, the Plaintiffs have lost the value of the money they invested in Xentex because the company is insolvent and cannot pay its bills, produce computers and its stock is essentially worthless.

645.    As a result of these breaches, Blair Robinson and Northview Bank have a fraudulent security interest in the corporation's assets which will preclude the Plaintiffs from utilizing said assets to reduce their losses.

646.    As a result of these breaches, Plaintiffs, who were creditors and shareholders of Xentex, suffered damages as the unauthorized security interest in the assets will prevent the Plaintiffs from collecting funds from the corporation's assets.

647.    As a result of these breaches, Plaintiffs, who were creditors and sharcholders of Xentex, have been damaged because Xentex has been unable to disburse funds to the creditors that were owed money by Xentex, including KDS and other manufacturers whose job was to further production of the Voyager computer.

648.    As a result of these breaches, Plaintiffs, who were creditors and shareholders of Xentex, suffered damages in that the unauthorized security interest in the assets have prevented Xentex from paying the subcontractors who were building the computer at issue, effectively obstructing the construction of said computer.

649.    As a result of these breaches, Plaintiffs, who were shareholders of Xentex, suffered damages as the unauthorized security interest in the assets of Xentex truncated the value of the shares owned by the Plaintiffs.

650.    As a result of these breaches, Plaintiffs, who were shareholders of Xentex,

suffered damages as Mr. Batio was further allowed to loot the funds of Xentex, even though a court order had put a hold on the accounts at Northview Bank & Trust.

WHEREFORE, Plaintiffs respectfully pray for Judgment against Mr. Robinson for their actual damages in an amount not less than Four Million Dollars ($4,000,000), plus their costs and filing fees incurred, and any other such relief that this Court deems warranted.

COUNT XXXIX
(Aiding and Abetting a Breach of Fiduciary Duty-Northview Bank & Trust)

651.    Plaintiffs reallege, reassert and incorporate paragraphs 1- 651 as if fully set forth herein.

652.    At all relevant times to this Complaint, Blair Robinson was the President of Northview Bank & Trust.

653.    At all relevant times to this Complaint, Northview Bank & Trust controlled numerous bank accounts for Xentex Technologies, Inc.

654.    Mr. Batio, as an officer and director of Xentex, owed a duty to the Plaintiffs, as shareholders and creditors of Xentex, to deal fairly, honestly, openly and with the utmost good faith.

655.    Northview, through its agent, Blair Robinson, knew or should have known that Mr. Batio was acting in a manner adverse to Xentex, as he had direct knowledge that Batio had forged a letter of credit with Robinson's signature which caused significant damage to Xentex.

656.    Northview, through its agent, Mr. Robinson, knew or should have known that Mr. Batio was withdrawing large sums of money from the corporations account for purposes unrelated to the business and/or activities of Xentex.

657.    Northview, through its agent, Mr. Robinson, aided and abetted Mr. Batio's failure

to deal fairly, honestly, openly and with the utmost good faith towards Plaintiffs, who were shareholders and creditors of Xentex, by allowing Mr. Batio to freely move money in and out of accounts in violation of a court order and a citation to discover assets in violation of 735 ILCS 5/2-1402(d)(1).

658.    Northview, through its agent, Mr. Robinson, aided and abetted Batio's failure to deal fairly, honestly, openly and with the utmost good faith towards Plaintiffs, who were shareholders and creditors of Xentex, by allowing Mr. Batio to overdraft the corporations accounts by large sums of money and then convert said overdrafts into loan agreements which he knew, or should have known, would not be repaid.

659.    Northview, through its agent, Mr. Robinson, aided and abetted Mr. Batio's failure to deal fairly, honestly, openly and with the utmost good faith towards Plaintiffs, who were shareholders and creditors of Xentex, by taking a security interest in all the assets of Xentex days before the corporation filed for bankruptcy protection based on a fraudulent overdraft loans given to Mr. Batio by Northern Bank and Trust.

660.    As a result of these breaches, the Plaintiffs have lost the value of the money they invested in Xentex because the company is insolvent and cannot pay it's bills, produce computers and it's stock is essentially worthless.

661.    As a result of these breaches, Blair Robinson and Northview Bank have a fraudulent security interest on the corporations assets which will preclude the Plaintiffs from utilizing said assets to reduce their losses.

662.    As a result of these breaches, Plaintiffs, who were creditors and shareholders of Xentex, suffered damages as the unauthorized security interest in the assets will prevent the Plaintiffs from collecting funds from the corporation's assets.

116

663. As a result of these breaches, Plaintiffs, who were creditors and shareholders of Xentex, have been damaged because Xentex has been unable to disburse funds to the creditors that were owed money by Xentex, including KDS and other manufacturers whose job was to further production of the Voyager computer.

664. As a result of these breaches, Plaintiffs, who were creditors and shareholders of Xentex, suffered damages in that the unauthorized security interest in the assets have prevented Xentex from paying the subcontractors who were building the computer at issue, effectively obstructing the construction of said computer.

665. As a result of these breaches, Plaintiffs, who were shareholders of Xentex, suffered damages as the unauthorized security interest in the assets of Xentex truncated the value of the shares owned by the Plaintiffs.

666. As a result of these breaches, Plaintiffs, who were shareholders of Xentex, suffered damages as Mr. Batio was further allowed to loot the funds of Xentex, even though a court order had put a hold on the accounts at Northview Bank & Trust.

WHEREFORE, Plaintiffs respectfully pray for Judgment against Northview Bank & Trust for their actual damages in an amount not less than Four Million Dollars ($4,000,000), plus their costs and filing fees incurred, and any other such relief that this Court deems warranted.

Respectfully submitted,

One of Plaintiffs' Attorneys

Richardson & Stasko, LLC
19 S. LaSalle Street, Suite 1500
Chicago, Illinois 60603
V: (312) 372-7075
F: (312) 372-7076