**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

PREMIER CAPITAL MANAGEMENT, L.L.C.,   )
*et. al.*,                            )
                                      )
                    Plaintiffs,       )
                                      )
        v.                            )   NO. 02 C 5368
                                      )
LARRY COHEN, *et al.*,                )   JUDGE JOAN B. GOTTSCHALL
                                      )
                    Defendants.       )

**COHEN'S, KIM'S AND TURCOTTE'S MEMORANDUM**
**OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

I.INTRODUCTION…………………………………………………………………............1-2

II.STATEMENT OF FACTS……………………………………………………………..2

III.ARGUMENT……………………………………………………………………………….3

    A.    STANDARD FOR SUMMARY JUDGMENT…………………………………………3

    B.    TURCOTTE, KIM AND COHEN ARE ENTITLED TO JUDGMENT IN THEIR FAVOR ON EACH OF THE COUNTS ASSERTING EITHER FEDERAL AND/OR VIRGINIA SECURITIES ACT VIOLATIONS AGAINST THEM AS "CONTROLLING PERSONS" BECAUSE THEY DID NOT "CONTROL" THE ALLEGED PRIMARY VIOLATOR NOR DID THEY "ACTIVELY PARTICIPATE" IN THE ALLEGED IMPROPER CONDUCT …………………………………………………………………………………….3-5

    C.    TURCOTTE, KIM AND COHEN ARE ENTITLED TO JUDGMENT IN THEIR FAVOR ON EACH OF THE COUNTS ASSERTING EITHER FEDERAL AND/OR VIRGINIA SECURITIES ACT VIOLATIONS BY THEM AS "CONTROLLING PERSONS" BECAUSE THEY ACTED IN GOOD FAITH …………………………………………………………………………………5-8

    D.    ADDITIONALLY OR IN THE ALTERNATIVE, THE FEDERAL SECURITIES LAW COUNTS AGAINST TURCOTTE AND KIM CANNOT BE MAINTAINED BECAUSE PLAINTIFFS DID NOT PURCHASE XENTEX STOCK IN A PUBLIC OFFERING …………………………………………………………………………………..8-10

    E.    TURCOTTE, KIM AND COHEN ARE ENTITLED TO JUDGMENT IN THEIR FAVOR ON EACH OF THE COUNTS ASSERTING EITHER FEDERAL AND/OR VIRGINIA SECURITIES ACT VIOLATIONS BY THEM AS "CONTROLLING PERSONS" BECAUSE THERE HAS BEEN NO PRIMARY VIOLATION OF THE SECURITIES LAWS BY XENTEX …………………………………………………………………………....10-18

F.    XEN INVESTORS CANNOT PREVAIL ON ITS CLAIMS BECAUSE IT HAS NO LOSSES FROM THE ALLEGED VIOLATION ………………………………………………………….…………………....18-19
        1.  Xen Investors Cannot Establish "Loss Causation" …………………….…...18-19
        2.  Xen Investors Did Not Suffer Any Economic Loss…………………...…...……19

    G.    TURCOTTE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIM………………………………19-21
        1.  Turcotte Did Not Intend For Plaintiffs to Rely on the Financial Information He Prepared……………………………………………………………..…21

2. Turcotte Owed No Duty to Provide Accurate Information to Plaintiffs……….21-22

3. Turcotte's Financial Statements Contained No False Information………………...22

H. PLAINTIFFS CANNOT ESTABLISH ANY OF THE ELEMENTS OF A CLAIM FOR COMMON LAW FRAUD AGAINST TURCOTTE AND KIM. ...................…..21-22

I. THE CLAIMS FOR BREACH OF FIDUCIARY DUTY AGAINST TURCOTTE AND KIM MUST ALSO FAIL..........……………………………………………………22-24

IV. CONCLUSION……………………………………………………………………………….24

## **TABLE OF AUTHORITIES**

### **Statutes**

15 U.S.C.§77o…………………………………………..………………………………….4-6

15 U.S.C.§77b(a)(10)………………………………………………………………….9

15 U.S.C. §77l(b)………………………………………………………………………19

Va. Code §13.1-522(C)………………………………………………………………4-6, 11

Va. Code §13.1-522(A)………………………………………………………………12

Del. Code Ann. Tit. 8, § 102(b)(7)……………………………………………………...25


### **Cases**

*Acme Propane, Inc. v. Tenexco, Inc.*, 844 F. 2d 1317, 1322 (7th Cir. 1988) ...............................18

*Ambrosino v. Rodman & Renshaw, Incorporated*, 972 F. 2d 776, 786 (7th Cir. 1992) ...............18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed2d (1986).....3

*Arnold v. Soc'y for Sav. Bancorp.*, 650 A.2d 1270, 1287 (Del. 1994) .......................................25

*Atocha Limited Partnership v. Witness Tree, LLC*, 65 Va. Cir. 213, 2004 WL 1665009 at *7 (Va. Cir. Ct. July 16, 2004) ............................................................................... .4, 6, 12, 23

*Bastian v. Petren Resources Corporation*, 892 F.2d 680, 682 (7th Cir. 1990) ...........................20

*Berson v. Hardiman*, 1999 U.S. Dist. Lexis 14767, *24-25 (N.D. Ill. 1999)...............................18

*Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997).......................19

*Dellastatious v.* Williams, 242 F. 3d 191, 194 (4th Cir. 2001) .........................................4, 6, 7, 8

*Dunn v. Ronbotics Corporation*, 2003 WL 23697826 at **10-11 (E.D. Va. Feb 20, 2003) ........12

*Ellis v. Sheahan*, 412 F. 3d 754, 756 (7th Cir. 2005)………………………………………….20

*First Indiana Bank v. Baker*, 657 F. 2d 506, 508 (7th Cir. 1992),...................................................3

*First Midwest Bank v. Stewart Title Guaranty Co.*, 218 Ill.2d 326, 335 (2006) .........................21

*Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), cert. denied, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988) ..................................................................3

*Gasner v. Board of Supervisors of the County of Dinwiddie, VA*, 103 F. 3d 351, 356 (4th Cir. 1996).......................................................................................................12, 13-14

*Goldstein v. Malcolm G. Fries & Associates, Inc.*, 72 F.Supp.2d 620, 627 (E.D. Va. 1999) . 22-23

*Gustafson v. Aklloyd Company, Inc.*, 513 U.S. 561, 568, 115 S. Ct. 1061, 1068, 131 L. Ed. 2d 1 (1995) ................................................................................................................................9,

*Halperin v. EBanker USA.COM, Inc.*, 295 F. 3d 352, 357 (2nd Cir. 2002)............................13, 14

*Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1404 (7th Cir. 1994)..............13, 15

*Harrison v. Dean Witter Reynolds, Inc.*, 974 F. 2d 873, 881 (7th Cir. 1992) .................................4

*Heartland Financial USA, Inc. v. Financial Institutions Capital Appreciation Partners, LLC,* 2002 WL 31819008, *8 (N.D. Ill. Dec. 12, 2002)…………………………………………...12, 18

*In reFlag Telecom Holdings, Ltd. Securities Litigation*, 352 F. Supp. 2d 429, 457

(S.D. N.Y. 2005) ...............................................................................................................................4

*Jackson National Life Insurance Company v. Kennedy*, 741 A. 2d 377, 388 (Del. Ch. 1999)23-24

*Metro Communication Corp. v. Advanced Mobilecomm Technologies, Inc.*, 854 A. 2d 121, 157 (Del. Ch. 2004) ...............................................................................................................................24

*Lennon v. Christoph*, 1997 WL 57150 at *23 (N.D.Ill. 1997) ......................................................10

*Maher v. Durango Metals, Inc.*, 144 F. 3d 1302, 1305 (10th Cir. 1998)............................4, 11, 12

*Malone v. Brincat*, 722 A. 2d 5, 10 (Del. 1998) ..........................................................................24

*Metro Communication Corp.* at 157-58, citing *Malone v. Brincat*, 722 A. 2d 5, 10 (Del. 1998) .23

*MW Manufacturers, Inc. v. Friedman Corp.,* No. 97 C 8319, 1998 WL 417501, at *4 (N.D. Ill. July 21, 1998) ................................................................................................................................22

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F. 3d 2d 2, 4 (2d Cir. 1996)...............................9, 14

*Rankow v. First Chicago Corp.,* 870 F.2d 356, 361 (7th Cir. 1989) ......................................21-22

*Ricketts v. Adamson,* 483 U.S.1,22, 107 S. Ct. 2680, 97 L. Ed. 2d 1 (1987)……………………20

*Rosenstein v. Standard & Poor's Corp.,* 264 Ill. App. 3d 818, 823 (1st Dist. 1993) ...................22

*Savino v. C.P. Hall Co.*, 199 F. 3d 925, 934-35 (7th Cir. 1999)…………………………………20

*S.E.C. v. First Jersey Securities, Inc.*, 101 F. 3d 1450, 1472 (2nd Cir. 1996)................................3

*Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990)......................................................................3

*SEC v. Continental Tobacco Co. of S.C.*, 463 F.2d 137,159 (5th Cir. 1972) ................................10

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976) ...............................................................................................................................13

*Teamsters Local 282 v. Angelos*, 762 F. 2d 522, 530 (7th Cir. 1985) ..........................................18

*Tolan and Son, Inc. v. KLLM Architects, Inc.,* 308 Ill. App. 3d 18, 27 (1st Dist. 1999) ..............21

*TriContinental Industries, Ltd. v. Price Waterhouse Coopers, LLP,* 475 F.3d 824, 833-34 (7th Cir. 2007)..................................................................................................................21

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).........................................................................3

*Vannest v. Sage, Rutty & Co.*, 960 F. Supp. 651, 653-55 (W.D.N.Y. 1997)...............................10

*Waltree Ltd. v. Ing Furman Selz LLC*, 97 F. Supp. 2d 464, 469 (S.D.N.Y. 2000)("§12(a)(2) ................................................................................................................................................9

*Weprin v. Peterson,* 736 F. Supp. 1124, 1127 (N.D.Ga. 1988)...................................................10

*Witness Tree, LLC*, 65 Va. Cir. 213, 2004 WL 1665009 at *7 (Va. Cir. Ct. July 16, 2004) ……………………………………………………………………………………..3, 11, 12

Defendants, Dr. LARRY COHEN ("Dr. Cohen"), Dr. WAN HEE KIM ("Dr. Kim") and MICHAEL TURCOTTE ("Mr. Turcotte"), collectively, "Movants", by their attorneys, BRYCEDOWNEY, LLC, submit the following Memorandum of Law In Support of their Motion for Summary Judgment on Counts I – VI, XII – XVI and XIX – XX of Plaintiffs' Third Amended Complaint.

## I.    INTRODUCTION

This case arises from venture capital investments made by Plaintiffs in Xentex Technologies, Inc, a corporate technology venture that had designed a unique laptop computer and intended to manufacture, market and sell it.  Defendants Dr. Cohen and Dr. Kim served as members of the Board of Directors and as advisors to Xentex but were not employees or officers of the company.  Mr. Turcotte was an employee and served in various accounting capacities reporting to the company's senior management.   Jeffrey A. Batio, Xentex's founder, controlling shareholder and its CEO during periods relevant hereto, is not a party to this action nor is Joe Negler who was Xentex's President and CEO for certain other periods related to this action.  In addition, except by way of third party cross-complaint not addressed by this motion, Douglas Tucker, the Company's principle legal advisor at its outside law firm and at other times pertinent hereto, President and Executive Vice President of Xentex is also not a defendant or a party to these proceedings. In this case Xen Investors, LLC ("Xen Investors"), TMB, LLC ("TMB") and Premier Capital Management, LLC ("Premier"), have filed a Third Amended Complaint ("Complaint"), attached hereto as Exhibit __, against defendants asserting claims under federal and/or state securities anti-fraud provisions, as well as other alleged common law violations.  Plaintiffs (including notably Premier, who never purchased any stock or other securities in Xentex), assert claims against Dr. Cohen, Dr. Kim and Mr. Turcotte as follows:

> Counts I and XII against Mr. Turcotte and Dr. Kim, respectively, for controlling person liability for an alleged violation by non-party Xentex of §12(2) of the Securities Act of 1933, 15 U.S.C. §77o, in connection with Xen Investors' stock purchase; Counts II, XIII and XIX against Mr. Turcotte, Dr. Kim and Dr. Cohen, respectively, for similar alleged controlling person liability under the Virginia Securities Act, Va. Code §13.1-522(C), in connection with Xen Investors' stock purchase; Counts III, XIV and XX against Mr. Turcotte, Dr. Kim and Dr. Cohen, respectively, for similar alleged controlling person liability under the Virginia Securities Act, Va. Code §13.1-

522(c), in connection with TMB's June, 2001 loan to Xentex; Counts IV and XVI against Mr. Turcotte and Dr. Kim for common law fraud; Counts VI and XV against Mr. Turcotte and Dr. Kim for breach of fiduciary duty; and Count V against Mr. Turcotte asserting negligent misrepresentation and/or constructive fraud in connection with Mr. Turcotte's internal accounting for Xentex.

Plaintiffs, acknowledged investment experts and highly experienced in corporate investing, are seeking legal redress against Dr. Cohen and Dr. Kim, former Xentex directors, and Mr. Turcotte, its controller (but not its senior management) none of whom the undisputed facts show had virtually any personal involvement in the solicitation, negotiation or completion of the investments in question. In fact, the defendants lost all they had invested in Xentex both in terms of money and in terms of time, effort and personal prestige as well. Neither the law nor the facts support Plaintiffs' attempts to hold the defendants personally liable for the investments that they made in Xentex and the Court should not permit the plaintiffs to continue this action at the extreme cost and prejudice to the defendants.

## II.    STATEMENT OF FACTS

A complete recitation of all material facts as to which Movants contend there is no genuine issue is contained in Movants' Statement of Uncontested Material Facts ("Statement"), filed concurrently herewith, and incorporated herein. Citations to Movants' Statement are designated throughout this Memorandum as "(Fact #)", in reference to specific numbered paragraphs in Movants' Statement.    To summarize briefly herein, beginning in or around November, 2000, Plaintiff Xen Investors, LLC ("Xen Investors") purchased stock in a start-up technology company, Xentex Technologies, Inc. ("Xentex"). (Facts 97--103). Approximately one half year later, certain members and/or principals of Xen Investors formed Plaintiff TMB, LLC ("TMB"), for the expressed purpose of making an emergency additional investment in Xentex (Facts 112-113), which took the form of a $650,000 loan to Xentex in June, 2001. (Fact 119). Plaintiff Premier Capital Management, LLC ("Premier"), neither purchased stock in Xentex nor made any loan to Xentex, but capitalized on Xen Investors' purchase of Xentex stock by acting as an agent for Xentex, and receiving a commission, on this sale of stock to Xen Investors. (Fact 129). Plaintiffs are professional managed investment firms managed by experienced investment professionals and controlled by extremely sophisticated individuals (Facts 15-17). Plaintiffs had access to and retained

qualified legal and accounting professionals to render them legal and accounting advice with respect to their operations and investments (Facts 19-21). All of the risks associated with an investment in Xentex were fully and plainly disclosed to Plaintiffs in Xentex's written offering memorandum, prior to Xen Investors' and TMB's investments in Xentex. (Facts 74-84).

## III.   ARGUMENT

### A.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed2d (1986). The court must view all evidence in a light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir. 1987), cert. denied, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. at 2510-11; *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), cert. denied, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *First Indiana Bank v. Baker*, 657 F. 2d 506, 508 (7th Cir. 1992), quoting *Liberty Lobby*, 477 U.S. at 248, 106 S. Ct. at 2510.

### B.    TURCOTTE, KIM AND COHEN ARE ENTITLED TO JUDGMENT IN THEIR FAVOR ON EACH OF THE COUNTS ASSERTING EITHER FEDERAL AND/OR VIRGINIA SECURITIES ACT VIOLATIONS AGAINST THEM AS "CONTROLLING PERSONS" BECAUSE THEY DID NOT "CONTROL" THE ALLEGED PRIMARY VIOLATOR NOR DID THEY "ACTIVELY PARTICIPATE" IN THE ALLEGED IMPROPER CONDUCT

In order to establish a prima facie case of "controlling person" liability, plaintiff must establish not only that there has been a primary violation, but that the alleged "controlling person" had "control" over the primary violator. *S.E.C. v. First Jersey Securities, Inc.*, 101 F. 3d 1450, 1472 (2nd Cir. 1996). This requirement of "control" applies to both the federal 1933

Act claims pursuant to 15 USC § 77o, and the VSA claims pursuant to Va. Code §13.1-522(C); *Id.*; *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 352 F. Supp. 2d 429, 457 (S.D. N.Y. 2005)(federal); *Maher v. Durango Metals, Inc.*, 144 F. 3d at 1304-05 (federal); *Dellastatious v.* Williams, 242 F. 3d 191, 194 (4th Cir. 2001)(federal and VSA); Atocha *Limited Partnership v. Witness Tree, LLC*, 65 Va. Cir. 213, 2004 WL 1665009 at *7 (Va. Cir. Ct. July 16, 2004)(VSA). The Seventh Circuit has construed "control" for purposes of the federal securities laws as requiring actual participation, or the actual exercise of control over the operations of the "person" in general, <u>and</u> "the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F. 2d 873, 881 (7th Cir. 1992). "It is well accepted that merely alleging that a particular defendant is an officer or director of a company is not sufficient to allege control." *In re Flag Telecom Holdings, Ltd. Securities Litigation* at 457. *See also Atocha Limited Partnership* at *9 (a director is not automatically liable as a controlling person). Control means the practical ability to direct the actions of the people who issue or sell securities. *Id.* at 458. Under the VSA, "control" is "not couched in terms of control over the day-to-day operations or voting weights", but the power to actually direct policies and management. *Atocha Limited Partnership* at *10.

Here, the evidence is undisputed that neither Mr. Turcotte, who was never a director of the company but an officer and employee, nor Dr. Kim, nor Dr. Cohen, who were outside directors, possessed the requisite "control" over Xentex to invoke liability for any representation that may have been made by Xentex in connection with the investments in question. (Facts 27, 30-33, 42-47). At all times relevant hereto Batio was the controlling shareholder of Xentex by virtue of his extensive shareholdings. (Facts 22-23), Negler was the CEO of Xentex for most of the periods in question (with Batio and Tucker serving in that capacity for short periods preceding and following his tenure), (22-23, 25), Batio, Tucker and Negler actually prepared the Information Statement referenced by the Complaint (Facts 33, 73) and Batio and Tucker also attended the meetings with plaintiffs at which their investment was solicited (Facts 69, 71-73). Turcotte, though an officer of Xentex, was the in-house accountant reporting to Batio, Negler and Tucker, whose only responsibilities for Xentex were in the preparation of unaudited financial statements for internal use only. (Facts 52- 53). Turcotte neither exercised, nor had the power or ability to exercise, any "control" over the

business or management of Xentex generally, nor over Xentex's transaction with Plaintiffs. (Facts 46, 50, 56, 95).

Dr. Kim's principal role at Xentex as a director and member of the Executive Committee was contributing his background in and standing with the Korean electronics industry and acting as Xentex's liaison with Korean manufacturer KDS. (Fact No. 44). Dr. Kim had no participation whatever in the creation of the Information Statement and was not even aware of its existence until commencement of this action (Fact No. 41). Dr. Kim did not participate in any manner in the solicitation, negotiation or completion of Plaintiffs' investments in Xentex and had only one social meeting with any of the principals of Plaintiffs, a luncheon at which nothing related to the Plaintiffs' investment was discussed (Fact No. 40).

Similarly, Dr. Cohen, as an outside director received all of his information regarding the business and progress at Xentex from Batio or Tucker. The record is void of any indication that he did do or could have done anything, other than serve as one of the directors of Xentex. (Facts 31 - 34). Like Dr. Kim, he had only a single social meeting with any of the Plaintiffs' principles, a brief encounter with Mathieu Reyna at a shareholders meeting, at which social matters only were discussed, and which occurred approximately two years after Plaintiffs invested in Xentex. (Fact 35).

The record is undisputed that for purposes of the transactions with Plaintiffs, none of these defendants had any involvement or even prior knowledge of the transactions, much less, the ability to control Xentex. In order to establish these defendants' "control" of Xentex for purposes of VSA 13.1-522(C) liability, Plaintiffs must, at a minimum, establish that they had the power to actually direct policies and management, and there is simply no evidence that they had the power or ability to do so. In fact, the undisputed evidence demonstrates that such "control" rested primarily with Batio, Negler and Tucker, and others who Plaintiffs have, inexplicably, not sought to name as defendants herein. (Facts 23-25, 33, 38, 73).

**C.**     **TURCOTTE, KIM AND COHEN ARE ENTITLED TO JUDGMENT IN THEIR FAVOR ON EACH OF THE COUNTS ASSERTING EITHER FEDERAL AND/OR VIRGINIA SECURITIES ACT VIOLATIONS BY THEM AS "CONTROLLING PERSONS" BECAUSE THEY ACTED IN GOOD FAITH**

Pursuant to 15 USC § 77o, the alleged "controlling person" is not liable for the

5

violation if he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. §77o. Similarly, VSA 13.1-522(C) allows control persons to avoid liability if they can demonstrate that they "did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Va Code §13.1-522(C).

In *Atocha Limited Partnership*, defendants Song and Mesrobian were two of the six founding members of a limited liability corporation that formed to go into the restaurant business. Plaintiffs who invested in the corporation brought suit against the corporation and its founding members under the VSA, alleging that they were misled as to what percentage of ownership they would have in the company, and also misled as to the flawed business background and bankruptcy of Caraluzzi, another one of the founding members, whom the corporation employed to bring the project to fruition. In asserting claims against defendants as "controlling persons" pursuant to VSA §13.1-522(C), plaintiffs claimed that defendant Song had provided information in the offering memorandum knowing that the document would be used to solicit investment, that he identified potential investors and actually solicited other investors, though not plaintiffs. The evidence showed that the wooing of investors, including creation of offering documents, was delegated to Caraluzzi, and there was "no indication that this system was unreasonable or inadequate for purposes of vetting presentations to investors", or that other founding members should have been more closely involved. The court found that based upon the foregoing, defendants satisfied Virginia's "good faith" defense.

Similarly, in *Dellastatious v. Williams*, 242 F. 3d 191 (4th Cir. 2001), the court affirmed summary judgment for defendants on plaintiffs' claims of controlling person liability under the Securities and Exchange Act and VSA 13.1-522 (C), finding for defendants on their "good faith" affirmative defense. The plaintiffs had invested in SurroundVision Advanced Imaging or "SAIL", a company formed to finance the marketing of technology developed by SAIL's parent company, LaserVision, for a camera system that created souvenirs for fans at sporting events. Defendant Gluck served as the President, CEO and a director of SAIL. Defendant Williams served as manager of SAIL, and defendant Kelly was an outside director. In October, 1997, Gluck invited plaintiff to become an equity investor in SAIL, and in November, 1997, provided plaintiff with offering documents regarding the sale of SAIL

6

securities (the "November Offering Memorandum"), which was a later draft of a prior offering memorandum that had been prepared by Gluck and Issac Cohen, who was LaserVision's attorney. The evidence also demonstrated that sometime prior to November, 1997, a director of LaserVision who had previously been a securities lawyer with the SEC, had criticized SAIL's offering documents. The directors of SAIL had been told about these criticisms, but were also told that the criticisms were technical in nature, and had been corrected prior to issuance of the November Offering Memorandum. Relying at least in part on the November Offering Memorandum, plaintiffs invested over $260,000 in SAIL.

Plaintiffs in *Dellastatious* alleged that SAIL's November Offering Memorandum was misleading in that it misrepresented the closeness of the relationship between SAIL and LaserVision (and that SAIL was really a shell operated by LaserVision), misrepresented SAIL's projected revenues by grossly overstating them, and misrepresented the nature of SAIL's assets. Plaintiffs sought to hold Williams and Kelly liable as control persons under Section 20 of the Securities and Exchange Act and VSA 13.1-522(C). The Fourth Circuit affirmed the Virginia district court's entry of summary judgment for Williams and Kelly based upon the "good faith" affirmative defense applicable to both the federal and VSA "controlling person" liability provisions. Under the federal statute, the court "examine[s] what the defendants could have done under the circumstances to prevent the violation, and then ask whether the defendants-aware that they could take such measures-decided not to", or in other words, to "determine if there is a genuine issue of fact regarding the defendants' recklessness." *Id*. at 194. On the VSA claims, the court looked at whether defendants could show that they acted reasonably under the circumstances. *Id*. at 195. The court found that that the evidence showed that Williams and Kelly acted reasonably and in good faith, and that it was reasonable for them to have delegated the creation and review of SAIL's offering documents to SAIL's officers and attorney, who was a securities lawyer and experienced in drafting offering documents, and also in delegating the raising of capital to Gluck, who was an entrepreneur experienced in raising capital for companies. There was no evidence that Williams or Kelly were aware of any irregularities in the offering documents that were sent to plaintiffs, and they were never charged with drafting or revising any of the documents before they were sent to plaintiffs.

There is no meaningful factual distinction between the facts in the instant action and

that in *Dellastatious*, and like the defendants in *Dellastatious*, Mr. Turcotte, Dr. Kim and Dr. Cohen are entitled to summary judgment in their favor on all of the "controlling person" liability Counts asserted against them based upon their "good faith" and the reasonableness of their actions under the circumstances. Mr. Turcotte, Dr. Kim and Dr. Cohen knew that Tucker, an officer and director of Xentex who was also Xentex's counsel and a securities lawyer, was responsible for Xentex's offering documents and participated in the sale of Xentex stock. (Facts 28, 30-34, 38, 57-61). They relied upon Tucker's knowledge and expertise in these matters, and under the circumstances, acted reasonably (and certainly, in no way recklessly) in doing so. Neither Mr. Turcotte, nor Dr. Kim, nor Dr. Cohen were involved in or charged with the creation of the Information Statement, and they had no knowledge of any irregularities or alleged misstatements contained within the Information Statement. (Facts 30-31, 33, 41, 54, 73). Moreover, to the extent that Plaintiffs base their claims upon alleged oral representations made by Batio and Tucker, undeniably Mr. Turcotte, Dr. Kim and Dr. Cohen could have no knowledge (or even the ability to acquire the knowledge) of what Batio and Tucker would state orally in their communications with potential investors. (Facts 68-72, 94-95). In sum, the evidence establishes that Mr. Turcotte, Dr. Kim and Dr. Cohen acted reasonably under the circumstances with respect to Xentex's offering documents, presentations to potential investors, and sales of stock by Xentex. They had no knowledge of any misrepresentations or omissions allegedly contained in the Information Statement, and undoubtedly, could have no knowledge, much less, any ability to act in response to, anything conveyed orally to Plaintiffs by Batio or Tucker.

D.   **ADDITIONALLY OR IN THE ALTERNATIVE, THE FEDERAL SECURITIES LAW COUNTS AGAINST TURCOTTE AND KIM CANNOT BE MAINTAINED BECAUSE PLAINTIFFS DID NOT PURCHASE XENTEX STOCK IN A PUBLIC OFFERING**

Mr. Turcotte and Dr. Kim are entitled to judgment in their favor on Counts I and XII against them, alleging that they are liable as controlling persons of Xentex pursuant to 15 USC § 77o, for Xentex's alleged violations of §12(a)(2) of the Securities Act of 1933, § 771(a)(2), because the Securities Act of 1933, § 771(a)(2), is inapplicable as a matter of law to the sale of Xentex stock to Xen Investors. Plaintiffs[1] assert in a conclusory fashion that

---

[1] While Movants refer to "Plaintiffs" collectively throughout this Memorandum and in connection with the purchase of Xentex stock, Movants except Premier Capital Management, LLC from the definition of "Plaintiffs",

"the securities were sold by means of a "prospectus," as that term is defined by the Securities Act of 1933, 15 U.S.C. § 77b(a)(10), because the securities were sold by means of the Information Statement, identified in Paragraph 29, which offered securities for sale." (Complaint at ¶150) Plaintiffs then plead "upon information and belief" that "the securities were sold to Plaintiffs in a public offering and did not qualify for any exemptions under the Securities Act of 1933", and further "upon information and belief", that "for purposes of Regulation D of the Securities Act of 1933, Xentex sold securities to more than 35 "purchasers" in the same "offering" as Plaintiffs." (Complaint at ¶¶151-2)

Liability under §12(a)(2) of the 1933 Act is based on misstatements in prospectuses, and is thus confined to documents related to public offerings by an issuer or its controlling shareholders. *Gustafson v. Aklloyd Company, Inc.*, 513 U.S. 561, 568, 115 S. Ct. 1061, 1068, 131 L. Ed. 2d 1 (1995); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F. 3d 2, 4 (2d Cir. 1996)(§12(a)(2) of the 1933 Act provides for liability for making a securities offering "by means of a prospectus or oral communication…"); *Waltree Ltd. v. Ing Furman Selz LLC*, 97 F. Supp. 2d 464, 469 (S.D.N.Y. 2000)("§12(a)(2) encompasses a narrow category of transactions-public offerings of securities via a written prospectus). "A plaintiff may maintain a claim under §12(a)(2) only where it complains of misstatements in a prospectus or "oral communications that relate to a prospectus."" *Waltree Ltd.* at 469, quoting *Gustafson*, 513 U.S. at 567-68, 115 S. Ct. 1061.

The undisputed evidence demonstrates that the Xen Investors acquired its stock in Xentex by means of a private placement or distinct transaction that involved Xen Investors alone, and not pursuant to a public offering, which Xentex never engaged in over the course of its history of equity funding and stock sales. (Facts 97-111). Xentex and Tucker, Xentex's Vice-Chairman and Executive Vice-President and a securities lawyer, were always careful to ensure that only accredited investors or investors who qualified for some other exemption invested in Xentex, and that Xentex took no money from anyone who was not an accredited investor. (Fact 57-61). Xentex always had investors complete and sign an

---

and further, seek summary judgment as to all claims asserted against them by Premier, as Premier neither purchased any stock in Xentex nor engaged in any transaction with Xentex or Movants which may be deemed as involving the sale of "securities". The undisputed evidence demonstrates that Premier was not a purchaser, but was a "seller" of Xentex stock, and received a commission on the sale of Xentex stock to Xen Investors. (Facts 125-129). Thus, Premier has no standing, or any factual or legal basis, for asserting any claims against Xentex or Movants herein.

"investor questionnaire" demonstrating that they were accredited investors, and never permitted anyone who didn't qualify for an exemption to purchase stock in Xentex. (Fact 61).

Prior to Xen Investors' acquisition of stock in Xentex, Xentex had engaged in only "four financing rounds". (Facts 78). By November 1, 2000, when Xen Investors was first introduced to Xentex, all of Xentex's "financing rounds" were "closed", and the last such "round" had occurred in December, 1999, nearly a full year beforehand. (Id.)

Xen Investors was presented with the Information Statement, which clearly stated that any offer to sell was made pursuant to Regulation D of the Securities Act of 1933, which relates solely to private placements. (Fact 77, 107); *Lennon v. Christoph*, 1997 WL 57150 at *23 (N.D.Ill. 1997) (holding that a "private placement memorandum such as the one at issue here does not involve a public offering" and granting defendants judgment on a §12(2) claim). Xen Investors also purchased its Xentex shares through a Subscription Agreement, as opposed to a prospectus broadcast to investors in general. (Fact 106). In the Subscription Agreement, Xen Investors warranted and represented to Xentex that:

> The Company has made available to the undersigned and as requested to any of the undersigned's attorney, accountant, or Investor Representative, all documents that each of the foregoing have requested relating to an investment in the Company.

(Fact 106). This kind of access and information placed Xen Investors in a "privileged relationship" with Xentex, a relationship that is "substantially different" from the status of members of the public at large. *SEC v. Continental Tobacco Co. of S.C.*, 463 F.2d 137,159 (5th Cir. 1972); see *Vannest v. Sage, Rutty & Co.*, 960 F. Supp. 651, 653-55 (W.D.N.Y. 1997) (court relied on a subscription agreement in determining that there was no public offering); see also *Weprin v. Peterson*, 736 F. Supp. 1124, 1127 (N.D.Ga. 1988) (subscription agreements and limitation of offering to qualified investors led to conclusion that there was no public offering).

Moreover, the undisputed evidence demonstrates that Xen Investors' acquisition of Xentex stock was not a part of any "offering" of Xentex stock. The Xen Investors/Copeland's acquisition of Xentex stock was a separate, unique and one-time or single "transaction" for Xentex. (Facts 97-106, 109-110). Xen Investors' investment in Xentex was pursuant to and part of a transaction unlike any other Xentex had ever been engaged in previously, or thereafter. Xen Investors first made an emergency loan to Xentex because of Xentex's

10

immediate insolvency and emergency need for money. (Fact 102, 109). Then, subject to due diligence, Xen Investors would convert that loan to equity under a particular set of circumstances, with certain non-dilution rights provided to them, warrants, and other particular circumstances and contingencies that were applicable only to them in this transaction. (Facts 98-100). It was not an "offering", but a "transaction", wherein Xen Investors' principal Robert Copeland made Xentex an offer, which was further negotiated by Xentex and Xen Investors. (Facts 104-106, 108, 111). It is also undisputed that Xen Investors itself was an "accredited investor". (Fact 106). The totality of evidence, which is undisputed, clearly demonstrates that Xen Investors did not acquire its shares in Xentex in a public offering, and therefore, the Securities Act of 1933 is wholly inapplicable as a matter of law, and Mr. Turcotte and Dr. Kim are entitled to judgment in their favor on Counts I and XII, respectively.

**E.      TURCOTTE, KIM AND COHEN ARE ENTITLED TO JUDGMENT IN THEIR FAVOR ON EACH OF THE COUNTS ASSERTING EITHER FEDERAL AND/OR VIRGINIA SECURITIES ACT VIOLATIONS BY THEM AS "CONTROLLING PERSONS" BECAUSE THERE HAS BEEN NO PRIMARY VIOLATION OF THE SECURITIES LAWS BY XENTEX**

Plaintiffs assert claims against Mr. Turcotte and Dr. Kim as "controlling persons", pursuant to §15 of the Securities Act, 15 U.S.C. §77o, for purposes of non-party Xentex's alleged violation of §12(a)(2) of the Securities Act of 1933, 15 U.S.C. §77l, in connection with Xen Inverstors' purchase of Xentex stock. Similarly, Plaintiffs assert claims against Mr. Turcotte, Dr. Kim and Dr. Cohen pursuant to §13.1-522(C) of the Virginia Securities Ac ("VSA"), as "controlling persons" of Xentex for purposes of Xentex's alleged violation of the VSA, §13.1-522(A), in connection with Xentex's alleged sale of securities to Xen Investors as well as for the TMB Loan, allegedly by means of untrue statements of material fact and/or omissions. Under both the federal statutory claims asserted against Turcotte and Kim, and the Virginia statutory claims asserted against Turcotte, Kim and Cohen, for liability as controlling persons for  alleged violations of the securities laws, Plaintiffs must first establish that the alleged primary violator – in this case, Xentex – is liable for the primary violation of these securities laws. 15 U.S.C. §77o ("Every person who … controls any <u>person liable</u> under sections 77k or 77l….")(emphasis supplied); Virginia Securities Act, Va. Code §13.1-522(C) (liability for someone who controls "a <u>person liable</u> under subsection A or B of this

section….") (emphasis supplied); *Maher v. Durango Metals, Inc.*, 144 F. 3d 1302, 1305 (10th Cir. 1998)(a prima facie case for control person liability under §15 of the Securities Act of 1933, for an alleged violation of §12(a)(2), requires that plaintiff establish a primary violation of §12(a)(2)); *Heartland Financial USA, Inc. v. Financial Institutions Capital Appreciation Partners, LLC,* 2002 WL 31819008, *8 (N.D. Ill. Dec. 12, 2002) (Judge Leinenweber) ("Control person" liability is a derivative claim, "cognizable only where plaintiffs allege a "primary" violation of the securities laws."); *Dunn v. Ronbotics Corporation*, 2003 WL 23697826 at **10-11 (E.D. Va. Feb 20, 2003)(no liability as a controlling person pursuant to VSA §13.1-522 (C) in the absence of a finding of a primary violation under §13.1-522(A) of the VSA); *Atocha Limited Partnershipv. Witness Tree, LLC*, 65 Va. Cir. 213, 2004 WL 1665009 at *7 (Va. Cir. Ct. July 16, 2004)(liability under VSA §13.1-522 (C) on those able to control a seller is addressed only if it is first determined that there has been a violation of VSA §13.1-522 (A) by the alleged seller). Mr. Turcotte, Dr. Kim and Dr. Cohen are entitled to summary judgment in their favor on Counts I-III, XII-XIV and XIX-XX because the undisputed evidence establishes that there is no basis for any liability for a primary violation of the Securities Act of 1933 or the VSA.

**Plaintiffs Cannot As A Matter Of Law Establish That Xentex Made Any Material Misrepresentations or Omissions**

To establish liability under §12(2) of the Securties Act of 1933, plaintiff must prove: "(1) that defendant offered or sold a security; (2) by use of any means of communication in interstate commerce; (3) through a prospectus; (4) **by making a false statement or omission of material fact**; (5) the untruth of which was known by defendant but not known by plaintiff; and (6) that caused plaintiff's damages." *Gasner v. Board of Supervisors of the County of Dinwiddie, VA*, 103 F. 3d 351, 356 (4th Cir. 1996)(emphasis supplied). Likewise, a violation of VSA §13.1-522(A) requires the sale of a security "by means of **an untrue statement of a material fact** or any **omission to state a material fact** …." Va. Code §13.1-522(A)(emphasis supplied).[2] "A misrepresented or omitted fact is material if there is a substantial likelihood that a reasonable investor would have been caused by disclosure of the truthful fact to change his decision to purchase the security." *Gasner* at 356. "Disclosure of

---

[2] Because of the scarcity of Virginia case law interpreting the VSA, Virginia courts have utilized cases interpreting the Federal Securities Act of 1933 for guidance. *Atocha Limited Partnershipv. Witness Tree, LLC*, 65 Va. Cir. 213, 2004 WL 1665009 at *5 (Va. Cir. Ct. July 16, 2004).

the true facts or of the omitted fact must have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." *Id.*, citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976). *See also Halperin v. EBanker USA.COM, Inc.*, 295 F. 3d 352, 357 (2nd Cir. 2002)(allegedly fraudulent materials must be analyzed in their entirety to determine whether a reasonable investor would have been mislead, considering the total mix of information). Moreover, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law. *Harden v. Raffensperger, Hughes & Co., Inc.,* 65 F.3d 1392, 1404 (7th Cir. 1994). Here, the total mix of information provided by Xentex, including the cautionary statements and explicit disclosures and warnings contained in the Information Statement, demonstrate that the alleged misrepresentations and omissions by Xentex could not, as a matter of law, have been material.

In *Gasner*, investors sued the county and its development authority alleging securities fraud pursuant to §12(a)(2) of the Securities Act of 1933 and the VSA, in connection with defaulted bonds that were issued to finance construction and operation of an anaerobic composting facility. The investors alleged that the offering materials contained misrepresentations or omissions regarding whether anaerobic composting had been a proven technology, and whether the county had only a temporary permit to operate such a facility. The Court granted defendants' motion for summary judgment on the securities fraud counts, finding as a matter of law that defendants made no material misrepresentations or omissions in the offering statement, which was replete with cautionary language that negated the materiality of any of the alleged misrepresentations or omissions. *Id.* at 358. The offering statement included cautionary language that the Virginia Bio-Fuel Corporation or "VBFC", which was the private corporation engaged to construct and operate the facility, had no significant assets other than the operations contract with county, and had never operated a facility similar to the one to be built by the county. The offering memorandum further disclosed that there could be no guarantee that the building would be completed, or if completed, would function as intended as a solid waste facility or one with sufficient revenues to cover operating costs. *Id.* at 359. Based upon the total mix of information, including this cautionary language found in the offering memorandum, the court concluded that summary judgment was properly granted by the district court. *Id.* at 360. "Although the total mix of

13

the information available warned them of the high risks they were facing, the bond-holders nonetheless chose to purchase these bonds. They can hardly now claim that their losses were, pursuant to Rule 10(b)(5) and §12(2), the result of securities fraud committed by the appellees." *Id.*

In *Olkey*, 98 F. 3d 2d at 2, 8 (2d Cir. 1996), a group of investors brought suit pursuant to §12(2) of the Securities Act, seeking damages for fraud in issuing and using prospectuses to market trusts formed to invest in mortgage backed securities. The investors alleged that the prospectuses misled investors by indicating that securities would be selected as to achieve a balance so that when interest rates rose and fell, the value and earnings of the trust would remain stable. *Id.* at 4. The plaintiffs further alleged that defendants failed to disclose the limitations of their hedging strategy, including its vulnerability to decreasing interest rates, and thus the prospectuses, and also the "roadshows" that defendants put on for potential investors, misrepresented the riskiness of the trusts. *Id.*

The district court in *Olkey* dismissed plaintiffs' claims pursuant to F. R. Civ. P. 12(b)(6) on the grounds that the investment strategy and risks were fully revealed on the face of the prospectuses, and that reasonable investors would not have relied on oral assurances when they were contradicted by specific disclosures in the prospectuses. *Id.* at 4. The Second Circuit affirmed, finding that when the prospectuses were read as a whole, they informed prospective investors of the nature of the investment and the attendant risks:

> Since the plaintiffs' claims are contradicted by the disclosure of risk made on the face of each prospectus, no set of additional facts could prove the plaintiffs' claims. Representations made by the defendants at the roadshows are immaterial since they are contradicted by the plain and prominently displayed language in the prospectuses.

*Id* at 7. *See also Halperin* at 360-61 (2nd Cir. 2002)(the offering memoranda addressed the relevant risk, and included sufficient cautionary language that the investment involved substantial risks, and was suitable only for those who could sustain the lost of their entire investment: when read in their entirety, the offering memoranda did not only "bespeak caution, they shout it from the roof tops, so to speak.").

It is undisputed that both Xen Investors and TMB were provided with and read the Information Statement prior to making their alleged respective investments in Xentex. (Facts 72, 74, 84-89). The total mix of information provided by Xentex, including the cautionary

statements and explicit disclosures and warnings contained in the Information Statement, demonstrate that the other alleged misrepresentations and omissions by Xentex were immaterial as a matter of law. The disclaimers and warnings on the Information Statement clearly provided extensive cautionary language. (Facts 76-83). Sufficient cautionary language renders the alleged omissions or misrepresentations immaterial as a matter of law. *Harden v. Raffensperger, Hughes & Co., Inc.,* 65 F.3d 1392, 1404 (7th Cir. 1994). The first two pages of the Information Statement contained the following:

> The Shares offered hereby involve a high degree of risk. Investors should not invest any funds in this private placement unless they can afford to lose their entire investment. *See* "Risk Factors" generally, and "Risk Factors – Failure to Commence Operations," particularly. (Information Statement, p. 1.)

> Any estimates or projections as to events that may occur in the future are based upon the judgment of management of the company as of the date of this memorandum. Whether or not such estimates or projections are achieved will depend upon the achievement by the company of its overall business objectives and the future availability of funds…There can be no assurance that any of these projections will be attained. Actual results will vary from the projections and such variations may be material. (Information Statement, p. 2.)

> This memorandum contains forward looking statements and financial projections that involve risks and uncertainties. Actual events and results could differ materially from those anticipated in these forward looking statements as a result of various factors. (Information Statement, p. 2.)

The Section of the Information Statement entitled "Business Strategy" further provides:

> Although the Company's agreements with KDS provide the Company with financing for product development, as well as for tooling and manufacturing of Voyager units, the Company expects to require an additional $5 – 10 million prior to the product launch, depending on the size of the Company's advertising budget ……..In the immediate future, the Company expects to begin contacting investment bankers and potential business partners (such as software and Internet service providers) to raise this amount on a private basis……..However, there is no assurance that the Company will be able to obtain such financing on favorable terms or at all.

In addition, the section of the Information Statement clearly designating "RISK FACTORS", and called to a prospective investor's attention on the first page of the Information Statement, provided:

15

> The securities offered hereby are speculative and involve a high degree of risk, and should be purchased only by investors who can afford to sustain a total loss of their investment…..

The "Lack of Operating History" section provides:

> Being **a startup organization**, the Company does not have any operating history, and has conducted no business to date other than matters related to its organization, **the preliminary design and development of the *Flip-Pad* line, the raising of capital and establishing its strategic alliance with KDS**. Although KDS is an established company with sales of over $500 million in 1999, the Company must still develop its own operations.  The intended business of the Company is subject to the risks inherent in the establishment of new business enterprise.  **Because the Company's intended products and services have not been fully developed or tested, investors do not have access to all of the information in assessing their proposed investment that is available to the purchasers of securities of a computer hardware company with a history of operations.  The Company's profitability for the foreseeable future will depend primarily upon the successful development, manufacture and marketing of the *Flip-Pad* line of products, and there is no assurance that the Company will ever operate profitably.  The Company can be expected to incur significant operating losses until its products are successfully marketed, if ever.**

(emphasis supplied).   The "Failure to Commence Operations" section, also specifically referenced on the first page of the Information Statement, provides:

> Although the Company's **engineering team has developed working models** of its full-size PC product, **there is no assurance that production models will ever be completed**.  Absent the commencement of profitable operations the Company's accumulated deficit will continue to increase (and book value per share will continue to decrease) as operating expenses continue to be incurred.  While KDS has agreed to pay for the remaining portion of the Voyager's product development and tooling costs, the Company still requires a marketing budget and other operation funds.  Unless the Company is able to raise additional capital, it is unlikely the Company will commence any significant marketing operations.  *See*" **– Significant Capital Requirements; Uncertainty of Additional Funding**.:  In such a case, and absent a sale of the entire Company, the Company is unlikely to recover any significant portion of its investment in the development of the *Flip-Pad* products.  As a result, if a liquidation of the company were to occur, investors would likely lose their entire investment.

(emphasis supplied).  (Facts 77-82).  Thus, the risks inherent in Plaintiffs' investment in Xentex were fully and plainly disclosed in the written materials -- the Information Statement

16

– provided to them, and relied upon both by Xen Investors when it made its investment, as well as by TMB in connection with its $650,000 loan six months later. (Fact 121). Admittedly, Plaintiffs also knew that Xentex was insolvent (Fact 92-93), and was incapable of meeting its operating expenses for even one more month without the Plaintiffs infusion of capital. (Facts 90, 92-93). Xen Investors was specifically informed that its investment of $300,000 per month (for four months) was the minimum amount of funding Xentex needed just to cover its minimum expenses to keep its doors open, unless or until it could obtain additional funding achieve its goal of mass production and sales. (Id.). In light of the total mix of information provided Plaintiffs, including the Information Statement and its explicit disclosure of Xentex's "Significant Capital Requirements" and the risk that the "**Company can be expected to incur significant operating losses until its products are successfully marketed, if ever**, Plaintiffs cannot now say that they were not aware of Xentex's dire financial situation, or the risks they were taking in making their investments.

Moreover, the undisputed evidence, including Xentex's agreements with KDS, its Korean manufacturer, demonstrate that the information contained in the Information Statement regarding present facts relating to the development, production, sales and servicing of the Voyager were true and accurate. (Fact 62-65). Plaintiffs assert that their claims are based upon the allegedly false or misleading statements that:

> (1) that KDS had agreed to provide the necessary financing for the balance of product development for Voyager computers; (2) that Xentex had already received product financing of approximately $40 million from its contract manufacturer (KDS); (3) that KDS had agreed to open a Silicon Valley service depot to provide warranty and repair services for Voyager units; (4) that KDS was obligated to purchase a minimum of 13,100 Voyager units during the first year of production and 26,200 units during the second year of production; and (5) that Xentex had the present expectation of launching Voyager in the fourth quarter of 2000 and had the present expectation of beginning production and shipment of Voyagers in the first quarter of 2001, ….

The plain written disclosures in the Information Statement and the additional supporting documentation -- including the KDS agreements, which were provided to Plaintiffs prior to their investments in Xentex – demonstrate the truth of Xentex's representations regarding its present contractual arrangements with KDS. (Fact 62-65, 104-105). These written disclosures must control over any alleged "oral variances" allegedly made by Batio or Tucker. Seventh Circuit law is clear that:

17

> "[t]he principle that the written statement controls the oral one is a staple of
> contract law, and we agree … that it should be used in securities law as well."
> Consequently, when the issuer discloses the truth, an oral variance is not a
> legal cause for injury." Id. As far as what the plaintiffs claim they were told
> about the risks of the investment, its profitability, and calling the letters of
> credit, and to the extent that the oral representations differ from the
> corresponding memorandum, the plaintiffs have not established a legal cause
> of injury.

*Ambrosino v. Rodman & Renshaw, Incorporated*, 972 F. 2d 776, 786 (7th Cir. 1992), quoting

*Teamsters Local 282 v. Angelos*, 762 F. 2d 522, 530 (7th Cir. 1985). Written disclosures

control over oral disclosures. *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F. 2d 1317, 1322 (7th

Cir. 1988)(a written declaration informing one party of an important fact dominates a contrary

oral declaration, so in the law of securities a written disclosure trumps an inconsistent oral

statement); *Berson v. Hardiman*, 1999 U.S. Dist. Lexis 14767, *24-25 (N.D. Ill. 1999)(Judge

Pallmeyer)(written disclosures in private placement memorandum trump any alleged oral

representations to the contrary). When there is a disparity between the allegations in the

pleading and the written instrument, the written instrument controls. *Heartland Financial*

*USA*, at *3 (warnings in private placement memorandum controlled over alleged statements to

the contrary). In addition, the Information Statement itself provided in two separate places

therein that:

> No person has been authorized to make any representations or give any
> information with respect to the company or the shares other than the
> information contained herein and, if made or given, such representations or
> information must not be relied upon as having been authorized by the company
> or otherwise. Prospective investors should not rely on any information not
> contained in this memorandum.

(Facts 77, 83). Plaintiffs only other assertion regarding the allegedly false information

provided by Xentex includes the claim that:

> The Information Statement also included false and misleading financial
> statements, prepared by Xentex's in-house accountant and Chief Financial
> Officer, Turcotte. The financial statements were materially false and
> misleading because: (1) they drastically overstated the value of Xentex's
> assets by millions of dollars by falsely representing that Xentex had over $5.3
> million in total assets, including $4.25 million in tooling assets.

Complaint at ¶29. While the undisputed evidence from Turcotte, Xentex's "in-house"

accountant and CFO, is that such financial statements were intended for internal distribution

only (Fact 51), and that he had no prior knowledge of any dissemination outside of Xentex's upper-management (Fact 52-53), the financial statement which Plaintiffs allege was attached to the Information Statement clearly designates on its face that it was "preliminary, unaudited and subject to change". (Facts 90-91). Moreover, the undisputed evidence demonstrates that the financial statement was accurate as of the date it was prepared, which is further corroborated by the KDS agreements, of which Plaintiffs were aware prior to their investment in Xentex. (Fact 51, 62-65, 105). In sum, all of the written materials, taken together, provided Plaintiffs with truthful, current and accurate information regarding Xentex's contracts, other assets, overall financial picture, and the risks associated with an investment in Xentex. Any contrary assertions of "falsity" plaintiffs allude to are trumped by the written materials, and Plaintiffs were specifically warned in writing that any oral representations to the contrary were not authorized by Xentex and not to be relied upon, and in any event, were immaterial given the total mix of information provided Plaintiffs.[3]

### F. XEN INVESTORS CANNOT PREVAIL ON ITS CLAIMS BECAUSE IT HAS NO LOSSES FROM THE ALLEGED VIOLATION

**1.    Xen Investors Cannot Establish "Loss Causation"**

To establish a primary violation against Xentex under 15 U.S.C. § 77*l*(a)(2), Xen Investors must prove valid loss causation:

> In an action described in subsection (a)(2) of this section, if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) of this section represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.

15 U.S.C. § 77*l*(b).

"Loss causation" requires Xen Investors to show that it was the very facts about which Xentex lied which caused its injuries. *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997). Dr. Kim and Mr. Turcotte are entitled to summary judgment if they can establish "that the decline in the value of the security is attributable in total to some . . .

---

[3] Additionally, Plaintiffs provide no evidence that any of the alleged statements were "false" or inaccurate or incomplete in any respect. Plaintiffs imply that the representations were false, simply because Xentex did not succeed in its goal of mass production and sales, and eventually filed for bankruptcy. However, Plaintiffs must do more than this to demonstrate that the statements made (or alleged omissions) were false at the time that they were made.

factor" other than the alleged false statement. *Id*. at 649-50. *See also Bastian v. Petren Resources Corporation*, 892 F.2d 680, 682 (7th Cir. 1990)("if the facts had been as represented by the defendants," but the value of the plaintiffs' investment still declined, there is no loss causation.) *Id*. at 682. Here, the reason why Xen Investors' (and all Xentex shareholders') suffered a loss of their investment in Xentex was because KDS went into bankruptcy, and as a result, could not produce computers for Xentex. (Facts 140, 142). There is no nexus between Xen Investors' loss of their investment and the alleged fraud.

### 2. Xen Investors Did Not Suffer Any Economic Loss.

In November 2002, the Virginia State Corporation Commission ("SCC") commenced an investigation of Premier Capital and Reyna relating to their role in the sale of Xentex stock to Virginia investors. (Fact 136). As a result of this investigation, Reyna was ordered to make a rescission offer to seven Virginia investors, including Xen Investors. (Fact 137-138).[4] Reyna and Premier made the offer, but Xen Investors refused this offer to rescind its investment. (Fact 139). Xen Investors therefore either suffered no damages, or alternatively, failed to mitigate its damages, and cannot now seek to recover from Defendants. *See e.g*., *Ricketts v. Adamson*, 483 U.S.1, 22, 107 S. Ct. 2680, 97 L. Ed. 2d 1 (1987); *Ellis v. Sheahan*, 412 F. 3d 754, 756 (7th Cir. 2005); *Savino v. C.P. Hall Co.*, 199 F. 3d 925, 934-35 (7th Cir. 1999).

### G. TURCOTTE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIM.

In Count V, Plaintiffs allege that Mr. Turcotte, Xentex's in-house accountant, prepared false and misleading financial documents so as to induce Plaintiffs to invest in Xentex. Specifically, Plaintiffs claim that (1) through the course of his business and employment with Xentex, Turcotte was in the business of supplying information for the guidance of others in their business dealings; (2) Turcotte negligently made statements to Plaintiffs that contained inaccurate information regarding Xentex's financial condition and production capabilities; and (3) Turcotte provided the information to Plaintiffs to guide them in their investment decisions, with the intent that Plaintiffs would act on those representations. (Compl., ¶¶ 81-83.) Plaintiffs, however, cannot establish that Turcotte provided them with any information in

---

[4] VSA §13.1-522(D) provides that a plaintiff may not even maintain suit for a violation of §13.1-522 A, B, or C if before suit is brought any person liable by any of those provisions makes a written offer to refund the consideration paid and any loss due to any investment advice provided by such person.

which he believed they would rely and, more importantly, cannot establish that Turcotte owed any duty to communicate accurate information to them. Thus, summary judgment is warranted.

To prevail on a claim for negligent misrepresentation, a plaintiff must prove (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information. *TriContinental Industries, Ltd. v. Price Waterhouse Coopers, LLP,* 475 F.3d 824, 833-34 (7th Cir. 2007), *citing First Midwest Bank v. Stewart Title Guaranty Co.,* 218 Ill.2d 326, 335 (2006). As stated above, Plaintiffs have shown no evidence to support such a claim.

## 1. Turcotte Did Not Intend For Plaintiffs to Rely on the Financial Information He Prepared.

The crux of Plaintiffs' claim against Turcotte is that he made misrepresentations about the financial condition of Xentex through financial statements that were provided to Plaintiffs at the November 1, 2000 meeting. Simply because Plaintiffs were shown those financial statements does not establish that Turcotte intended for them to rely on those statements. Indeed, Turcotte testified that he prepared those documents for internal purposes only and had no knowledge that Batio or Tucker were going to give them to anyone. (Facts 52-53). Moreover, those statements were clearly designated as "preliminary, unaudited and subject to change" and Turcotte never disclosed them to anyone outside of Xentex and never gave them to any investor. (Id.). Importantly, Reyna acknowledged that the financial statements Plaintiffs were provided were unaudited. (Fact 91).

## 2. Turcotte Owed No Duty to Provide Accurate Information to Plaintiffs.

Although Plaintiffs claim that Mr. Turcotte had some kind of duty to provide them with accurate information to "guide them in their business dealings," their position is contrary to the law and the facts in this case. In determining whether a particular enterprise is in the business of supplying information for the guidance of others in their business transactions, courts must undertake a "precise, case-specific inquiry." *Tolan and Son, Inc. v. KLLM Architects, Inc.,* 308 Ill. App. 3d 18, 27 (1st Dist. 1999), *quoting Rankow v. First Chicago*

*Corp.,* 870 F.2d 356, 361 (7th Cir. 1989). To determine whether a defendant is in the business of supplying information for the guidance of others in their business transactions is:

> whether the end product of the relationship between plaintiff is a tangible object (i.e., a product) which could be readily described in a contract or whether it is intangible. In short, if the intended end result of the plaintiff defendant relationship is for the defendant to create a product, a tangible thing, then the defendant will not fit into the business of supplying information.

*Id.* at 28, *quoting MW Manufacturers, Inc. v. Friedman Corp.,* No. 97 C 8319, 1998 WL 417501, at *4 (N.D. Ill. July 21, 1998). Moreover, whether the information supplied is merely ancillary to the sale of a product or service or in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings. *Id.*, *citing Rosenstein v. Standard & Poor's Corp.,* 264 Ill. App. 3d 818, 823 (1st Dist. 1993). Turcotte was an employee of Xentex, preparing financials statements of for internal use only, for Xentex's upper management, and for no one outside of this group. (Facts 46, 50, 52-53). Turcotte did not supply information to anyone outside of Xentex's upper-management, and clearly was not in the business of supplying information to Plaintiffs, whom he had never met, and was only vaguely aware of their existence. (Fact 51).

**3.    Turcotte's Financial Statements Contained No False Information**

The financial statements Mr. Turcotte did prepare internally for Xentex were neither false, nor was Mr. Turcotte carelessness or negligent in ascertaining the truth. Turcotte's inclusion of the $4.25 Million for tooling as an asset was accurate, and ascertained directly from the KDS agreements, which at the time certain financial statements were prepared, were the only means or basis for assigning value to this asset. (Fact 51). When Mr. Turcotte believed he had obtained more precise information regarding the value of the tooling to date, he revised Xentex's financial statements accordingly. (Id.).

**H.    PLAINTIFFS CANNOT ESTABLISH ANY OF THE ELEMENTS OF A CLAIM FOR COMMON LAW FRAUD AGAINST TURCOTTE AND KIM**

Under Virginia law, a plaintiff must prove that a defendant knowingly and intentionally made a false representation of a material fact, with the intent to mislead, and that the plaintiff reasonably relied on the representation to his or her detriment. *Goldstein v.*

*Malcolm G. Fries & Associates, Inc.,* 72 F.Supp.2d 620, 627 (E.D. Va. 1999); Atocha *Limited Partnership* at *11. In a case that involves multiple defendants, a plaintiff cannot group all alleged wrongdoers together – he or she must prove specific circumstances of fraud for each individual defendant. *Goldstein* at 627. In the absence of a knowingly false representation, plaintiffs cannot prove a case for fraud. *Atocha* at *11.

Plaintiffs cannot present even a scintilla of evidence on even one of the requisite elements for establishing a claim for fraud. The undisputed evidence demonstrates that neither Mr. Turcotte nor Dr. Kim made any representations to Plaintiffs, much less, known false ones of material fact, and there is no evidence that Turcotte or Kim intended to mislead Plaintiffs in any respect. (Facts 35, 39-41, 51, 55-57, 73). Accordingly, Turcotte and Kim are entitled to summary judgment on Plaintiffs claims for common law fraud.

## I. THE CLAIMS FOR BREACH OF FIDUCIARY DUTY AGAINST TURCOTTE AND KIM MUST ALSO FAIL

In a vein similar to the alleged fraud claims, Plaintiffs' Complaint asserts that Mr. Turcotte and Dr. Kim owed a fiduciary duty to Plaintiffs to "act honestly, loyally and in good faith and fairness to Plaintiffs (Complaint at ¶88, 186), and that they allegedly breached their duties because they "allowed Xentex to make each of the misrepresentations made to Plaintiffs", as alleged elsewhere in Plaintiffs' Complaint, allegedly had the "ability to prevent Xentex from making the misrepresentations", and "continu[ed] to conceal the false nature of [Xentex's] earlier misrepresentations even though [they] knew [they] owed Plaintiffs a fiduciary duty." See Complaint at ¶89-92, 187-190. This Court has already ruled in its Memorandum Opinion and Order dated September 29, 2004, that while officers and directors generally owe a fiduciary duty to the shareholders of a corporation, "that duty does not emerge until after there is an actual director-shareholder relationship", and "to the extent that plaintiffs breach of fiduciary duty claims are based on defendants' conduct prior to plaintiffs' purchase of Xentex stock, those claims must be dismissed." Memorandum Opinion and Order dated September 29, 2004, at p. 8.

To the extent that Plaintiffs attempt to plead a claim for breach of fiduciary duty after they became shareholders in Xentex, Plaintiffs appear to assert breach of the duty of disclosure. "While it is true that the directors of a Delaware corporation owe a fiduciary "duty of disclosure" to its stockholders when they seek stockholder action", *See Jackson National*

*Life Insurance Company v. Kennedy*, 741 A. 2d 377, 388 (Del. Ch. 1999), this is not the issue here, and Plaintiffs assert no other basis for any duty allegedly owed to them.

Delaware has recognized a claim for breach of fiduciary duty for issuing misleading disclosures to stockholders when those disclosures were not connected to a specific request for a discretionary voting or tendering decision, classifying such a claim as a species of the duty of loyalty. *Metro Communication Corp. v. Advanced Mobilecomm Technologies, Inc.*, 854 A. 2d 121, 157 (Del. Ch. 2004). In *Malone v. Brincat*, 722 A. 2d 5, 10 (Del. 1998), the Delaware Supreme Court recognized this claim, but "set a very high bar for plaintiffs seeking to prove a claim. In the *Malone* context, a plaintiff had to prove that the directors "knowingly disseminated false information". This level of proof is similar to, but even more stringent than, the level of scienter required for common law fraud." *Metro Communication Corp.* at 157-58, citing *Malone v. Brincat*, 722 A. 2d 5, 10 (Del. 1998).

Plaintiffs breach of fiduciary duty claims against Mr. Turcotte and Dr. Kim fail for the same reasons as their fraud claims. Absent from the evidence in this case is any indication that Mr. Turcotte or Dr. Kim made any representations to Plaintiffs, provided them with any false information, had any knowledge that someone else had provided false information, and finally, that either Mr. Turcotte or Dr. Kim possessed the requisite scienter or intent to mislead Plaintiffs, in any respect.

Finally**,** Xentex's Amended and Restated Certificate of Incorporation insulates Dr. Kim from liability from any alleged breach of fiduciary duty. Article X of the Amended and Restated Certificate of Incorporation of Xentex contains the following exculpatory clause:

> To the fullest extent permitted by the General Corporation Law of Delaware, as the same now exists or may be hereafter amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. No amendment to or repeal of this Article X shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for or with respect to any acts or omissions of such director occurring prior to the effective date of such amendment or repeal.

(Fact 24).

Under Delaware law, a corporation's certificate of incorporation may include "[a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." Del. Code

Ann. tit. 8, § 102(b)(7) (2007).  "Claims alleging disclosure violations that do not otherwise fall within any exception are protected by Section 102(b)(7) and any certificate of incorporation provision . . . adopted pursuant thereto." *Arnold v. Soc'y for Sav. Bancorp.*, 650 A.2d 1270, 1287 (Del. 1994) (affirming summary judgment in favor of directors on failure to disclose claim).   As a result, the exculpatory clause shields Dr. Kim from liability for any alleged breach of fiduciary duty.

## IV.     CONCLUSION

For the foregoing reasons, Defendants, Dr. LARRY COHEN, Dr. WAN HEE KIM and MICHAEL TURCOTTE respectfully request that the Court grant their Motion for Summary Judgment on Counts I – VI, XII – XVI and XIX – XX of Plaintiffs' Third Amended Complaint.

**LARRY COHEN, WAN HEE KIM, and
MICHAEL TURCOTTE**
**Defendants**


By:____/s/Jeanne M. Hoffmann_____
        One of Their Attorneys

Jeanne M. Hoffmann
**BRYCEDOWNEY, LLC.**
200 N. LaSalle Street, Suite 2700
Chicago, IL  60601
(312) 377-1501

## CERTIFICATE OF SERVICE

I, Jeanne M. Hoffmann, an attorney, certify that on July 9, 2007, I electronically filed Defendants' Cohen, Kim and Turcotte Memorandum of Law in Support of Motion for Summary Judgment with the Clerk of the United States District Court using the CM/ECF system, which will send electronic notification to all parties of record.

By:____/s/Jeanne M. Hoffmann_____
        One of Their Attorneys

Jeanne M. Hoffmann
**BRYCEDOWNEY, LLC.**
200 N. LaSalle Street, Suite 2700
Chicago, IL  60601
(312) 377-1501