IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PREMIER CAPITAL MANAGEMENT, L.L.C., et al. | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LARRY COHEN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| LARRY COHEN, et al. | ) | Case No. 02 C 5368 |
| | ) | |
| Third-Party Plaintiffs, | ) | Judge Joan B. Gottschall |
| v. | ) | |
| | ) | |
| DOUGLAS TUCKER, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| DOUGLAS TUCKER, | ) | **MEMORANDUM OF LAW IN SUPPORT** |
| | ) | **OF DEFENDANT BRIAN FLANAGAN'S** |
| Cross-Claimant/Fourth-Party | ) | **MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PREMIER CAPITAL MANAGEMENT, L.L.C. and MATHIEU REYNA, | ) | |
| | ) | |
| Cross-Defendant/Fourth-Party | ) | |
| Defendant, | ) | |
| LARRY COHEN, et al., | ) | |
| | ) | |
| Counterclaimants/Cross-Claimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PREMIER CAPITAL MANAGEMENT, L.L.C. and MATHIEU REYNA, | ) | |
| | ) | |
| Counterdefendants/Cross-Defendants. | ) | |

# TABLE OF CONTENTS

**Page**

Factual Background ......................................................................................................1

Standard of Review ....................................................................................................4

Argument ....................................................................................................................5

I.  Flanagan is Entitled to Judgment as a Matter of Law on the Federal and
    State Securities Law Claims Stemming from Xen Investors' $1.2 Million
    Investment (Counts VII and VIII). ....................................................................5

    A.  Flanagan Is Not a Control Person. ..........................................................5

        1.  Flanagan Did Not Exercise General Control Over Xentex........................5

        2.  Flanagan Did Not Have the Power or Ability to Control the
            Alleged Fraud..........................................................................................8

    B.  Flanagan Acted in Good Faith. ................................................................9

    C.  There Was No Primary Violation of the Securities Laws by Xentex. ................11

        1.  The Alleged Misrepresentations Were Not Material...............................11

        2.  Xen Investors Did Not Suffer Any Economic Loss. ...............................12

        3.  Plaintiffs Cannot Establish Loss Causation. ............................................13

II. Flanagan is Entitled to Judgment as a Matter of Law on Xen Investors'
    Federal Securities Law Claim (Count VII) for Additional Reasons. ...............14

    A.  Xen Investors Did Not Purchase Shares Through a Public Offering...................14

    B.  Xen Investors' Claims Are Barred by the Statute of Limitations.........................15

III. Flanagan is Entitled to Judgment as a Matter of Law on Plaintiffs' Breach
     of Fiduciary Duty Claim (Count X). .................................................................17

    A.  Flanagan Did Not Owe a Fiduciary Duty to Any of the Plaintiffs at the
        Time of the Alleged Fraud. ...............................................................17

    B.  Plaintiffs Have Not Suffered a Unique Harm.......................................18

    C.  The Exculpatory Clause in Xentex's Amended and Restated Certificate of
        Incorporation Insulates Flanagan from Liability for Alleged Breach of
        Fiduciary Duty. .................................................................................20

IV.    Flanagan is Entitled to Judgment as a Matter of Law on Plaintiffs' Fraud
Claim (Count XI)..........................................................................................................21

       A.    Flanagan's Telephone Call with Reyna Does Not Support a Claim for
Actual Fraud.. ..................................................................................................21

       B.    No Evidence Exists That Can Support a Finding That Flanagan
Committed Constructive Fraud...........................................................................22

V.    Flanagan Is Entitled To Judgment as a Matter of Law on TMB's Virginia
Securities Act Claim (Count IX)....................................................................................24

Conclusion...................................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ......................................................................6

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
  545 A.2d 1171 (Del. 1988) ...........................................................................21

*Arnlund v. Smith*,
  210 F. Supp. 2d 755 (E.D. Va. 2002) ...........................................................21

*Arnold v. Soc'y for Sav. Bancorp.*,
  650 A.2d 1270 (Del. 1994) ...........................................................................20

*Atocha Ltd. P'ship v. Witness Tree, LLC*,
  65 Va. Cir. 213 (2004) .............................................................................5, 6, 9

*Badger v. Boulevard Bancorp, Inc.*,
  970 F.3d 410 (7th Cir. 1992) ........................................................................16

*Bastian v. Petren Res. Corp.*,
  892 F.2d 680 (7th Cir. 1990) ...................................................................13, 14

*Blair Constr., Inc. v. Weatherford*,
  485 S.E.2d 137 (Va. 1997) ...........................................................................23

*Bokat v. Getty Oil Co.*,
  262 A.2d 246 (Del. 1970) .............................................................................18

*Caremark, Inc. v. Coram Healthcare Corp.*,
  113 F.3d 645 (7th Cir. 1997) ........................................................................13

*Cohn v. Knowledge Connections, Inc.*,
  585 S.E.2d 578 (Va. 2003) ...........................................................................23

*Craig v. First Am. Capital Res., Inc.*,
  740 F. Supp. 530 (N.D. Ill. 1990) ..................................................................6

*Dellastatious v. Williams*,
  242 F.3d 191 (4th Cir. 2001) ...............................................................9, 10, 11

*Dennis v. Gen. Imaging, Inc.*,
  918 F.2d 496 (5th Cir. 1990) ..........................................................................6

*Dodds v. Cigna Sec., Inc.*,

12 F.3d 346 (2d Cir. 1993) .......................................................................15

*Donohoe v. Consol. Operating & Prod. Corp.*,

    982 F.2d 1130 (7th Cir. 1992) .......................................................5, 6, 9, 10

*Donovan v. ABC-NACO, Inc.*,

    2002 U.S. LEXIS 12797 (N.D. Ill. Jul. 12, 2002).........................................6, 9

*Dura Pharms., Inc. v. Broudo*,

    544 U.S. 336 (2005) ..........................................................................12, 13

*Eden v. Weight*,

    578 S.E.2d 769 (Va. 2003) ......................................................................23

*Ell v. Moss*,

    39 Va. Cir. 8 (1995) .............................................................................22

*Elster v. Am. Airlines*,

    100 A.2d 219 (Del. Ch. 1953) .................................................................18

*Fujisawa Pharm. Co. v. Kapoor*,

    115 F.3d 1332 (7th Cir. 1997) .................................................................12

*Gasner v. Bd. of Supervisors of County of Dinwiddie, Va.*,

    103 F.3d 351 (4th Cir. 1996) ..................................................................12

*Gottlieb v. McKee*,

    107 A.2d 240 (Del. Ch. 1954) .................................................................11

*Harden v. Raffensperger, Hughes & Co., Inc.*,

    65 F.3d 1392 (7th Cir. 1995) ..................................................................11

*Harrison v. Dean Witter Reynolds, Inc.*,

    974 F.2d 873 (7th Cir. 1992) ....................................................................5

*Henning v. Kyle*,

    56 S.E.2d 67 (Va. 1949) ........................................................................21

*Herm v. Stafford*,

    663 F.2d 669 (6th Cir. 1981) ..................................................................15

*In re Caremark Int'l Inc. Deriv. Litig.*,

    698 A.2d 959 (Del. Ch. 1996) .................................................................25

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,

    441 F. Supp. 2d 579 (S.D.N.Y. 2006).........................................................13

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,

    2004 U.S. Dist LEXIS 20733 (D.N.H. Oct. 14, 2004)......................................6

*Kaufman v. Motorola, Inc.*,
    1999 U.S. Dist LEXIS 6303 (N.D. Ill. Apr. 7, 1999) ...................................................6, 9

*Kauthar SDN BHD v. Sternberg*,
    149 F.3d 659 (7th Cir. 1998) .......................................................................................16

*Kuczmanski v. Gill*,
    302 S.E.2d 48 (Va. 1983) .............................................................................................21

*Lambert v. Downtown Garage, Inc.*,
    53 S.E.2d 714 (Va. 2001) .............................................................................................21

*Massey v. Merrill Lynch & Co.*,
    464 F.3d 642 (7th Cir. 2006) .......................................................................................18

*Metge v. Baehler*,
    762 F.2d 621 (8th Cir. 1985) .........................................................................................7

*McGowan v. Sears, Roebuck & Co.*,
    722 F. Supp. 1069 (S.D.N.Y. 1989)...............................................................................5

*Norris v. Mitchell*,
    495 S.E.2d 809 (Va. 1998) ...........................................................................................23

*Pereira v. Cogan*,
    2001 U.S. Dist LEXIS 2461 (S.D.N.Y. Mar. 13, 2001)................................................20

*Prime Leasing, Inc. v. Kendig*,
    332 Ill. App. 3d 300 (1st Dist. 2002) ...........................................................................17

*Pugh v. City of Attica*,
    259 F.3d 619 (7th Cir. 2001) .........................................................................................4

*Ruffin-Thompkins v. Experian Info. Solutions, Inc.*,
    422 F.3d 603 (7th Cir. 2005) .........................................................................................4

*Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*,
    973 F.2d 474 (6th Cir. 1992) .......................................................................................17

*Sanders v. Devine*,
    1997 Del. Ch. LEXIS 131 (Del Ch. Sept. 24, 1997)....................................................17

*Schlifke v. Seafirst Corp.*,
    866 F.2d 935 (7th Cir. 1989) .....................................................................................4, 7

*Searls v. Glasser*,
    64 F.3d 1061 (7th Cir. 1995) .......................................................................................12

*Secon Serv. Sys., Inc. v. St. Joseph Bank & Trust Co.*,

855 F.2d 406 (7th Cir. 1988) ....................................................................4

*Spicer v. Chicago Bd. Options Exch., Inc.*,

1992 U.S. Dist. LEXIS 18796 (N.D. Ill. Dec. 9, 1992) ...................................7

*Starr v. !hey, Inc.*,

2003 U.S. Dist. LEXIS 8698 (N.D. Ill. May 21, 2003) ....................................6

*Tate v. Colony House Builders, Inc.*,

508 S.E.2d 597 (Va. 1999) ....................................................................23

*Treganza v. Great Am. Commc'ns Co.*,

12 F.3d 717 (7th Cir. 1993) ..................................................................16

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,

845 A.2d 1031 (Del. 2004) ....................................................................18

*Walker v. Cardinal Sav. & Loan Ass'n*,

690 F. Supp. 494 (E.D. Va. 1988)............................................................5

*Wal-Mart Stores, Inc. v. J.A. Fielden Co.*,

440 F. Supp. 2d 523 (W.D. Va. 2006).......................................................23

*Weiss v. Leewards Creative Crafts, Inc.*,

1993 Del. Ch. LEXIS 73 (Apr. 29, 1993) ...................................................17

*Whirlpool Fin. Corp. v. GN Holdings, Inc.*,

67 F.3d 605 (7th Cir. 1995) ..............................................................15, 16

*Winn v. Aleda Constr. Co.*,

315 S.E.2d 193 (Va. 1984) ....................................................................21

**Statutes**

15 U.S.C. § 77d(2) .................................................................................14

15 U.S.C. § 77*l*(a)(2).............................................................................15

15 U.S.C. § 77*l*(b) .................................................................................13

15 U.S.C. § 77m..........................................................................15, 16, 17

15 U.S.C. § 77o ..............................................................................5, 7, 9, 15

Del. Code Ann. Tit. 8, § 102(b)(7) (2007) ...............................................20

Va. Code Ann. § 13.1-522(c) ..........................................................5, 9, 24

Va. Code Ann. § 13.1-522(d) .................................................................13

Va. Code Ann. § 13.1-501.......................................................................5

**Other**

Fed R. Civ. P. 56(c) ..................................................................................................4

17 C.F.R § 230.501(a)(8). ........................................................................................15

17 C.F.R. § 230.502(a) ............................................................................................15

17 C.F.R. § 230.502(b) ............................................................................................15

17 C.F.R. § 230.502(c) ............................................................................................15

17 C.F.R. § 230.502(d) ............................................................................................15

17 C.F.R. § 230.506 .................................................................................................14

17 C.F.R. § 230.506(b)(1) ........................................................................................14

17 C.F.R. § 230.506(b)(2) ........................................................................................15

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## BRIAN FLANAGAN'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs attempt to hold an outside director liable for securities fraud arising from an "Information Statement" he had no role in preparing and from a meeting with potential investors he did not attend and of which he was not aware. Plaintiffs also try to hold this outside director liable for fraudulently inducing them to enter into a loan that he personally had spoken out against at a board of directors meeting just days earlier because, in his words, the company could get better terms "from a loan shark in Cicero." Because no reasonable jury could return a verdict in Plaintiffs' favor on these facts and the evidentiary record generated during discovery, the outside director is entitled to summary judgment.

### Factual Background

Xentex Technologies, Inc. ("Xentex") was a start-up technology company whose primary business purpose was to develop, manufacture, and market laptop computers with a folding screen. (Statement ¶ 1.) The computer was the brainchild of Jeff Batio ("Batio"), who founded Xentex in 1996. (*Id*. ¶ 21.) At all relevant times, Batio owned a controlling share of Xentex's stock. (*Id*. ¶ 26.)

Xentex did not plan to manufacture computers itself. (*Id*. ¶ 22.) Rather, Xentex contracted with a Korean company called Korean Data Systems, Ltd. ("KDS") to manufacture the computers. (*Id*.) In 2000 and 2001, the business of Xentex was devoted to working with KDS to develop its first product – the Voyager computer. (*Id*. ¶ 23.)

As a start-up computer company, Xentex did not have any revenue and had to raise capital from investors to fund the design and manufacture of the Voyager and the day-to-day operations of the company. (*Id*. ¶ 24.) This case arises from Xentex's efforts to raise money from a group of investors in Virginia Beach, Virginia.

On November 1, 2000, Batio, Doug Tucker ("Tucker"), and a third person associated with Xentex met with Bobby Copeland, his son Todd Copeland, Mathieu Reyna ("Reyna"), and others at Bobby Copeland's office in Virginia Beach to demonstrate a prototype of the computer KDS was developing. (*Id*. ¶¶ 47-49.) The meeting was arranged by Reyna's investment company, plaintiff Premier Capital Management, L.L.C. ("Premier Capital"). (*Id*. ¶ 47.) At this meeting, Batio and Tucker distributed an Information Statement with financial statements attached to it. (*Id*. ¶ 50.) Plaintiffs allege that the Information Statement and financial statements contained multiple misrepresentations and that Batio and Tucker made a number of

oral misrepresentations at the November 1 meeting.  (Third Am. Compl. ¶ 29.)  As a result of this meeting, the Copelands agreed to lend Xentex $300,000 to get the company through the next month while they performed additional diligence to determine whether to make a larger investment.  (Statement ¶¶ 73-77.)  The Copelands formed plaintiff Xen Investors, L.L.C. ("Xen Investors") to make the investments.  (*Id.* ¶ 2.)

Following the November 1 meeting, Todd Copeland and Reyna visited Xentex's offices in California for the purpose of conducting additional research on Xentex.  (*Id.* ¶ 78.)  At this meeting, Tucker provided Todd Copeland with copies of Xentex's agreements with key suppliers, including KDS, and other documents relating to Xentex's financial condition.  (*Id.* ¶ 83.)  After this meeting, Xen Investors agreed to make a further investment in Xentex.  (*Id.* ¶¶ 86, 90, 92.)  All told, Xen Investors purchased 400,000 shares of Xentex stock for a total investment of $1.2 million (which total includes the initial $300,000 loan).  (*Id.* ¶ 95.)

Defendant Brian Flanagan ("Flanagan") did not attend the November 1 meeting or even know about it beforehand.  (*Id.* ¶ 63.)  He did not create or participate in the creation the Information Statement or the accompanying financial statements.  (*Id.* ¶ 64.)  Plaintiffs have admitted that Flanagan did not personally attend the November 1 meeting, did not personally present Plaintiffs with an offer to invest in Xentex, and did not personally have any direct oral or written communications with Plaintiffs until after they had purchased their first shares of stock in Xentex.  (*Id.* ¶ 65.)  Prior to this litigation, Flanagan had never met the Copelands in person and had at most two telephone conversations with them.  (*Id.* ¶ 111.)  Bobby Copeland admits that Flanagan did not say anything untrue in the first call, and the second took place a year after Xen Investors made its decision to invest.  (*Id.*)

Flanagan did not play any role in soliciting investors for Xentex or in the November 1 presentation.  (*Id.* ¶¶ 63, 96.).  Because Xen Investors cannot point to any direct involvement by Flanagan in the alleged fraud, it seeks to hold Flanagan liable for its $1.2 million loss as a "control person" of Xentex.  (Third Am. Compl. ¶¶ 103-05.)  After extensive discovery, the only facts that Xen Investors can even arguably cite in support of this theory are that Flanagan loaned Xentex $500,000, held 10 shares of Xentex stock, and was a member of the company's Board of Directors.  (Statement ¶¶ 39-43.)  This was not enough to give Flanagan any real ability to control the company, because Batio, as majority shareholder, had the authority to remove any Director or the entire Board of Directors.  (*Id.* ¶¶ 26, 28.)  In addition, prior to the time Flanagan

joined the Board of Directors, the Board had delegated most decision-making authority to an Executive Committee.  (*Id*. ¶¶ 31-35.)  Flanagan attended his first Board meeting on October 18, 2000, only two weeks before the meeting in Virginia Beach.  (*Id*. ¶ 43.)

The only direct act of Flanagan that forms the basis of any of Plaintiffs' claims is a telephone call between Flanagan and Reyna shortly before June 4, 2001, which allegedly induced plaintiff TMB, LLC ("TMB") to loan Xentex $650,000.  (Third Am. Compl. ¶ 31(e).)  In the spring of 2001, KDS continued its work on the development and production of the Voyager.  (Statement ¶ 115.)  However, Xentex still needed money to pay expenses, so Batio and Tucker approached Todd Copeland about providing additional funding.  (*Id*. ¶ 117.)  Todd Copeland provided Xentex with $100,000, and then Batio, Tucker, and the individuals associated with TMB negotiated terms for a larger loan.  (*Id*. ¶¶ 117-19.)  On May 29, 2001, the day before the telephone conversation between Reyna and Flanagan, Xentex's Board of Directors discussed the loan proposal.  (*Id*. ¶¶ 123, 125.)  The proposal was so unfavorable to Xentex that Flanagan spoke out against the loan, calling the terms "atrocious" and stating that Xentex could get better terms "from a loan shark in Cicero."  (*Id*. ¶ 125.)  The Board rejected the proposal, and Flanagan considered the issue to be closed.  (*Id*.)  According to Reyna's version of events (which Flanagan accepts only for purposes of summary judgment), the day after the Board meeting, he called Flanagan, and Flanagan told him that the "company was fine," "the computers were coming," and "everything was in place to launch this product."  (*Id*. ¶¶ 114(c), 126.)  Flanagan did not have the impression that Reyna was seeking information to determine whether to make the loan, and Flanagan did intend to induce TMB to make the loan.  (*Id*. ¶ 126.)  After the Board meeting and Reyna's telephone call with Flanagan, Batio and Tucker renegotiated the terms of the loan, and TMB and Xentex executed the loan documents on June 4, 2001.  (*Id*. ¶¶ 127-30.)  Flanagan was unaware of these negotiations, did not play any role in the execution of the loan, and did not learn that the loan had been executed until months later.  (*Id*. ¶ 136.)

In the spring of 2002, Xentex collapsed because its supplier, KDS, unexpectedly went into receivership before it could manufacture any production models of the Voyager.  (*Id*. ¶¶ 139-40.)  As a result, Xen Investors lost its $1.2 million investment, and Xentex did not repay TMB's $650,000 loan.  (*Id*. ¶¶ 95, 138.)

Plaintiffs have sued Tucker in Illinois state court and filed an adversary action in Batio's individual bankruptcy proceeding stemming from these investment losses.  (*Id*. ¶ 149.)  Plaintiffs

filed this suit on March 30, 2002, against the peripheral players associated with Xentex, including Flanagan. Plaintiffs assert five causes of action against Flanagan for losses arising from these two investments: (1) a control person liability claim under the Securities Act of 1933 (the "1933 Act") relating to Xen Investors' initial stock purchase (Count VII), (2) a control person liability claim under the Virginia Securities Act ("VSA") relating to Xen Investors' initial stock purchase (Count VIII), (3) a control person liability and aiding and abetting claim under the VSA relating to the TMB loan (Count IX), (4) a claim for breach of fiduciary duty (Count X), and (5) a claim for actual and constructive fraud (Count XI).

As set forth below, Flanagan is entitled to judgment as a matter of law on all five counts.

## Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, district courts view the evidence in the light most favorable to the non-moving party. *See, e.g.*, *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 937 (7th Cir. 1989). However, the party with the burden of proof (Plaintiffs here) may not rest on their pleadings, but rather must affirmatively demonstrate that there is a genuine issue of material fact that necessitates a trial. *See, e.g.*, *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). Plaintiffs cannot point to the "mere existence of *some* alleged factual dispute between the parties" because "the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001). Thus, to defeat summary judgment, Plaintiffs must "produce more than a scintilla of evidence to support" their claims. *Secon Serv. Sys., Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 419 (7th Cir. 1988).

<u>Argument</u>

I.  **Flanagan is Entitled to Judgment as a Matter of Law on the Federal and State Securities Law Claims Stemming from Xen Investors' $1.2 Million Investment (Counts VII and VIII).**

   A.  **Flanagan Is Not a Control Person.**

   Xen Investors has asserted claims against Flanagan under the 1933 Act (Count VII) and the VSA (Count VIII) for losses arising from its initial stock purchase.  To prevail on these claims, Xen Investors must establish that Flanagan meets the definition of a control person.  *See* 15 U.S.C. § 77o; Va. Code Ann. § 13.1-522(c).  As demonstrated below, Flanagan's standing at Xentex did not rise to the level of a control person.  As a result, he is entitled to judgment as a matter of law on Xen Investors' federal and state securities law claims.

   In order to establish control person liability, Xen Investors must show that Flanagan had "'the practical ability to direct the actions of the people who issue or sell the securities.'" *Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1138 (7th Cir. 1992) (citation omitted).  The Seventh Circuit has adopted a two-prong test for determining control person liability under federal law:  the plaintiff must show that the defendant (1) "actually exercised general control over the operations of the entity principally liable," and (2) "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated."  *Id.*; *see also Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992).  Xen Investors cannot demonstrate either prong of this test.[1]

      1.  **Flanagan Did Not Exercise General Control Over Xentex.**

   Undisputed facts demonstrate that Flanagan did not "exercise[] general control over the operations of [Xentex]."  *Donohoe*, 982 F.2d at 1138.  At all relevant times, Batio owned a majority of Xentex's common stock.  (Statement ¶ 26.)  Under the company's Bylaws and Amended and Restated Certificate of Incorporation, this gave Batio the power to remove any Director or the entire Board of Directors.  (*Id.* ¶ 28.)  The Amended and Restated Certificate of

---

[1] The VSA defines control as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  Va. Code Ann. § 13.1-501.  Because this language is similar to federal law, Virginia courts hold that "federal cases concerning control are informative."  *Atocha Ltd. P'ship v. Witness Tree, LLC*, 65 Va. Cir. 213, 225 (2004); *see also McGowan v. Sears, Roebuck & Co.*, 722 F. Supp. 1069, 1072-73 (S.D.N.Y. 1989).  However, in at least one case interpreting Va. Code Ann. § 13.1-522(c), the district court held that a plaintiff must "prove the defendants' culpable conduct," *Walker v. Cardinal Sav. & Loan Ass'n*, 690 F. Supp. 494, 500 (E.D. Va. 1988), a standard stricter than that adopted by the Seventh Circuit.  *See Harrison*, 974 F.2d at 876-81.

Incorporation further empowered Batio to adopt, amend, or repeal the company's Bylaws and take any action that could be taken at any stockholder meeting without a meeting, without prior notice, and without a vote. (*Id.*) Batio was CEO of Xentex from March 2000 through October 2000 and from March or April 2001 through the time Xentex filed for bankruptcy. (*Id.* ¶ 27.) During his time as CEO, Batio had general supervision, direction, and control of the business and affairs of the corporation, subject to the control of the Board and the Executive Committee. (*Id.* ¶ 30.)

In May 2000, the Board (on which Flanagan did not yet sit) formed an Executive Committee. (*Id.* ¶ 32.) This committee, composed of Batio, Tucker, and Kim, possessed wide latitude in making decisions for Xentex without board approval. (*Id.* ¶¶ 32, 34.) The Executive Committee could remove any Officer, fill a vacancy in any office, and control the CEO and Executive Vice President. (*Id.* ¶ 35.) Under the company's Bylaws, the Executive Committee had all of the authority of the Board of Directors, with certain exceptions. (*Id.* ¶ 34.) A quorum for Executive Committee meetings required two of the three members, meaning that any two members of the Executive Committee could make decisions for the company. (*Id.* ¶ 36.) Flanagan never served on or attended any meeting of the Executive Committee. (*Id.* ¶ 37.)

As this Court previously noted, "Flanagan's status as a member of the Board of Directors is insufficient to state a control person claim." (Mem. Op. & Order [Docket No. 87] at 23.)[2] However, the Court ruled that Plaintiffs had "allege[d] a bit more," namely, that Flanagan "'actively participated in and controlled decisions of the Board of Directors (general control).'" (*Id.*) While this allegation may have been sufficient to survive a motion to dismiss, the undisputed facts show a completely different picture. Flanagan attended only one Board meeting prior to the November 1 meeting in Virginia Beach. (Statement ¶ 43.) That Board meeting took place on October 18, 2000 (*id.*), exactly two weeks prior to the November 1 meeting. Xen

---

[2] This ruling is consistent with the general rule in this District that "a plaintiff may not premise control person liability solely upon status within the company." *Starr v. !hey, Inc.*, 2003 U.S. Dist. LEXIS 8698, at *16 (N.D. Ill. May 21, 2003); *see also Donovan v. ABC-NACO, Inc.*, 2002 U.S. Dist. LEXIS 12797, at *16 (N.D. Ill. Jul. 12, 2002) (defendants' status as directors not enough to establish they were control persons); *Kaufman v. Motorola, Inc.*, 1999 U.S. Dist. LEXIS 6303, at *49 (N.D. Ill. Apr. 7, 1999) (a director is not automatically liable as a control person); *Craig v. First Am. Capital Res., Inc.*, 740 F. Supp. 530, 537 (N.D. Ill. 1990) (allegation that defendant controlled acts of company by virtue of his position as officer and director insufficient); *see also Atocha Ltd. P'ship*, 65 Va. Cir. at 225 (a director is not automatically liable as a control person); *accord, e.g.*, *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003); *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509-10 (5th Cir. 1990); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 2004 U.S. Dist. LEXIS 20733, at *52-53 (D.N.H. Oct. 14, 2004).

Investors can point to no fact to show that Flanagan's participation in that Board meeting was no different than that of any other director of any other corporation. To hold otherwise would contravene the general rule that status as a director does not automatically make one a control person and would extend control person liability to all corporate directors.

In their most recent complaint, Plaintiffs also allege that Flanagan exercised general control over the operations of Xentex by virtue of his $500,000 loan. (Third Am. Compl. ¶ 104(l)-(m).) This is insufficient to create a genuine issue of material fact regarding Flanagan's status as a control person. Persuasive influence or financial interdependence is not enough to show control. *See, e.g.*, *Spicer v. Chicago Bd. Options Exch., Inc.*, 1992 U.S. Dist. LEXIS 18796, at *6 (N.D. Ill. Dec. 9, 1992) (fact that defendant supplied two-thirds of violating entity's business did not establish ability to control). For instance, in *Metge v. Baehler*, the Eighth Circuit rejected the plaintiffs' argument that the company's primary lender was a control person under 15 U.S.C. § 77o. 762 F.2d 621, 631-32 (8th Cir. 1985). The plaintiffs there argued that the lender had the ability to foreclose on loans whenever the company was delinquent on payment and cited several other factors showing the lender's involvement with the company, *id.* at 631, but the court affirmed summary judgment because the facts suggested only the "potential" for influence over some of the company's business decisions, not that the lender "actually exercised control over the operation of the corporation in general." *Id.* at 632. In *Schlifke v. Seafirst Corporation*, the Seventh Circuit followed *Metge* to hold that the fact that a lender "extended a loan to a company to finance its investment programs and took measures to secure its loans does not establish actual exercise of control." 866 F.2d 935, 949 (7th Cir. 1989); *see also, e.g.*, *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 486 (6th Cir. 1992) ("Extending a loan to a company and taking measures to secure that loan do not amount to actual control."). An interest as a creditor or shareholder alone cannot confer control person status, as virtually every director has a financial stake in the company he or she serves.

Discovery conducted since the Court's ruling has demonstrated that Flanagan's note did not give any undue influence over company affairs. Flanagan participated in the affairs of Xentex as an outside director, and in meetings of the Board, Flanagan had the same voting power as any other Director of the company. (Statement ¶ 44.) Flanagan never threatened to call his note in exchange for any type of action by Xentex, by any member of the Board of Directors, or any member of Xentex's management team. (*Id.*) In fact, Flanagan extended the term of his

note on multiple occasions in 2000 and 2001 and did not demand or receive any consideration in exchange. (*Id.*)

### 2. Flanagan Did Not Have the Power or Ability to Control the Alleged Fraud.

Even if Plaintiffs could point to more than a scintilla of evidence showing that Flanagan's general control over Xentex – which they cannot – there is no genuine issue with respect to Flanagan's "power or ability to control the specific transaction or activity upon which the primary violation was predicated." *Donohoe*, 982 F.2d at 1138.

Plaintiffs admit that Flanagan did not personally attend the November 2000 meeting, did not personally present Plaintiffs with an offer to invest in Xentex, and did not personally have any direct oral or written communications with Plaintiffs until after they had purchased their first shares of stock in Xentex. (Statement ¶ 65.) Plaintiffs also admit that Flanagan did not personally make any of the alleged oral misrepresentations at the November 2000 meeting or in the weeks and months thereafter. (*Id.* ¶ 66.)

Flanagan did not create or have any role in the creation of the Information Statement. (*Id.* ¶ 64.) Flanagan did not create or help create the financial statements attached to the Information Statement. (*Id.*) Flanagan did have any knowledge that the Information Statement was being presented to potential investors or to Xen Investors. (*Id.*) Flanagan had not even seen the Information Statement prior to this litigation. (*Id.*)

As stated above, Flanagan attended his first Board meeting on October 18, 2000 (*id.* ¶ 43), just two weeks before the meeting in Virginia Beach. At the October 18 Board meeting, the Board was not presented with and did not discuss any document entitled "Information Statement," any prospectus, or any private placement memorandum. (*Id.*) Other than a letter to stockholders, the Board did not discuss any other information to be distributed to investors. (*Id.*) The Board did not discuss any particular investors that representatives of Xentex had met with or planned to meet with, nor did anyone at the meeting mention any potential investors in Virginia Beach, Virginia. (*Id.*)

Flanagan did not attend the November 1 meeting. (*Id.* ¶ 63.) He did not prepare or play any role in the preparation of the presentation given at the November 1 meeting. (*Id.*) Flanagan was not present in California when Todd Copeland and Reyna were performing due diligence on the company. (*Id.* ¶ 80.) Flanagan did not play any role in soliciting investors generally. (*Id.* ¶ 96.)

This case is virtually identical to *Kaufman v. Motorola, Inc.*, where the Court granted a corporate director's motion for summary judgment, on the ground that the director attended management board meetings two to three times per year and received monthly documents describing the company's operating results but was not responsible for the allegedly false securities filing and public statements made by the company. 1999 U.S. Dist. LEXIS 6303, at *47-50 (N.D. Ill. Apr. 7, 1999).

After extensive discovery, the only fact to which Xen Investors can point is Flanagan's membership in the Board of Directors. Because this is not sufficient to make Flanagan a control person, *see, e.g.*, *Donovan*, 2002 U.S. Dist. LEXIS 12797, at *16; *Atocha Ltd. P'ship*, 65 Va. Cir. at 225, Flanagan is entitled to judgment as a matter of law on Counts VII and VIII.

### B.      Flanagan Acted in Good Faith.

Even if Xen Investors can create a genuine issue of material fact regarding Flanagan's status as a control person – which they cannot – good faith is a defense to control person liability. *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 912 (7th Cir. 1994); *Dellastatious v. Williams*, 242 F.3d 191, 194-95 (4th Cir. 2001). Under section 15 of the 1933 Act, Flanagan cannot be held liable as a control person if he "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o. Under the VSA, Flanagan cannot be held liable as a control person if "he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Va. Code Ann. § 13.1-522(c).

To hold Flanagan liable as a control person, Xen Investors must demonstrate that Flanagan acted recklessly; negligence alone is insufficient. *Donohoe*, 30 F.3d at 912. Summary judgment is appropriate on the good faith defense if the undisputed facts demonstrate that the defendant did not act recklessly. *Id.*[3]

---

[3] In *Dellastatious*, the plaintiff argued that the good faith defense under the VSA "is stricter than its federal counterpart because it requires defendants to prove that they were not negligent, as opposed to not reckless." 242 F.3d at 195. The Fourth Circuit assumed, without deciding, that defendants must show that they acted reasonably in order to satisfy the VSA's good faith defense. *Id.* Because the language of both statutes is so similar, there is no reason that liability of directors under the VSA should be more expansive than federal law. In any event, because the facts of the case at bar are so similar to *Dellastatious*, Flanagan is entitled to summary judgment even under the standard applied by the *Dellastatious* court.

The Seventh Circuit upheld summary judgment based on the good faith defense in *Donohoe*, 30 F.3d at 912-13. The plaintiffs in that case alleged that the defendants lured them into investing in a project to drill oil wells on land in which the defendants knew there was not any oil. *Id.* The defendants were principals and shareholders in and controlled the administrative and finance functions the company. *Id.* at 909, 912. However, they relied on the superior technical expertise of a third principal and shareholder, *id.* at 912, who, it turned out, "defrauded everyone." *Id.* at 909. To determine if there is a genuine issue of material fact regarding a defendant's recklessness, courts must "examine what the defendant[] could have done under the circumstances to prevent the violation, and then ask whether the defendant[] – aware that [he] could take such measures – decided not to." *Id.* at 912.

The seminal case on good faith under the VSA is *Dellastatious*, 242 F.3d at 194-97. In that case, the district court granted summary judgment in favor of two outside directors. *Id.* at 192-93. Like Flanagan, the directors were on the board because they invested in the company. *Id.* at 196. Like Flanagan, they had delegated responsibility for the creation and review of the company's offering documents to experienced corporate officers, a certified public accountant, an attorney with experience in drafting offering documents. *Id.* Like Flanagan, they only had a "tangential relationship" to the company's efforts to raise capital, where not aware of any irregularities in the materials sent to the plaintiff, were never charged with drafting or revising any of the documents submitted to the plaintiffs, and never met or communicated with the plaintiff. *Id.* at 197. The Fourth Circuit held that no jury could infer that the directors acted in bad faith and affirmed the district court's decision to grant summary judgment in their favor. *Id.*

In this case, Flanagan did not know and had no reason to know about the Information Statement or the meeting in Virginia Beach. Flanagan attended his first meeting of the Board just two weeks before the November 1 meeting. (Statement ¶¶ 43, 48.) The Board did not review or discuss the Information Statement or any specific investors that the company was soliciting. (*Id.* 43.) Flanagan did not take any role in fundraising at Xentex. (*Id.* ¶ 96.) Instead, as an outside director, Flanagan relied on Tucker, an experienced securities lawyer, and Barack Ferrazzano, the company's primary outside counsel, to make sure Xentex's offering memoranda complied with all applicable securities laws. (*Id.*) Under *Dellastatious*, Flanagan's reliance is reasonable as a matter of law and entitles him to summary judgment. 242 F.3d at 196 (holding

that it was reasonable for directors to delegate the creation and review of offering documents to company's officers and attorney).

      **C.    There Was No Primary Violation of the Securities Laws by Xentex.**

          **1.    The Alleged Misrepresentations Were Not Material.**

Xen Investors alleges that Xentex made multiple false statements of material fact in the Information Statement and in oral statements during and after the November 1 meeting. (Third Am. Compl. ¶ 29.). "'Cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.'" *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1404 (7th Cir. 1995) (citation omitted).

The Information Statement contains open and obvious cautionary language (Statement ¶¶ 54-56), perhaps best exemplified on the first page of the text of the Information Statement, which states, in bold print, that "**[t]he Shares offered hereby involve a high degree of risk**" and that "**[i]nvestors should not invest any funds in this private placement unless they can afford to lose their entire investment**." (*Id.* ¶ 54.)

The Information Statement and accompanying financial statements also disclosed Xentex's precarious financial condition. The financial statements stated that Xentex had overdrawn its bank account by more than $60,000, had accounts payable of nearly $800,000, and had a current liability of $1.8 million (*id.* ¶ 59), and the Information Statement stated that the company would "spend all, or substantially all, of its cash on hand over the next 30 days." (*Id.* ¶ 56(d).)

The Information Statement also contains "'substantive'" cautionary language specifically "'tailored'" to the statements that Xen Investors is challenging here. *Harden*, 65 F.3d at 1404 (citation omitted). For instance, Plaintiffs allege that the Information Statement falsely stated that "Xentex had the present expectation of launching Voyager in the fourth quarter of 2000 and had the present expectation of beginning production and shipment of Voyagers in the first quarter of 2001." (Third Am. Compl. ¶ 29(a)(5).) Language to this effect is found in a section of the Information Statement listing Xentex's "short term objectives." (Statement ¶ 55.) Two of the objectives are "[t]o commence pre-launch sales/marketing activities by the fourth quarter of 2000" and "[t]o begin production and shipment of the Voyager *Flip*-Pad in the first quarter of 2001." (*Id.*) However, this section expressly states that **"there can be no assurance that the Company will be able to accomplish any or all of these goals**." (*Id.* (emphasis added).)

The Information Statement also includes a section entitled "**RISK FACTORS**" that prospective investors should "carefully consider" in analyzing the offer. (*Id.* ¶ 56) Among other things, this portion of the Information Statement states that "the Company's intended products . . . have not been fully developed or tested," and that while the company had "developed working models" of the computer, "**there is no assurance that production models will ever be completed**." (*Id.* ¶ 56(a), (b) (emphasis added).)

Xen Investors also alleges that the Information Statement made false statements regarding Xentex's agreements with KDS. (Third Am. Compl. ¶ 29(a)(1)-(4).) According to the Court's ruling on September 27, 2004, these "are not 'soft' predictions but, rather, alleged misstatements of then-existing fact." (Mem. Op. and Order [Docket No. 163] at 7.) Xen Investors cannot, however, rest its case "on a few isolated passages in the lengthy [Information] Statement" and "disregard[] the 'total mix' of available information." *Gasner v. Bd. of Supervisors of County of Dinwiddie, Va.*, 103 F.3d 351, 358 (4th Cir. 1996) (affirming summary judgment on claim under Section 12(2) of 1933 Act); *see also, e.g.*, *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (statement is material if "the information would have been viewed by the reasonable investor to have significantly altered the total mix of information."). Rather, the Court should consider the statements "in the full context in which they were made." *Gasner*, 103 F.3d at 358. Taken in its entirety, the Information Statement contains more than enough cautionary language (*see* Statement ¶¶ 54-56) to adequately "warn[] them of the high risks they were facing." *Id.* at 360.[4]

### 2. Xen Investors Did Not Suffer Any Economic Loss.

"A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 338 (2005). Premier Capital arranged the meeting between Xentex and the Copelands (Statement ¶ 47), signed a commission agreement under which it would earn a 10 percent commission on funds it raised for Xentex (including Xen Investors' investment) (*id.* ¶¶ 68, 71), and took an active role in locating investors for Xentex. (*Id.* ¶¶ 97-100.) In November 2002, the Virginia State Corporation

---

[4] Moreover, Tucker made copies of the actual KDS agreements available for Todd Copeland and Reyna to review during their due diligence trip to California. (Statement ¶¶ 83-84.) No reasonable investor would view these statements (summaries of the KDS agreements) as significantly altering the total mix of information made available when they had more complete information (copies of the agreements themselves) in their possession.

Commission ("SCC") commenced an investigation of Premier Capital and Reyna relating to their role in the sale of Xentex stock to Virginia investors. (*Id.* ¶ 141.)[5] As a result of this investigation, the SCC ordered Premier Capital and Reyna to make a offer of rescission to seven Virginia investors, including Xen Investors. (*Id.* ¶ 143.) In December 2004, Premier Capital and Reyna sent Xen Investors an offer to rescind its investment in Xentex and to refund Xen Investors the full amount of its investment. (*Id.* ¶ 144.) Xen Investors refused this offer, even though Reyna had enough money to repay it. (*Id.* ¶¶ 145-46.) Xen Investors therefore suffered no damages. In the alternative, to the extent it suffered any loss, Xen Investors either failed to mitigate its damages or was the contributing cause of its own damages. Under the Virginia securities act, Xen Investors' claim is expressly barred by Va. Code Ann. § 13.1-522(d).

### 3. Plaintiffs Cannot Establish Loss Causation.

To establish a primary violation against Xentex, Xen Investors must prove valid loss causation. *See* 15 U.S.C. § 77*l*(b); *see also, e.g.*, *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 588 (S.D.N.Y. 2006) ("Congress added an express loss causation provision to § 12 of the 1933 Act through the adoption of the Private Securities Reform Act of 1995."). "Transaction causation" requires Xen Investors to show that it would not have invested if Xentex stated truthfully the material facts at the time of sale, while "loss causation" requires Xen Investors to show that it was the very facts about which Xentex lied which caused its injuries. *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997). Flanagan is entitled to summary judgment if he can establish "that the decline in the value of the security is attributable in total to some . . . factor" other than the alleged false statement. *Id.* at 649-50; *see generally Dura Pharms.*, 544 U.S. at 342 (loss causation is "a causal connection between the material misrepresentation and the loss").

In the leading Seventh Circuit case of *Bastian v. Petren Resources Corporation*, the plaintiffs, who invested $600,000 in oil and gas limited partnerships, alleged that offering memoranda misrepresented the defendants' competence and integrity and that they would not have invested had it not been for the misrepresentations. 892 F.2d 680, 682 (7th Cir. 1990). The plaintiffs lost their investment because the price of oil declined drastically after they invested.

---

[5] In this investigation, the SCC alleged that Premier Capital and Reyna offered and sold unregistered shares of Xentex stock, failed to properly register with the SCC, made material omissions and misrepresentations in the officer and sale of Xentex stock, and made false and misleading statements in the course of the SCC's investigation. (Statement ¶ 142.)

*Id.* at 684. In other words, the cause of their loss "was unrelated to the competence and honesty of the defendants." *Id.* To prove valid loss causation, it is not enough for a plaintiff to prove the cause of why the it entered into the transaction; the plaintiffs must also prove "the cause of the transaction's turning out to be a losing one." *Id.* In other words, "if the facts had been as represented by the defendants," but the value of the plaintiffs' investment still declined, there would be no loss causation. *Id.* at 682.

The reason why the transaction in this case "turn[ed] out to be a losing one" was because KDS went into receivership and, as a result, could not produce computers for Xentex to sell. (Statement ¶ 139.) This bears no nexus to the alleged fraud. Suppose, for example, that KDS did agree to open a Silicon Valley service depot to provide warranty and repair services. (Third Am. Compl. ¶ 29(a)(3).) This would not have prevented KDS's financial problems or helped KDS produce computers. As the Seventh Circuit stated in *Bastian*, "[n]o social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through offering memoranda with a fine tooth comb in the hope of uncovering a misrepresentation." 892 F.2d at 685.

## II. Flanagan is Entitled to Judgment as a Matter of Law on Xen Investors' Federal Securities Law Claim (Count VII) for Additional Reasons.

### A. Xen Investors Did Not Purchase Shares Through a Public Offering.

The 1933 Act does not apply to "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(2). Under Rule 506 of Regulation D, the offer and sale of a security is deemed not to be a public offering within the meaning of 15 U.S.C. § 77d(2) if it (1) satisfies the terms and conditions of 17 C.F.R. §§ 230.501 and 230.502 and (2) "[t]here are no more than or the issuer reasonably believes that there are no more than 35 purchasers of securities from the issuer." 17 C.F.R. § 230.506.

The undisputed facts demonstrate that the offering to Xen Investors meets the general conditions of 17 C.F.R. §§ 230.501 and 230.502. *See* 17 C.F.R. § 230.506(b)(1). First, there were no other offers six months prior and six month subsequent to November 2000 that could be integrated with the offering to Xen Investors. *Compare* 17 C.F.R. § 230.502(a) *with* Statement ¶ 93. Second, because Xen Investors was an accredited investor, Xentex did not have an obligation to furnish any information set forth under Rule 502. *Compare* 17 C.F.R. § 230.502(b) *with* Statement ¶ 89. Third, Xentex did not use general solicitation or advertising to market the securities offered to Xen Investors. *Compare* 17 C.F.R. § 230.502(c) *with* Statement ¶ 25(d).

-14-

Fourth, the offering to Xen Investors was restricted, and the securities could not be resold without registration under the Act. *Compare* 17 C.F.R. § 230.502(d) *with* Statement ¶ 53.

The undisputed facts also demonstrate that there were no more than 35 purchasers of securities in the offering to Xen Investors. *See* 17 C.F.R. § 230.506(b)(2). This offering only involved one investor – Xen Investors. Xentex considered the transaction with Xen Investors to be its own discrete offering. (Statement ¶ 93.) Batio and Tucker met with representatives of Xen Investors privately. (*Id.*) The parties negotiated the transaction privately. (*Id.*) The terms offered to Xen Investors differed from the terms contained in Xentex's previous private placement memoranda, and Xentex did not solicit other investors to purchase stock on the same terms offered to Xen Investors. (*Id.*) In fact, the securities issued to Xen Investors contained features not granted to any previous or subsequent investors, including anti-dilution protection, rights to Board information, and warrants conditioned on fundraising goals for Premier Capital. (*Id.*) Bobby Copeland signed a subscription agreement warranting that Xen Investors was an accredited investor and completed an investor questionnaire stating that all of Xen Investors' partners were accredited investors. (*Id.* ¶¶ 88-89.) Xen Investors thus qualifies as an accredited investor. *See* 17 C.F.R. § 230.501(a)(8). Consistent with Xentex's conscious decision not to make any public offerings of securities and the steps Barack Ferrazzano had taken to ensure there were no public offerings of Xentex stock in 2000 and 2001 (Statement ¶ 25), the documentation relating to this transaction clearly states that the placement was made pursuant to Regulation D of the 1933 Act. (*Id.* ¶¶ 53, 72, 87, 92.)

### B.   Xen Investors' Claims Are Barred by the Statute of Limitations.

The primary violation that forms the basis of Xen Investors' control person liability claim against Flanagan arises out of 15 U.S.C. § 77*l*(a)(2). (Third Am. Compl. ¶ 102.) A cause of action under 15 U.S.C. § 77*l*(a)(2) must be brought within one year "after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C.§ 77m. The one-year statute of limitations contained in 15 U.S.C. § 77m also applies to actions brought under 15 U.S.C. § 77o. *See, e.g.*, *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 n.1 (2d Cir. 1993); *Herm v. Stafford*, 663 F.2d 669, 679 (6th Cir. 1981).

"[I]nquiry notice is sufficient to begin the limitations clock." *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir. 1995). Facts that put a victim on inquiry notice "can

fall short of actual proof of fraud." *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997). Rather, the statute of limitations begins to run "'when the victim of the alleged fraud became aware of facts that would have led a reasonable person to investigate whether he might have a claim.'" *Whirlpool Fin. Corp.*, 67 F.3d at 609 (quoting *Treganza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993)).

Xen Investors alleges that the Information Statement contained "multiple untrue statements of material fact," which fall into two major categories: (1) misrepresentations regarding the company's agreements with KDS and (2) misrepresentations regarding the development of the Voyager computer. (Third Am. Compl. ¶ 29(a).) Tucker made the KDS agreements available to Todd Copeland during his trip to California on November 14, 2000. (Statement ¶¶ 83-84.) Following his trip, Tucker sent the stack of due diligence documents, including the KDS agreements, to Xen Investors' attorney. (*Id.*) If the Information Statement had misrepresented KDS's contractual obligations, Todd Copeland should have discovered those misrepresentations during that trip, and Xen Investors' attorney should have discovered them shortly thereafter. *See, e.g.*, *Badger v. Boulevard Bancorp, Inc.*, 970 F.3d 410, 411-12 (7th Cir. 1992) (affirming summary judgment pursuant to 15 U.S.C. § 77m where plaintiffs were sophisticated business people, were represented by law firm and accounting firm, and had access to company's business records); *accord Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 670-71 (7th Cir. 1998) (affirming summary judgment on statute of limitations grounds where plaintiff had access to financial information that would have disclosed existence of allegedly undisclosed finder's fee).

There is no dispute that Xentex did not mass produce computers in the first quarter of 2001. As a result, assuming that Xen Investors was told that computers would be mass produced in the first quarter of 2000, they should have known of the misrepresentation at the beginning of 2001, when mass produced computers did not arrive. *See, e.g.*, *Whirlpool Fin. Corp.*, 67 F.3d at 609-10 (discrepancies between projections and actual results sufficient to put plaintiff on inquiry notice).

Bobby Copeland was on notice of the alleged fraud prior to March 30, 2001. On January 1, 2001, Xentex sent a letter to shareholders informing them of "disappointments and difficult decisions" in the previous year, including "delays in the development schedule" due to switching microprocessor suppliers and "significant revisions" to its video design, and that the first

motherboards for the design would not be ready until early January 2001. (Statement ¶ 105.) According to Bobby Copeland, this letter contradicted everything that he purportedly learned about tooling the previous November. (*Id*.) On or about March 15, 2001, Bobby Copeland received a memorandum that "raised eyebrows" because it conflicted with representations that Batio and Tucker had made to him. (*Id.* ¶ 106.) By this time, Bobby Copeland had lost confidence in the ability of Xentex to operated in a fiduciary manner. (*Id*.) Clearly, if Xen Investors were told the things it alleges it were told in November 2000, it was on notice of the alleged fraud by the first of January 2001, and no later than mid-March. Xen Investors did not file their complaint until March 30, 2002. Having failed to file their complaint within the one-year time limit, Xen Investors federal securities claim against Flanagan is barred by the one-year statute of limitations. 15 U.S.C. § 77m.

**III.    Flanagan is Entitled to Judgment as a Matter of Law on Plaintiffs' Breach of Fiduciary Duty Claim (Count X).**

   **A.    Flanagan Did Not Owe a Fiduciary Duty to Any of the Plaintiffs at the Time of the Alleged Fraud.**

Corporate directors owe a fiduciary duty to the corporation and its shareholders. *See Gottlieb v. McKee*, 107 A.2d 240, 243 (Del. Ch. 1954).[6] They do not owe a fiduciary duty to prospective shareholders. *See Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1172 (Del. 1988) (finding that directors owe no fiduciary duties prior to the date of distribution of the stock interests, since until the distribution date plaintiff was not considered a shareholder); *Sanders v. Devine*, 1997 Del. Ch. LEXIS 131, at *16 (Sept. 24, 1997) (finding, as a matter of law, that there is no fiduciary duty for disclosures made in connection with a stock offering when plaintiff was not a stockholder at the time the prospectus was issued); *see also Weiss v. Leewards Creative Crafts, Inc.*, 1993 Del. Ch. LEXIS 73, at *8-9 (Apr. 29, 1993) (finding that a fiduciary duty was conditioned on the closing of the offer).

In this case, Batio and Tucker handed out the Information Statement to representatives of what would later become Xen Investors on November 1, 2000. (Statement ¶¶ 48, 50.) Xen Investors signed a letter of intent with Xentex and provided Xentex with an initial loan of $300,000 on November 10, 2000. (*Id.* ¶ 74.) That loan was later converted into stock on

---

[6] Under Illinois choice-of-law principles, Plaintiffs' fiduciary duty claim is governed by the law of the state of incorporation, *Prime Leasing, Inc. v. Kendig*, 332 Ill. App. 3d 300, 314 (1st Dist. 2002), which in this case is Delaware. (Statement ¶ 1.)

November 22, 2000.  (*Id.* ¶ 86.)  The first stock certificate for Xen Investors is dated November 21, 2000.  (*Id.* ¶ 95.)  Thus, Flanagan did not owe Xen Investors a fiduciary duty on the date the alleged fraud occurred.

The telephone call between Reyna and Flanagan took place the day after the May 29, 2001, Board meeting.  (*Id.* ¶ 114(c), 126.)  TMB executed the promissory note on June 4, 2001.  (*Id*. ¶ 130.)  Even then, the note did not make TMB a shareholder, but stated that Xentex would issue stock to TMB at a later time.  (*Id.* ¶ 134.)  In fact, TMB was never a shareholder of the company, as the shares were issued to the individual members of TMB.  (*Id.*)  Thus, Flanagan did not owe TMB a fiduciary duty on the date the alleged fraud occurred, or at any other time.

### B.      Plaintiffs Have Not Suffered a Unique Harm.

The Seventh Circuit recognizes the well-established corporate law principle that shareholders of a corporation may not maintain actions at law in their own names to redress an injury to the corporation.  *See, e.g.*, *Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 645 (7th Cir. 2006).  To determine whether Plaintiffs' claims are derivative or direct, the Court should look to the state of incorporation, *id.*, in this case Delaware.  (Statement ¶ 1.)

A derivative suit is a suit brought by a shareholder on behalf of the corporation alleging harm to the corporation.  *See, e.g.*, *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004).  In determining whether a suit is derivative or individual, the Delaware Supreme Court has developed a two-pronged test, which asks (1) "who suffered the alleged harm" and (2) "who would receive the benefit of any recovery or other remedy."  *Id.* at 1033.  In a derivative suit, it is the corporation that is alleged to have suffered harm, and any recovery must go to the corporation.  *Id.*  A shareholder can always bring an individual suit for "injuries affecting his or her legal rights as a stockholder," but in an individual suit any recovery goes to the shareholders.  *Id.*  The prime example of a derivative claim is a claim that directors have mismanaged the corporation.  *See Tooley*, 845 A.2d at 1037-38 (summarizing *Elster v. Am. Airlines, Inc.*, 100 A.2d 219, 222 (Del. Ch. 1953)); *Bokat v. Getty Oil Co.*, 262 A.2d 246, 249 (Del. 1970).

In contrast, to maintain an individual claim, a shareholder must show that the director breached a duty owed to the shareholder and that the shareholder "can prevail without showing an injury to the corporation."  *Tooley*, 845 A.2d at 1039.  In other words, a shareholder's unique harm "must be independent of any injury to the corporation.  *Id.*

In its September 2004 order, the Court ruled that "[i]f the facts do not support a finding that plaintiffs suffered a unique harm, defendants may move for summary judgment on that basis." (Mem. Op. and Order [Docket No. 163] at 7.) To prove a unique harm, Plaintiffs must show that "*knowingly* made false misrepresentations *directly* to plaintiffs to induce their investment in Xentex." (*Id.*) In essence, in order to show unique harm, Plaintiffs must show that Flanagan made misrepresentations directly to them. The undisputed facts show that Flanagan did not make any alleged misrepresentations directly to Plaintiffs as shareholders.

Prior to this litigation, Flanagan had never met or communicated in writing with Bobby Copeland. (Statement ¶ 110.) According to Bobby Copeland, he and Flanagan spoke on two occasions prior to this lawsuit – he admits that Flanagan did not tell him anything false in the first conversation, and the second conversation took place more than a year after Xen Investors' initial investment. (*Id.*) Similarly, Todd Copeland has never met or communicated in writing with Flanagan. (*Id.* ¶ 113.) The only time Todd Copeland spoke with Flanagan was in 2002, more than a year after Xen Investors' initial investment. (*Id.*)

Prior to this litigation, Flanagan had never met Reyna. (*Id.* ¶ 114.) In his deposition, Reyna recalled three telephone conversations with Flanagan, including a telephone call in May or June 2001 in which Reyna contends that Flanagan told him that allege that Flanagan told him that the "company was fine," "the computers were coming," and "everything was in place to launch this product." (*Id.* ¶ 114(c).) This telephone call is the only direct communication between Flanagan and any representative of Plaintiffs alleged to be fraudulent. (Third Am. Compl. ¶ 31(e).)

However, at the time of this conversation, TMB was not a shareholder of Xentex. This conversation allegedly took place the day after the May 29, 2001, Board meeting. (Statement ¶ 126.) TMB did not execute the loan documents until June 4, 2001. (*Id.* ¶ 130.) And, as discussed in more detail in Section IV below, Flanagan did not knowingly make any false misrepresentation to Reyna.

C.    **The Exculpatory Clause in Xentex's Amended and Restated Certificate of Incorporation Insulates Flanagan from Liability for Alleged Breach of Fiduciary Duty.**

Article X of the Second Amended and Restated Certificate of Incorporation of Xentex contains the following exculpatory clause:

> To the fullest extent permitted by the General Corporation Law of Delaware, as the same now exists or may be hereafter amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.  No amendment to or repeal of this Article X shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for or with respect to any acts or omissions of such director occurring prior to the effective date of such amendment or repeal.

(Statement ¶ 29.)

Under Delaware law, a corporation's certificate of incorporation may include "[a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." Del. Code Ann. tit. 8, § 102(b)(7) (2007).  Such a provision may not, however, eliminate or limit a director's liability for (1) breach of the director's duty loyalty, (2) acts or omissions not in good faith or intentional or knowing misconduct, (3) unlawful dividends or stock purchases, and (4) self-dealing.  *Id.*  Exculpatory clauses are "premised on the rationale that shareholders should have the ability to contract with the corporation and its directors, via the articles of incorporation, regarding the directors' liability to the corporation or the shareholders" and the notion that allowing corporations to shield directors from suit would encourage "qualified individuals to serve as corporate directors."  *Pereira v. Cogan*, 2001 U.S. Dist. LEXIS 2461, at *33-34 (S.D.N.Y. Mar. 13, 2001).  "Claims alleging disclosure violations that do not otherwise fall within any exception are protected by Section 102(b)(7) and any certificate of incorporation provision . . . adopted pursuant thereto."  *Arnold v. Soc'y for Sav. Bancorp.*, 650 A.2d 1270, 1287 (Del. 1994).  In this case, Plaintiffs have not alleged – much less uncovered any facts to suggest – that Flanagan has breached the duty of loyalty, acted in bad faith, or engaged in intentional or knowing misconduct or self-dealing.  The facts discussed in Section I.B above show that Flanagan acted in good faith.  As a result, the exculpatory clause shields him from liability for breach of fiduciary duty.  *Id.* at 1286-89 (affirming summary judgment in favor of directors on failure to disclose claim).

**IV.** **Flanagan is Entitled to Judgment as a Matter of Law on Plaintiffs' Fraud Claim (Count XI).**

    **A.** **Flanagan's Telephone Call with Reyna Does Not Support a Claim for Actual Fraud.**

TMB brings a claim for actual fraud arising from the telephone call between Reyna and Flanagan. (Compl. ¶ 145.) To establish a claim for actual fraud under Virginia law, TMB must show (1) a false representation, (2) of a material fact, (3) made intentionally or knowingly, (4) with the intent to mislead, (5) reliance by the party mislead, and (6) resulting damage to the party misled. *See, e.g.*, *Winn v. Aleda Constr. Co.*, 315 S.E.2d 193, 195 (Va. 1984). The plaintiff carries the burden of proving each element by clear and convincing evidence. *Id.* Flanagan is entitled to judgment as a matter of law on TMB's actual fraud claim for four independent reasons.

First, there was no false representation of material fact. An alleged misrepresentation "must be of an existing fact, and not the mere expression of an opinion. The mere expression of an opinion, however strong and positive the language may be, is no fraud." *Lambert v. Downtown Garage, Inc.*, 553 S.E.2d 714, 717 (Va. 2001) (internal quotations omitted). According to Reyna's deposition testimony, Flanagan told Reyna that the "company was fine," "the computers were coming," and "everything was in place to launch this product." (Statement ¶ 114(c).) Even assuming for purposes of summary judgment that Flanagan made these statements, they would not constitute fraud under Virginia law. *See, e.g.*, *Lambert*, 553 S.E.2d at 717 (defendant's "statement that the vehicle was in 'excellent' condition cannot be viewed as anything more than an opinion"); *see also, e.g.*, *Arnlund v. Smith*, 210 F. Supp. 2d 755, 767-68 (E.D. Va. 2002) (statements referencing a "classic turnaround situation" not actionable); *Kuczmanski v. Gill*, 302 S.E.2d 48, 50 (Va. 1983) (general statement that house was in "excellent condition" could not support action for fraud); *Henning v. Kyle*, 56 S.E.2d 67, 69 (Va. 1949) ("good condition").

Second, even assuming, *arguendo*, that Flanagan made these statements to Reyna and that they were untrue, Flanagan would not have made the statements knowing they were untrue. At the Board meeting on May 29, 2001, Kim reported that KDS was on schedule to commence manufacturing in July. (Statement ¶ 124.) The Board also discussed the best uses of 20 to 30 prototype computers that it expected to receive shortly. (*Id.*) If anything, Flanagan reported what he learned from the Board meeting a day earlier and, thus, did not make the statements to

Reyna knowing they were untrue (even assuming they were untrue).  *See, e.g.*, *Ell v. Moss*, 39 Va. Cir. 8, 19 (1995) (representation that structure was "well built" not fraudulent when defendant did not know of any flaws in the building process).

Third, Flanagan did not intend to mislead Reyna.  Flanagan did not have the impression that Reyna was asking for Flanagan's view of the company's progress as a whole.  (Statement ¶ 126.)  Flanagan did not have the impression that Reyna was asking for his view of the company's progress, that Reyna was seeking information from him to determine whether to make the loan, or that Reyna was seeking his advice.  (*Id*.)  In fact, objecting to the high yield of the proposed loan, Flanagan spoke out against it at the May 29 Board meeting, calling the terms of the loan "atrocious" and stating that the company could get better terms "from a loan shark in Cicero." (*Id*. ¶ 125.)

Fourth, TMB did not rely on Flanagan's alleged statements.  Todd Copeland funded $100,000 of the loan before the telephone call even took place.  (*Id*. ¶ 121.)  Reyna put another $500,000 into an escrow account before the telephone call took place.  (*Id*. ¶ 122.)  Thus, TMB could not have relied on Flanagan's alleged statements because it had already made the decision to fund and in fact had funded the loan before the telephone call took place.  Once the Board rejected the loan, Reyna worked with Tucker to restructure the loan's terms.  (*Id*. ¶ 128-29.)  At 3:53 a.m. on May 31, Tucker e-mailed Reyna explaining that the Board of Directors had turned down the loan proposal and thanking Reyna for spending time with him that night creating a new one.  (*Id*. ¶ 129.)  In the e-mail, Tucker stated that the new loan structure "will be much better and will not require Xentex board approval."  (*Id*.)  Further underscoring the fact that Flanagan did not intend to induce Reyna to make the loan, Flanagan did not have any role in renegotiating the terms of the loan, did not have any role in the actual execution of the loan, and did not even know about the new loan proposal until approximately October 2001.  (*Id*. ¶ 136.)

### B.     No Evidence Exists That Can Support a Finding That Flanagan Committed Constructive Fraud.

Plaintiffs also bring a claim for constructive fraud, alleging that Flanagan (a) negligently made false representations of material fact in the Information Statement and the accompanying financial statements and (b) innocently or negligently failed to disclose alleged facts concerning Xentex's ability to produce computers and financial condition.  (Third Am. Compl. ¶ 146.)

To prevail on a constructive fraud theory, Plaintiffs must prove by clear and convincing evidence that Flanagan innocently or negligently made false representations of material fact upon

which they relied to their detriment. *See, e.g.*, *Eden v. Weight*, 578 S.E.2d 769, 773-74 (Va. 2003). The alleged misrepresentations "must relate to a present or pre-existing fact, not statements involving promises or future events, unless the evidence shows an intent not to fulfill such promise when made." *Id.* at 773; *see also Tate v. Colony House Builders, Inc.*, 508 S.E.2d 597, 600 (Va. 1999) ("mere expressions of opinion" and "representations predicated upon future events or promises cannot form the basis of an action for constructive fraud"); *accord, e.g.*, *Wal-Mart Stores, Inc. v. J.A. Fielden Co.*, 440 F. Supp. 2d 523, 528-29 (W.D. Va. 2006) (same). A finding of constructive fraud requires evidence that a defendant has "represented as true what is really false, in such a way as to induce a reasonable person to believe it, with the intent that the person will act upon this representation." *Blair Constr., Inc. v. Weatherford*, 485 S.E.2d 137, 138 (Va. 1997). The difference between actual and constructive fraud is that actual fraud requires that the defendant make a false statement of fact and know that it is was false, and constructive fraud requires that the defendant make a false statement of fact without knowing it is false, but in either case the defendant must act with intent that the person rely on the representation.

Flanagan is entitled to judgment as a matter of law on the constructive fraud claim stemming from the Information Statement and the accompanying financial statements (Third Am. Compl. ¶ 146(a)) because Flanagan did not personally make any of the representations in those documents.

Flanagan is entitled to judgment as a matter of law on the constructive fraud claim stemming from alleged omissions of fact (Third Am. Compl. ¶ 146(b)) because "concealment, in general, can only give rise to a claim of actual fraud." *Cohn v. Knowledge Connections, Inc.*, 585 S.E.2d 578, 581 n.2 (Va. 2003). To withstand summary judgment on a concealment theory, Plaintiffs must present some "evidence of a knowing and deliberate decision not to disclose a material fact." *Norris v. Mitchell*, 495 S.E.2d 809, 812 (Va. 1998). Xen Investors cannot show that Flanagan intentionally concealed any facts pertaining to its initial investment decision because Flanagan was not actually aware the November 1 meeting was taking place. (Statement ¶ 63.) Even after the November 1 meeting, there was no ongoing duty on Flanagan's part to keep this group of investors informed of Xentex's financial condition and the status of the computers because Flanagan's interactions with this group of investors was so limited (*id.* ¶¶ 107-14), others at Xentex had taken on the role of communicating with them (*id.* ¶¶ 101-04), and

one of the individuals associated with Plaintiffs – Reyna – was personally involved in raising money for Xentex and knew or should have known as much about the company's affairs as Flanagan. (*Id.* ¶ 97.) TMB cannot show that Flanagan intentionally concealed any facts pertaining to its decision to loan Xentex $650,000 because Flanagan was personally against the loan and thought the loan was rejected by the Board of Directors (*Id.* ¶ 125.) The loan was later restructured by Batio, Tucker, and Reyna without the involvement of Flanagan or the Board. (*Id.* ¶ 128-29, 136.)

## V.       Flanagan Is Entitled To Judgment as a Matter of Law on TMB's Virginia Securities Act Claim (Count IX).

TMB also advances a claim against Flanagan under the VSA (Count IX). Specifically, TMB alleges that Flanagan is derivatively liable for the purported misrepresentations in Paragraphs 31 and 32 of the Third Amended Complaint because he "directly and indirectly controlled Xentex." (Third Am. Compl. ¶ 127.) This claim fails for the same reasons discussed in Sections I.A and I.B above.

TMB also allege that Flanagan "materially aided" Xentex in making the purported misrepresentations in Paragraphs 31 and 32 of the Third Amended Complaint. (*Id.*) As an threshold matter, TMB cannot state a valid claim against Flanagan for materially aiding Xentex because he was not an "employee," "investment advisor," "investment advisor representative," or "agent" of Xentex. Va. Code Ann. § 13.1-522(c). Moreover, TMB bases this allegation on six facts (Third Am. Compl. ¶ 127(a)(f)), which are contradicted by undisputed facts individually and fail to support a claim for aiding and abetting collectively. First, Flanagan did not materially aid Xentex because of the reasons stated in Paragraph 105 – as alleged in Paragraph 127(a) – for the same reasons discussed in Section I.A.2 above. Second, Flanagan did not materially aid Xentex in making the statements in Paragraphs 31(b), (c), (d), (f), and (g) – as alleged in Paragraph 127(b) and (d). Plaintiffs admit that Flanagan did not personally make any of these statements (Statement ¶ 67.) The only people from Xentex that TMB communicated with about the loan were Batio and Tucker. (*Id.* ¶¶ 116-17, 119, 127.) Flanagan was not a party to these communications and thus did not have personal knowledge of whatever information Batio and Tucker provided to the individual members of TMB. In the time leading up to the TMB loan, Batio and Tucker actually informed Todd Copeland and Reyna about glitches in and adjustments that needed to be made to the computer. (*Id.* ¶ 120.) Plus, Flanagan spoke out against the loan that TMB now accuses him of inducing them to make. (*Id.* ¶ 125.) Third, Flanagan cannot be

liable for "personally utter[ing] . . . false statements" to Reyna – as alleged in Paragraph 127(c) – for the same reasons discussed in Section IV above.  Fourth, contrary to the allegations in Paragraph 127(e), Flanagan had very few conversations with any individuals associated with Plaintiffs and did not believe that these individuals were turning to him for information regarding Xentex.  (*Id*. ¶¶ 108, 111-14, 126.)  Fifth, Flanagan did not have the "ability to control" the misrepresentations in Paragraphs 31 and 32 "because his duties as a top-ranking company official necessarily involved general oversight and direction of Xentex" – as alleged in Paragraph 127(f).  Again, as discussed in Sections I.A and I.B above, Flanagan's status as a outside director did not give him the ability to control the fundraising activities that had appropriately been delegated to others in the corporation.

## Conclusion

Xentex is in bankruptcy.  So is Batio.  Plaintiffs have thus attempted to recoup their losses from several peripheral actors connected to Xentex, including outside directors like Flanagan, in this lawsuit.  However, "mishaps within a corporation do not alone entitle a plaintiff to bring suit against directors in their personal capacities," and "service as director of a corporation should not be a journey through liability land mines."  *Dellastatious*, 242 F.3d at 196.  For this reason and those stated above, the Court should grant summary judgment in Flanagan's favor on all counts.

Dated:  July 9, 2007                                         Respectfully submitted,


                                                             /s/ David L. Hanselman, Jr.
                                                             Alan S. Rutkoff, P.C.
                                                             David L. Hanselman, Jr.
                                                             Michael D. Arnold
                                                             McDermott Will & Emery LLP
                                                             227 West Monroe Street
                                                             Chicago, Illinois 60606
                                                             Telephone:  (312) 372-2000
                                                             Facsimile:  (312) 984-7700

                                                             *Attorneys for Defendant Brian Flanagan*

## <u>CERTIFICATE OF SERVICE</u>

I, Michael D. Arnold, an attorney of record in this case, hereby certify that, on this 9th day of July, 2007, I caused a copy of the foregoing instrument to be served electronically upon all counsel of record in this action pursuant to the Court's General Order on Electronic Case Filing ("ECF"), which will send notification of and copies of such filing to all counsel of record who are registered as ECF users, and by electronic mail, pursuant to Federal Rule of Civil Procedure 5(b)(2)(D), upon the following:

Douglas J. Tucker
dtucker@quarles.com
Quarles & Brady LLP
500 West Madison Street
Suite 370
Chicago, Illinois 60661

/s/ Michael D. Arnold
Michael D. Arnold

CHI99 4839174-3.052317.0014

-26-