# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| PREMIER CAPITAL MANAGEMENT, LLC, ) | |
| TMB, LLC, and XEN INVESTORS, LLC, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 02 C 5368 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| LARRY COHEN, BRIAN FLANAGAN, ) | |
| WAN HEE KIM, JUNG KOH, MICHAEL ) | |
| TURCOTTE, RON FALESE, BLAIR ) | |
| ROBINSON, NORTHVIEW BANK & TRUST, ) | |
| and XENTEX TECHNOLOGIES, INC.,[1] ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Premier Capital Management, LLC ("Premier"), TMB, LLC ("TMB") and Xen Investors, LLC ("Xen") (collectively "Plaintiffs"), have filed a twenty-two count third amended complaint claiming violations of federal and state securities laws, as well as several state common laws. Plaintiffs allege, among other things, that the officers and directors of Xentex Technologies, Inc. ("Xentex") violated the various laws when they induced Plaintiffs to invest in Xentex. These officers and directors were Larry Cohen ("Cohen"), Wan Hee Kim ("Kim"),

---

[1] This is the caption of the original complaint. On March 26, 2003, after Xentex Technologies, Inc. had filed for Chapter 11 bankruptcy, the court granted Plaintiffs' motion to dismiss Xentex without prejudice. Plaintiffs dismissed defendant Ron Falese on October 28, 2004 with their third amended complaint. Defendant Jung Koh, named in Counts XVII-XVIII, has never appeared or been defaulted in the past six years of litigation and there is nothing in the docket to show that he has even been served. Two other parties joined the case during litigation: Mathieu Reyna ("Reyna"), counter-defendant, and Douglas Tucker ("Tucker"), third party defendant. The court denied a motion for summary judgment on the counterclaims, filed by Premier and Reyna, on September 13, 2007.

Michael Turcotte ("Turcotte"), and Brian Flanagan ("Flanagan"). Plaintiffs also allege that

Northview Bank & Trust ("Northview"), Xentex's bank, and its president, Blair Robinson

("Robinson"), aided and abetted that inducement by providing an environment in which Jeffrey

Batio ("Batio"), the founder and Chief Executive Officer ("CEO") of Xentex, could

misappropriate corporate funds. The various defendants have filed motions for summary

judgment.[2] Before the court are two motions: (1) Flanagan's motion for summary judgment on

Counts VII-XI; and (2) motion for summary judgment on Counts I-VI, XII-XVI, and XIX-XX

filed by defendants Cohen, Kim, and Turcotte (collectively "the Cohen Defendants"). Because

Plaintiffs' claims against the four defendants are almost identical, and because the defendants

raise essentially the same legal arguments, the court is ruling on both motions together. For the

reasons stated below, the court grants both parties' motions in part and denies them both in part.

## I. BACKGROUND[3]

### A.    The Parties And Relevant Persons

Xentex was a Delaware corporation that, around the year 2000, was developing and

launching a laptop computer with a folding screen known as the Voyager. Premier is a

registered investment advisor, registered as a Delaware limited liability company. Xen is a

Virginia limited liability company formed for the purpose of making investments in Xentex.

TMB is a Virginia limited liability company formed for the sole purpose of making an

---

[2]The court has granted defendants Blair Robinson and Northview Bank & Trust's motion for summary judgment on Counts XXI-XXII. Plaintiff is ordered to show cause why defendant Koh should not be dismissed.

[3]Facts are taken from the parties' Rule 56.1 statements of material facts and are undisputed unless otherwise noted. Facts specific to a particular legal claim are addressed in the relevant section below.

investment in Xentex.

Cohen was a member of the Board of Directors of Xentex (the "Board"). Kim was also a member of the Board, as well as Chairman of the Executive Committee of Xentex, and the primary liaison for product development and manufacturing efforts with Xentex's business partners, including Korean Data Systems, Ltd. ("KDS"). Turcotte was Vice President of Accounting and Control and Chief Financial Officer of Xentex. Flanagan's company, Mercury Partners 135 XT, Inc., made a $500,000 loan to Xentex, the terms of which allowed the company to designate a person to be elected to the Board. Flanagan was elected to the Board and attended his first meeting in October 2000. From March to October 2000 and then again from around March 2001, Batio served as CEO of Xentex. From October 2000 to around March 2001, Batio served as Chief Strategic Officer and Joe Negler ("Negler") joined Xentex as CEO. Douglas Tucker ("Tucker") is an attorney who was President of Xentex from March 2000 to October 2000, Executive Vice President of Xentex from October 2000 to January 2002, and a member of the Board during his entire tenure.

**B.      The Transactions At Issue**

Xentex, through Batio and Tucker, first presented Plaintiffs with an opportunity to invest at a meeting held in Virginia on November 1, 2000. During that meeting, Plaintiffs received an Information Statement dated November 1, 2000 (the "Information Statement"), which contained numerous representations relating to Xentex, the Voyager computer, Xentex's plans for launching the Voyager into the market, and the ability of Xentex's supplier, KDS, to finance, manufacture and service necessary hardware. Plaintiffs communicated – orally and in writing – with various representatives of Xentex after this date, including at a multi-day meeting at the

Xentex facility in California. Xen made a series of stock purchases between November 2000 and February 2001, purchasing a total of 400,000 shares of common stock in Xentex for $1.2 million. Subsequently, on June 4, 2001, TMB loaned Xentex $650,000 in exchange for a promissory note that was repayable in stock.

Plaintiffs allege that the representations made in the Information Statement, the oral representations made at the November 1st meeting, and various other representations made in connection with the stock purchases and execution of the promissory note were false. Plaintiffs claim that the defendants hid Xentex's deteriorating financial condition from Plaintiffs, thereby obscuring the true value of Plaintiffs' investment.

## II. ANALYSIS

### A.    Summary Judgment Legal Standard

Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). It is not appropriate if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325.

In response, the non-moving party cannot rest on the pleadings, but must designate

specific material facts showing that there is a genuine issue for trial.[4]  Fed. R. Civ. P. 56(e);

*Celotex Corp.*, 477 U.S. at 324.  "The applicable substantive law will dictate which facts are

material.  Only disputes that could affect the outcome of the suit under governing law will

properly preclude the entry of summary judgment."  *McGinn v. Burlington N.R.R. Co.*, 102 F.3d

295, 298 (7th Cir. 1996) (internal citation omitted).  The non-moving party must make a

"sufficient showing of evidence for each essential element of its case on which it bears the

burden at trial."  *Salas v. Wis. Dep't of Corrs.*, 493 F.3d 913, 921 (7th Cir. 2007) (citing *Celotex*,

477 U.S. at 322-23).  The court must view the record and any inferences to be drawn from it in

the light most favorable to the opposing party.  *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.

1991).

---

[4]Flanagan and the Cohen Defendants have moved to strike parts of Plaintiffs' Statement of Facts for noncompliance with Local Rule 56.1 (docket no. 429).  Local Rule 56.1 states that the party opposing summary judgment shall file "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment . . . ." Local R. 56.1(b)(3)(C).  Defendants assert that Plaintiffs' statement contains paragraphs with sub-parts and dozens of sentences in violation of the rule.  In addition to the Local Rule 56.1, the court has issued a very specific standing order regarding summary judgment.  The standing order prohibits argument and inference in 56.1 statements of fact and requires a simple denial and cite to the record for disputed facts. *See* Standing Order, *available at* http://www.ilnd.uscourts.gov.  As Plaintiffs point out in their response to the motion to strike, both parties are guilty of violations. The various rules exist to maximize judicial efficiency and promote the smooth flow of litigation.  The court simply does not possess the resources to comb through the parties' statements of fact in an attempt to sift out usable fact from impermissible argument or inference or to refer to original contracts and deposition transcripts to see if a party has accurately parsed its contents.  Furthermore, there is no reason why it should have to do so. *See United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").  In making its ruling, the court has considered all paragraphs – in the briefs of both sides – that comport with Federal Rule of Civil Procedure 56, Local Rule 56.1, and the court's standing order.  For those that do not, mindful of the age of this case, the court has exercised its discretion to consider those parts that help decide the motion before it (namely material facts) and has ignored statements that contain clearly inadmissible evidence, impermissible argument, or immaterial facts.  Thus, defendants' motion to strike is denied in part and granted in part.

**B.     Claims Under The Securities Act of 1933**

The Securities Act of 1933 (the "1933 Act") requires that investors receive certain information on securities being offered for public sale and prohibits misrepresentations in the sale of securities. Section 12(a)(2) of the 1933 Act imposes liability on those who offer or sell a security by means of a sales prospectus that "includes an untrue statement of material fact or omits to state a material fact . . . ." *See* 15 U.S.C. § 77l(a)(2). Under § 15 of the 1933 Act, liability flows to anyone who "controls any person liable under section[] . . . 12," unless that control person can establish an absence of negligence. *See id.* § 77o.

Plaintiffs assert claims under § 15 of the 1933 Act, seeking to hold liable Xentex's control persons for Xentex's alleged violation of § 77l by use of a prospectus and other communications containing false statements and misleading omissions. Specifically, Plaintiffs allege that Xentex provided misleading financial disclosures, misrepresented the involvement and commitment of KDS, failed to disclose known misappropriations of funds, and provided inaccurate information regarding the launch date of the product. They argue that certain defendants are control persons within the meaning of § 77o and are therefore derivatively liable for Xentex's misrepresentations and omissions.

In Count VII, Plaintiffs allege that Flanagan, as a director of Xentex, violated § 77o. Flanagan argues that: (1) he is not a control person; (2) if he is a control person, he has the defense of good faith; and (3) even if he does not have a defense, Xentex did not commit a primary violation of the 1933 Act for which Flanagan can be derivatively liable. Flanagan therefore asserts that he is "entitled to judgment as a matter of law on [Xen's] federal . . . securities law claims." Mem. in Supp. of Flanagan's Mot. for Summ. J. at 5.

In Count I, Plaintiffs allege that Turcotte, as Chief Financial Officer and Vice President of Accounting and Control of Xentex, violated § 77o. In Count XII, they allege that Kim, as a director and officer of Xentex, violated § 77o. (Plaintiffs do not allege that Cohen violated the 1933 Act.) The Cohen Defendants argue (1) Kim and Turcotte are not control persons; (2) even if they are, they have the defense of good faith; (3) even if they do not have a defense, Plaintiffs cannot maintain a cause of action because the sale of Xentex stock to Xen was not a public offering; (4) Xentex did not commit a primary violation of the 1933 Act so there can be no derivative liability; and (5) Xen has no losses for which Kim and Turcotte can be liable.

Before it considers the evidence presented on the § 77o claims, the court will address the more expansive arguments that: (1) the sales of stock to Plaintiffs were not covered by the 1933 Act; and (2) Plaintiffs' claims are barred by a one-year statute of limitations.

1. <u>Whether The Transactions Are Covered By The 1933 Act</u>

a. <u>Whether The Stock Sales Were Made Pursuant To Regulation D</u>

Under the 1933 Act, any offer or sale of securities must be either registered with the U.S. Securities and Exchange Commission ("SEC") or quality for an exemption. Registration of securities ensures that companies file essential facts with the SEC, which then makes these facts public. However, the SEC exempts small offerings from the registration process "to foster capital formation by lowering the cost of offering securities to the public." *See* SEC, The Laws That Govern the Securities Industry (2007), http://www.sec.gov/about/laws.shtml.

Flanagan and the Cohen Defendants argue that the Xen transaction was exempt from registration as a private placement made pursuant to Regulation D, a "safe harbor" regulatory provision under the 1933 Act. *See* 15 U.S.C. § 77d(2) (exempting from registration

"transactions by an issuer not involving any public offering"); 17 C.F.R. § 230.506 (providing specific rules under which an issuer can ensure a transaction is not a public offering). Therefore, they argue, the transaction is exempt from the requirements of § 12(a)(2) of the 1933 Act, upon which Plaintiffs claims rest, because that section requires that the false statements or omissions to have been made in connection with a "prospectus." And, as this court explained in a previous order, only documents related to public offerings involve a "prospectus," which means that "causes of action brought under [the 1933 Act], where the transaction at issue was a private placement rather than a public offering, are subject to dismissal." *See Premier Capital Mgmt., LLC v. Cohen*, 02 C 5368, 2005 WL 21960357, *10 (N.D. Ill. Aug. 15, 2005) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)). Flanagan explicitly invokes Regulation D, whereas the Cohen Defendants frame their arguments in a more general "public offering" context, which includes a Regulation D component. The court will address Flanagan's specific argument first.

The burden of proof for establishing that Regulation D applies rests with the defendants. *See SEC v. Ralston-Purina Co.*, 346 U.S. 119, 126 (1953) (finding the "imposition of the burden of proof on an issuer who would plead the [private placement] exemption" to be "fair and reasonable" given the "broadly remedial purposes of federal securities regulation"); *SEC v. Van Horn*, 371 F.2d 181, 187 (7th Cir. 1966) (same).

The specific section of Regulation D upon which Flanagan relies is Rule 506. Rule 506 provides, in relevant part, that "[o]ffers and sales of securities by an issuer that satisfy [the general and specific conditions listed in paragraph (b) of this rule] shall be deemed to be transactions not involving any public offering . . . ." *See* 17 C.F.R. § 230.506(a). The "general conditions" are those conditions contained in Rule 501, which provides definitions of terms used

in Regulation D, and in Rule 502.  *Id.* § 230.506(b).  In turn, Rule 502 provides, in part, that:

> All sales that are part of the same Regulation D offering must meet all of the terms and conditions of Regulation D.  Offers and sales that are made more than six months before the start of a Regulation D offering or are made more than six months after completion of a Regulation D offering will not be considered part of that Regulation D offering, so long as during those six month periods there are no offers or sales of securities by or for the issuer that are of the same or a similar class as those offered or sold under Regulation D . . . .

*Id.* § 230.502(a) (commonly known as the "incorporation doctrine).  Rule 502 also requires certain information to be disclosed to non-accredited investors, limits the manner of offering, and limits the re-saleability of securities sold.  *Id.* § 230.502(b)-(d).  The "specific conditions" to which Rule 506 refers limit the number of purchasers to "no more than 35" and require that all non-accredited investors[5] have "knowledge and experience in financial and business matters [so] that he is capable of evaluating the merits and risks of the prospective investment."  *Id.* §§ 230.506(b)(2)(i)-(ii).  Robinson has the burden of proving that the offering meets these requirements.

Flanagan (who incorporates the reply arguments of the Cohen Defendants) argues that the only issue is whether Plaintiffs purchased stock pursuant to a private placement and that other investors' purchases and other sales by Xentex are irrelevant to this analysis.  However, the very purpose of the incorporation doctrine is to require a broad analysis of the company's stock transactions to ensure that, cumulatively, they do not violate Rule 506.  Additionally, Flanagan argues that Plaintiffs do not raise "even a scintilla of evidence raising a genuine issue for trial

---

[5]An "accredited investor" includes any person "whose individual net worth . . . at the time of his purchase exceeds $1,000,000" and "who had an individual income in excess of $200,000 in each of the two most recent years."  17 C.F.R. §§ 501(a)(5)-(6).  An accredited investor is excluded from the maximum number of purchasers under § 506(b).  *Id.* § 501(e)(1)(iv).

regarding the fact that its own purchase of Xentex stock was pursuant to a private placement, not a public offering." Cohen Defs. Reply at 4. However, the burden of proof that a Regulation D exemption applies lies with Flanagan and, until he establishes an exemption applies, Plaintiffs have no need to rebut. Thus, Flanagan's evidence is the first order of concern.

Flanagan relies exclusively on the evidence provided by Tucker, who was President or Executive Vice President of Xentex around the time of the sales to Xen and who was present during the meeting in November 2000. However, Tucker's evidence is insufficient to establish a *prima facie* exemption under Regulation D because he does not address actual sales of stock. For example, in support of his argument that "there were no other offers . . . that could be integrated with the offering to Xen Investors," Flanagan cites to Tucker's deposition. Mem. of Law in Supp. of Flanagan Mot. for Summ. J. at 14 (citing to Flanagan Statement of Facts ¶ 93). However, Tucker says nothing specific in regard to other stock sales in the cited portions. Rather, he states, in conclusory terms, that the stock sale to Xen Investors "was not an offering" and that "[Xentex] never – never before that date nor subsequent to that date – *discussed*" with any other party the terms offered to Plaintiffs. *See* Flanagan Statement of Facts, Tab 14, Dep. of Tucker at 322:22-325:9 (emphasis added). Other evidence offered from Tucker is similarly inadequate to establish an exemption applies. For example, Tucker states that the terms were different from those in "*previous* private placement memoranda," without addressing subsequent memoranda, and that "Xentex *did not solicit* other investors to purchase stock on the same terms offered to Xen Investors," without addressing actual sales. *Id.*, Tab 2, Tucker Aff. ¶ 10 (emphasis added). The most favorable inference from these statements may be that if Xentex did not discuss such sales it did not make them; however, the court is obligated to draw reasonable

inferences in favor of the *non-moving* party, and in so doing, it finds that Flanagan has not provided sufficient information on actual sales of stock sufficient to meet his burden.

Rule 502 requires there to be no "offers *or* sales of securities" (emphasis added) within the relevant six-month time frame. To conflate the two terms would be to render one of them surplusage, which this court will not do. *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, on the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal citation and quotation marks omitted)); *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2535 (2007) (refusing to interpret an agency regulation in a way that would render part of the text surplusage). In addition, other court's holdings support such an interpretation of the regulation. *See, e.g.*, *Wright v. Nat'l Warranty Co.*, 953 F.2d 256, 260 (6th Cir. 1992) (finding an exemption under Regulation D where defendants' lawyer's affidavit "stated that the technical requirements found in 230.501 [through] 503 were satisfied [and] states that Form D[6] was duly filed with the SEC . . . ."); *Fay L. Roth Revocable Trust v. UBS Painewebber, Inc.*, 323 F. Supp. 2d 1279, 1283 (S.D. Fla. 2004) (finding no material dispute that the offering complied with Regulation D where the defendants' statement of facts stated that "the offering and issuance of interests in the Fund was made pursuant to Rule 506 of Regulation D"). The burden is on Flanagan – as the movant and

---

[6]Rule 500 requires that "a notice on [Form D] shall be filed with the [Securities and Exchange] Commission no later than 15 days after the first sale of securities in an offering under Regulation D (§ 230.501- § 230.508 of this chapter) . . . ." 17 C.F.R. § 239.500(a). Although the filing of Form D is not a condition to a Rule 506 exemption, failure to file may result in disqualification from future use of exemptions or felony charges, if the failure was wilful. *Hamby v. Clearwater Consulting Concepts, LLP*, 428 F. Supp. 2d 915, 920 (E.D. Ark. 2006).

proponent of the exemption – to prove Regulation D applies and he fails to address a key

element.[7]  Therefore, Flanagan has failed to prove that the exemption applies and summary

judgment on this ground is denied.  The Cohen Defendants argue that the Information Statement

contained explicit language stating that the stock was being sold pursuant to Regulation D, but

they – like Flanagan – fail to provide evidence sufficient to sustain a Regulation D affirmative

defense.

The court now turns to the flip-side of the Regulation D argument, namely the Cohen

Defendants' contention that Plaintiffs cannot prove the "public offering" element of their *prima*

*facie* case.  As the court observed in a previous order, the case law supports the Cohen

Defendants' argument that Plaintiffs would lack standing to assert a § 77l(a)(2) claim if Xen did

not purchase stock in a public offering.  *See Premier Capital Mgmt., LLC*, 2005 WL 21960357 at

*10 (citing to *Gustafson*)*; see also Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005) ("*Gustafson*'s

definition of a prospectus as 'a document that describes a public offering of securities' compels

the conclusion that a Section 12(a)(2) action cannot be maintained by a plaintiff who acquires

securities through a private transaction, whether primary or secondary." (citing to *Gustafson*, 513

U.S. at 584)).

The Cohen Defendants argue that the evidence shows that Xentex "took no money from

anyone who was not an accredited investor," "never permitted anyone who did not qualify for an

---

[7]The court reviewed all the evidence cited by Flanagan in support of his Regulation D argument, not just that offered for Rule 502, and found not a single reference to the existence or absence of actual sales to persons other than Plaintiffs. *See, e.g.*, Flanagan Statement of Facts, Tab 2, Tucker Aff. at ¶ 8 (discussing offerings); *id.*, Tab 19 at PCM019526 ("Information Statement" discussing the offering); *id.*, Tab 21 at PCM029236 (discussing the agreement between Plaintiffs and Xentex); *id.*, Tab 20 at PCM020795 (subscription agreement between Plaintiffs and Xentex).

exemption to purchase stock," and closed the last of its four "financing rounds" more than a year

before Xen purchased stock. Cohen Defs.' Mem. in Supp. of Mot. for Summ. J. at 9-10. In

response, Plaintiffs have presented undisputed evidence that Xentex sold to non-accredited

investors, several of whom purchased stock around the same time as Xen, although the parties

dispute whether these sales fall within the scope of the incorporation doctrine. *See* Pls.'

Statement of Facts (Cohen Defs.) ¶ 42 (listing eight people who bought Xentex stock). In

addition, close inspection of the record shows that the deposition testimony relied on by the

Cohen Defendants is much more tentative about whether the sales were part of a public offering

than their brief suggests. *See, e.g.*, Cohen Defs.' Statement of Facts ¶¶ 58-59 (deposition of

Tucker where he says he "*probably* talked about [whether or not Xentex's stock sales were

public offerings or private placements] with [Xentex's counsel] and other people at Xentex" and

agrees that he and Xentex's counsel "*took efforts to ensure* that there were no public offerings"

(emphasis added)). A reasonable jury, considering the tentative statements and Plaintiffs'

evidence of other sales, could reject the Cohen Defendants' conclusory argument that Xen's

purchase was a private placement and find that it was part of a public offering. Thus, Plaintiffs

survive summary judgement on this issue.

    2.    <u>Statute of Limitations Bar</u>[8]

Flanagan argues that Plaintiffs' claims are barred by the statute of limitations because,

under the 1933 Act, no § 77l(a)(2) claim may be maintained "unless brought within one year

---

[8]Flanagan originally raised the statute of limitations bar as an affirmative defense in his
answer to the third amended complaint. The Cohen Defendants also raised the defense in their
answers, but inappropriately raised it on summary judgment for the first time in their reply
(incorporating Flanagan's arguments), thus denying Plaintiffs the opportunity to respond.

after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ." 15 U.S.C. § 77m. He argues that Plaintiffs knew or could have found out about the alleged fraudulent statements and omissions more than a year before they filed suit (on March 20, 2002), namely when: (1) Xentex delivered documents to Plaintiffs' attorney around November 2000; (2) Xentex failed to produce computers according to schedule in early 2001; (3) Xentex, at the beginning of 2001, sent a letter to Plaintiffs telling them of delays and design revisions; and/or (4) Plaintiffs, around March 15, 2001, received a memorandum that conflicted with representations made by Batio and Tucker.

Plaintiffs have raised a triable issue of material fact as to whether the claims are barred. Specifically, they dispute that the documents were actually sent to their attorney and that they were put on notice of fraudulent statements by events and documents relating to manufacturing delays, and allege that they were reassured that everything was alright by Xentex. *See, e.g.*, Pls.' Statement of Facts (Flanagan) ¶ 27 (citing deposition testimony from Plaintiffs' lawyer stating he did not recall seeing the documents and from the person who allegedly sent the documents saying she did not recall sending them); *id.* ¶ 44 (citing deposition testimony where Plaintiffs' representative states the January 2001 letter did not contradict earlier statements). Therefore, summary judgment on this ground is denied.

3.     <u>Plaintiffs' Control Person Liability Claims</u>

Plaintiffs allege that Flanagan, Kim, and Turcotte are liable as control persons for Xentex's misstatements and omissions in its prospectus pursuant to § 77o of the 1933 Act, which states:

> Every person who, by or through stock ownership, agency, or otherwise, or who pursuant to or in connection with an agreement or understanding with one or more

other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlled person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o. Flanagan and the Cohen Defendants argue that they do not meet the control person test and so cannot be held liable. The Seventh Circuit has established a two-prong test to determine control person liability:[9] "First, the 'control person' needs to have actually exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability – even if not exercised – to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-12 (7th Cir. 1994) (citing *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880-81 (7th Cir. 1992)); *Premier Capital Mgmt.*, 2005 WL 21960357 at *11 (internal citations omitted).

    a.    <u>Control Person Status: Flanagan, Kim, and Turcotte</u>

       i.    *Flanagan's Status*

In its order denying Flanagan's motion to dismiss this count, the court noted that "[s]imply relying on Flanagan's status as a member of the Board of Directors is insufficient . . . ." *Premier Capital Mgmt., LLC,* 2005 WL 21960357 at *11 (observing that Plaintiffs did "a bit more" by alleging active participation in and control of decisions of the Board, helping and/or

---

[9]The cited case deals with § 78(t)(a), which establishes control person liability under the Securities Exchange Act of 1934 (the "1934 Act"), not with § 77o under the 1933 Act. However, "[t]hough the two sections are not identical, the analysis applied to them is the same." *Cent. Laborers' Pension Fund v. SIRVA, Inc.*, 04 C 7644, 2006 WL 2787520, *24 (N.D. Ill. Sept. 22, 2006) (citing *Dohohoe*, 30 F.3d at 911-13 and *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir. 1986)).

reviewing the Information Statement, and holding a security interest in Xentex's assets). The issue before the court now, however, is whether Plaintiffs have raised sufficient questions of disputed fact to survive for summary judgment on their claims under § 77o.

*(a)     General Control*

First, Plaintiffs must prove that Flanagan exercised general control over the operations of Xentex. The parties do not dispute that: (1) Flanagan owned just ten shares of Xentex stock; (2) he attended only two Board meetings, one in October 2000 and one (by telephone) in May 2001; (3) the majority shareholder had authority to remove any or all Directors, except that Flanagan could not be removed until his $500,000 loan was paid off; (4) the JB Family Trust[10] was the majority shareholder; (5) Xentex formed an Executive Committee (consisting of Batio, Tucker and Kim) in May 2000 to make decisions for the Board; (6) Flanagan was never a member of the Executive Committee; (7) the Executive Committee had the same authority as the Board to remove officers, fill office vacancies, and control the CEO, President, and Executive Vice President. Despite these undisputed facts, which certainly seem to suggest that Flanagan's role in Xentex was not a major one, Plaintiffs posit five reasons why Flanagan did, in fact, exercise general control: (1) he was a director; (2) he was not a passive director, rather he was active and spoke out and voted for and against resolutions; (3) he exercised control over some board decisions, including the rejection of the original loan terms proposed by TMB; (4) he played an instrumental role in replacing Batio as the CEO of Xentex; (5) he made a $500,000 loan to

---

[10]Plaintiffs, and a Xentex document (Pls.' Statement of Facts (Flanagan), Tab 44), say the majority shareholder is "JB Family Trust," Flanagan says the majority shareholder is "Jeff Batio's family trust," and Tucker writes in a document proffered by Plaintiffs (*id.* Tab 82) that "Jeff" is the "majority stockholder."

Xentex.  Flanagan does not dispute this, but rather argues that, even cumulatively, these actions are insufficient to show control person status.

The dispute essentially comes down to whether Flanagan had more influence than it would appear he should have had as a minority shareholder and non-member of the Executive Board.   Flanagan is correct that neither his status as director nor his status as creditor is alone sufficient to establish he was a control person.  *See Schlifke v. Seafirst Corp.*, 866 F.2d 935, 949 (7th Cir. 1989) (concluding that a bank that lent money to a corporation did not have control over the corporation's activities); *Premier Capital Mgmt., LLC,* 2005 WL 21960357 at *11. However, the *intersection* of his status as a creditor *and* a board member allows an inference that he could have exerted an influence over Xentex that was greater than a person who occupied just one of those statuses.  *See, e.g.*, *Harrison*, 79 F.3d at 614 ("We have long recognized that some indirect means of discipline or influence, although short of actual direction, is sufficient to hold a 'control person' liable.").  Additionally, by virtue of his $500,000 loan to Xentex, Flanagan was the only member of the Board who could not be dismissed at the whim of the majority stockholder.  His "tenured" status could have provided him with more influence over both the majority shareholder and other Board members.  Thus, viewing the facts in the light most favorable to Plaintiffs, the court concludes that a genuine factual dispute exists as to the weight of Flanagan's influence on day-to-day decisions and the general control of Xentex.

*(b)      Specific Control*

Plaintiffs also need to show that Flanagan had the "power or ability . . . to control the specific transaction or activity that is alleged to give rise to liability," namely the misrepresentations and omissions.  *See Donohoe*, 30 F.3d at 912.  Flanagan argues that he was

simply a member of the Board of Directors who had no role in creating the Information

Statement and was not present when any fraudulent statements were made to Plaintiffs.

Plaintiffs argue that, even if this is true (which they dispute), Flanagan had the ability to review

the documents and control the transactions, which makes him liable.[11]  The parties do not dispute

that Flanagan did not personally attend the November 2000 meeting and did not personally

present Plaintiffs with an offer to invest.  Pls.' Resp.  to Flanagan Statement of Facts ¶ 65.

However, Flanagan's role in the creation of the Information Statement is disputed as is

his ability to correct or supplement information previously given to Plaintiffs.  Specifically, there

are factual disputes about whether Flanagan was involved as part of "management" in crafting

the content of the Information Statement, whether he was on notice of a potential disclosure

problem given that he knew before November 1, 2000 that Xentex was meeting with potential

investors, and whether he had an obligation in January 2001 to be more actively involved in the

solicitation statements given what he was told about production delays, the lack of "Plan B"

financing options, and Executive Committee approval of funding deals up to $7 million.

Flanagan Am. Resp. to Pls.' Statement of Facts ¶¶ 15, 17, 19.  When viewed in the light most

---

[11]Plaintiffs rely, in part, on an expert opinion by Matthew Clary ("Clary").  The Cohen
Defendants have filed a motion in limine to bar Clary's testimony at trial (docket no. 344);
Flanagan has joined that motion.  As an initial matter, the court finds unpersuasive the argument
that Clary, a lawyer with twenty years of practice experience in corporate law who serves as
Chairman of the Securities Law Committee of the Business Law Section of the Virginia Bar
Association, is unqualified to offer opinions in this case.  The defendants also argue that Clary's
opinions are no more than legal conclusions and are therefore inadmissible.  To the extent that
the motion goes to Plaintiffs' reliance on Clary's opinions in their response to summary
judgment, the court has treated it as a motion to strike.  However, Clary's opinions played no
part in the court's finding of disputed issues of fact for any defendant; therefore, the motion is
moot.  To the extent that the motion goes to Clary's testimony at trial, the motion is premature
and is denied without prejudice.

favorable to them, Plaintiffs raise an issue of disputed fact as to whether Flanagan had the ability to control the misrepresentations sufficient to survive summary judgment.

### ii. Kim's Status

#### (a) General Control

The Plaintiffs argue that Kim exercised general control over Xentex because: (1) he was a director; (2) he was not a passive director; (3) he was Chairman of the Xentex Executive Committee; (4) he was an officer (Vice-Chairman), who was paid $200,000 per year and maintained physical office space at the Xentex offices; (5) he controlled Xentex's relationships with its suppliers, including KDS. The Cohen Defendants answer that Kim was simply one member of a multi-member Board and that ascribing general control to him would eviscerate the general rule that a director is not automatically liable as a controlling person.

The Cohen Defendants are correct that Kim's status as a director is insufficient alone to render him a control person. *Premier Capital Mgmt., LLC,* 2005 WL 21960357 at *11. However, Kim was not a "typical" director as the Cohen Defendants assert; he was a member of the Executive Committee. The parties do not dispute that Xentex's three-person Executive Committee was formed in May 2000, that Kim was its Chairman from the beginning, and that a resolution could be adopted by a majority of the Executive Committee (that is, by two of the three members). Pls.' Statement of Facts (Cohen Defs.) ¶¶ 25-26; *id.* Tab 46. Although the Executive Committee could only recommend action to the Board, the Board was made up of just eight people, including the three members of the Executive Committee. *Id.* ¶ 26, *id.* Tab 49. Thus, decision-making power was concentrated in the hands of very few people and Kim held a very powerful position within that group. Because this is sufficient evidence from which to infer

Kim had general control over the operations of Xentex the court does not reach the other arguments advanced by Plaintiffs.

*(b)      Specific Control*

The Cohen Defendants argue that Kim "did not participate in any manner in the solicitation, negotiation or completion of Plaintiffs' investments in Xentex and had only one social meeting with any of the principals . . . ." Cohen Defs.' Mem. in Supp. of Mot. for Summ. J. at 5. Plaintiffs dispute this and assert that Kim oversaw the sale and issuance of stock as part of the Executive Committee and Board, was part of the management team that created and approved the Information Statement, and personally made false statements to Plaintiffs.

The following facts are undisputed. Kim was on the Board and Executive Committee and, as such, he was part of the group that oversaw stock sales. Defs.' Statement of Facts ¶ 37. Kim was aware (even if only "vaguely") that Xentex was raising funds from investors and he met with Plaintiffs in early November 2000 (even if only for lunch). *Id.* ¶¶ 40-41. The Information Statement identifies Kim as a member of Xentex management and includes language that it is written from management's perspective. Cohen Defs.' Resp. to Pls' Statement of Facts ¶ 12. Kim helped prepare summaries of the KDS agreements that were used in the Information Statement, although he may not have seen the final product. *Id.* ¶ 7. A reasonable inference from these facts is that Kim knew Xentex was selling stock, had input into the materials used to solicit investors, and had the ability, even if he did not use it, to control misrepresentations to investors by means of oversight or direct intervention as a member of the Executive Committee. As such, Plaintiffs have established a genuine issue of material fact regarding Kim's control person status and summary judgment on this basis is denied.

### iii. Turcotte's Status

#### (a) General Control

The Plaintiffs argue that Turcotte exercised general control over Xentex because: (1) he was an employee and officer (Controller, then Executive Vice President of Accounting and Control, then Vice President of Finance and Chief Financial Officer); and (2) he exercised control over Xentex's money, including the ability to stem the misappropriation of funds by Batio. The Cohen Defendants contend that Turcotte was simply the in-house accountant who prepared unaudited financial statements for internal use only.

The job titles and compensation details relating to Turcotte's employment with Xentex are undisputed. Plaintiffs' attempt to ascribe general control to Turcotte by emphasizing, for example, the facts that he "controlled" Xentex's money and drafted a policy for reimbursement of travel expenses. These tasks are unremarkable given the fact he was hired to take care of Xentex's finances. *Id.* ¶ 20. Plaintiffs' argument that Turcotte "influenced the direction of Xentex" by allowing Batio to misappropriate funds, *id.* ¶ 4, stretches the concept of general control too far and is nothing more than an attempt to insert a claim for aiding and abetting a breach of fiduciary duty into a federal securities claim. Even construing the evidence in the light most favorable to Plaintiffs, the court fails to see how the facts show that Turcotte was anything more than a very well-compensated employee and officer who received significant annual raises and had considerable latitude in hiring his own assistants. *See* Pls. Statement of Facts (Cohen Defs.) ¶¶ 17-21. In short, Plaintiffs have proffered no triable issue of material fact regarding Turcotte's general control of Xentex. Therefore, the court does not need to reach the issue of specific control or Turcotte's "good faith." Summary judgment is granted.

b.     <u>Affirmative Defenses: Flanagan and Kim</u>

Both Flanagan and Kim argue that they are not liable as control persons because they acted in good faith and their behavior was not reckless.  Plaintiffs dispute that "reckless" is the appropriate state of mind under a § 77o claim and argue that Flanagan and Kim are liable if he acted negligently.  Under either standard, Flanagan and Kim have the burden of proof of the affirmative defense.  *See, e.g.*, *Donohoe*, 30 F.3d at 912.

i.     *State Of Mind*

Section 15 of the 1933 Act and § 20(a) of the 1934 Act provide for liability of controlling persons, 15 U.S.C.§ 77o and § 78t respectively.  It is well-established that the test for whether a person is a control person is the same under both sections.  *See* § II(B)(3)(a) *supra*.  However, it is less clear whether the scienter required for the affirmative defense is the same under each section as the majority of cases deal primarily with the 1934 Act or fail to make explicit the standard they are applying.  The parties therefore dispute whether recklessness or negligence is the appropriate standard.[12]

Flanagan cites to *Donohoe* for the proposition that, to be liable, "[t]he controlling person must . . . act recklessly."  30 F.3d at 912 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 209 n.28 (1976); *Monieson v. Commodity Futures Trading Comm'n*, 996 F.2d 852, 860 (7th Cir.

---

[12]The court imputes the dispute over necessary scienter to the Cohen Defendants because, although they do not raise the issue explicitly, they employ "good faith" language throughout their argument.  In fact, the Cohen Defendants mix up § 78t and § 77o in their memorandum of law, erroneously asserting that § 77o provides that there is no liability if the defendant acted in "good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  *See* Cohen Defs.' Mem. in Supp. of Mot. for Summ. J. at 5-6.  The Plaintiffs explicitly called attention to the error in their response.  Pls.' Resp. in Opp'n to Cohen Defs.' Mot. for Summ. J. at 12 n.1.  Nevertheless, the Cohen Defendants again used the same "good faith" quote in their reply brief.  *See* Cohen Defs.' Reply at 4 n.5.

1993)).  However, as Plaintiffs point out, although the *Donohoe* court cites to both § 78t and § 77o in its control person analysis, a claim under § 78t was the sole claim remaining at the point when the court was addressing the issue of a good faith defense to control person liability.  *See Donohoe*, 982 F.2d at 1138 (noting that only § 20(a) of the 1934 Act was at issue because the court affirmed the dismissal of plaintiff's § 15 claim).  Thus, it is unclear that the Seventh Circuit was deciding the scienter required for a defense under § 77o.

The starting point of the analysis is the statutory language itself.  *Williams v. Taylor*, 529 U.S. 420, 431 (2000).  Section 78t, the affirmative defense for a control person under the 1934 Act, provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, *unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action*.

15 U.S.C. § 78t (emphasis added).  In contrast, § 77o of the 1933 Act, provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, *unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist*.

*Id.* § 77o (emphasis added).  The plain language of the two statutory sections differs in regard to the circumstances that excuse a control person from liability.  Under § 78t, acting in "good faith" suffices to absolve a control person of liability; however, under § 77o, a control person must prove an absence of knowledge and any "reasonable ground to believe" that there was any kind

of misrepresentation. Section § 77o appears to place a higher burden on the control person.

In *Ernst & Ernst*, the U.S. Supreme Court discusses the statutory structure of the 1933 and 1934 Acts and the state of mind required for liability under different sections. *See* 425 U.S. at 207-08. As part of its discussion, the Court notes that "the express civil remedies in the 1933 Act allow[] recovery for negligent conduct" and includes § 77o as an example of such a provision. *See id.* 208-09 ("We also consider it significant that each of the express civil remedies in the 1933 Act allowing recovery for negligent conduct, see §§ 11, 12[a](2), 15, 15 U.S.C. §§ 77k, 77l(2), 77o, is subject to significant procedural restrictions not applicable under § 10(b).")). In an associated footnote, the Court discusses the relationship between § 12(a)(2) and § 77o in more depth. *See id.* at 209 n.27. The Court contrasts the 1933 Act provisions with "provisions of the 1934 Act that expressly create civil liability [and] contains a state-of-mind condition requiring something more than negligence." *See id.* at 209 & n.28. It specifically cites to § 78t. *See id.* at 209 n.28 ([S]ection 20, which imposes liability upon 'controlling person[s]' for violations of the [1934] Act by those they control . . . ."). It is to footnote 28, referring to provisions of the 1934 Act, that the Seventh Circuit cites to support its conclusion that a recklessness standard applies to control person liability.

Therefore, the court concludes that, given the clear difference in the plain language of the two control person statutory provisions, the dicta of *Ernst & Ernst*, and the limited claims at issue in *Donohoe*, a recklessness standard applies only to § 78t, and a negligence standard applies to § 77o. *But see Carpenter v. Harris, Upham & Co., Inc.*, 594 F.2d 388, 394 (4th Cir. 1979) ("The controlling persons provision [of both the 1933 and 1934 Acts] contain a state-of-mind condition that requires a showing of something more than negligence to establish liability."

24

(citing *Ernst & Ernst*, 425 U.S. at 209 nn.27-28)).  Thus, to prevail in his affirmative defense, Flanagan must establish that he was not negligent in regard to Xentex's alleged use of a materially misleading prospectus or other communications in the offer or sale of its securities.

ii.     *Flanagan's Actions*

Flanagan asserts that he did not have actual knowledge of the Information Statement or the November 2000 meeting and therefore could not have done anything to prevent the alleged misrepresentations.  However, he frames the issue too narrowly.  Section 77o also requires that Flanagan show that he had "no . . . reasonable ground to believe" that Xentex was using materially misleading information to solicit sales.

The parties agree that Flanagan was elected to the Board in May 2000, but dispute if he knew about the election before September 2000.  In any event, Flanagan was a member of the Board when Xen purchased stock and TMB made its loan.  Plaintiffs argue that a director is obligated to oversee stock sales and ensure that representations are accurate.  Flanagan points out that the Board had delegated its authority in this regard to the Executive Committee (consisting of Tucker, Batio, and Kim).  Although such a designation is generally appropriate in order to streamline decisionmaking in an organization, it raises a question of material fact about Flanagan's duty to investigate in this particular case.  Xentex was a small company with a Board of only eight people.  *See* Flanagan Statement of Facts, Tab 22 (minutes of October 18, 2000 Xentex Board of Directors meeting listing the Board as Batio, Kim, Flanagan, Cohen, Tucker, Michael Venditti, Jung Koh, and Victor DeDois).  Despite its small size and concentrated stock ownership, the Board decided to pare down further the number of decision makers in May 2000. *See* Flanagan Statement of Facts ¶ 32.  Such a concentration of power allows an inference that

the Board eliminated its ability to oversee effectively important tasks relating to the authorization and offering of stock. *See, e.g.*, Pls.' Statement of Facts (Flanagan), Tab 38 at ¶ 3 (email from Flanagan stating that he asked Tucker about Board approval of the stock sales to "the east coast real estate family" and was told that "the Exec. committee was given board approval to authorize funding deals up to 7 million.").

Thus, there is a genuine issue of fact regarding whether it was reasonable for Flanagan to rely on the Executive Committee to ensure that the offerings complied with the law or whether, as a director on a small corporate board, he had an obligation to review personally documents and oversee communications. Flanagan has not met his burden to prove his affirmative defense, and his motion for summary judgment as to § 15 liability is denied.

### iii. Kim's Actions

The Cohen Defendants argue that Kim: (1) had nothing to do with the Information Statement; (2) had no ability to police what Batio and Tucker told Plaintiffs; and (3) acted in "good faith" by reasonably relying on Tucker, a securities lawyer and co-member of the Executive Committee, to take care of everything to do with sales of stock. The first two arguments are identical in content to those raised by Flanagan and rejected by the court. In Kim's case, the oversight obligation is more explicit than it was for Flanagan because Kim was not only a member of the Board, but was also the Chairman of the three-member Executive Committee to which the Board had designated that very obligation. Turning to Kim's argument regarding reasonable delegation to Tucker, such delegation to a specialist is eminently reasonable in certain circumstances, such as when a large company employs an outside expert to ensure the company's actions comply with legal requirements. However, in Xentex's case, the

specific facts regarding that delegation raise questions about abdication of duty. Here, an eight-person Board of a small corporation delegated responsibility for oversight to a three-person Executive Committee, which then allegedly further delegated to just one person whose own financial and professional future was enmeshed the financial success of Xentex. Under those circumstances, a reasonable jury could find that Kim was negligent in failing to review documents and oversee communications notwithstanding the fact that he relied on Tucker to ensure Xentex's actions complied with the law. Therefore, Kim has not met his burden to prove his affirmative defense, and his motion for summary judgment as to § 15 liability is denied.

      c.     <u>Whether There Was A Primary Violation of Securities Laws by Xentex</u>

Flanagan and the Cohen Defendants argue that Plaintiffs cannot prove a primary violation of the 1933 Act because: (1) the Information Statement contained sufficient cautionary language to notify Plaintiffs of the high degree of risk involved in investing in Xentex; (2) the statements Plaintiffs identify do not constitute a material misrepresentation; (3) Plaintiffs suffered no economic loss; and (4) Plaintiffs cannot establish loss causation.

The court addressed legal arguments similar to the first two of these arguments when it ruled on a motion to dismiss in this case. At that time, it concluded that: (1) Plaintiffs' allegations that the Information Statement misstated assets, falsely indicated preparations for the launch of a product were complete, and falsely described the involvement of KDS were "not 'soft' predictions, but rather, alleged misstatements of then-existing fact"; and (2) "[t]he 'bespeaks caution' doctrine does not as a matter of law negate the materiality of those statements." *Premier Capital Mgmt., LLC v. Cohen*, 02 C 5368, 2004 WL 2203419, *4 (N.D. Ill. Sept. 27, 2004) (citing *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1404, 1406

(7th Cir. 1995)).  The passage of time, in this case almost four years, has not changed the court's

conclusion that the disclaimers in the Information Statement do not eradicate Plaintiffs' claims.

Thus, the only issue is whether Plaintiffs have established a question of material fact as to

the alleged misrepresentations sufficient to survive summary judgment.  The court has already

concluded that there is disputed issue of material fact as to whether Plaintiffs received certain

information about KDS prior to making their investments.  *See* § II(B)(2) *supra*; *see also* Pls.'

Statement of Facts (Flanagan) ¶ 27 (citing deposition testimony from Plaintiffs' lawyer stating

he did not recall seeing the documents and from the person who allegedly sent the documents

saying she did not recall sending them); Pls.' Statement of Facts (Cohen Defs.) ¶ 15 (same).

Additionally, the accuracy of the financial information provided to Plaintiffs is a disputed

material fact.  *See, e.g.*, Pls.' Statement of Facts (Flanagan) ¶ 22 (deposition testimony of

Turcotte regarding two spreadsheets with the same date that show tooling figures disparate by

almost $3 million); Pls.' Statement of Facts (Cohen Defs.) ¶ 9 (contrasting a disclosure of $40

million in product financing in the Information Statement with Turcotte's admission that that it

never received any such financing).  A reasonable jury could conclude that this constituted a

violation of the disclosure requirements of the 1933 Act justifying § 77o liability.

As to the issue of damages, Flanagan and the Cohen Defendants briefly argue that

Plaintiffs have no right to damages (under a waiver or estoppel argument – it is unclear which)

and, even if they do, they cannot prove loss causation.  Waiver, estoppel, and the lack of loss

causation are affirmative defenses for which the burden of proof rests with defendants.  *See, e.g.*,

15 U.S.C. § 77l ("*[I]f the person who offered or sold such security proves* that any portion or all

of the amount recovered under [§ 77l(a)(2)] represents other than the depreciation in value of the

subject security . . . then such portion or amount . . . shall not be recoverable." (emphasis added)); *Meyers v. C&M Petroleum Producers, Inc.*, 476 F.2d 427, 429 (5th Cir. 1973) (finding that under the 1933 Act, waiver was not a defense to the lawsuit even where the plaintiff had rejected a conditional offer of settlement after the defendant discovered it had violated the law). Thus, Plaintiffs need only rebut if the defendants make out a *prima facie* affirmative defense, not, as Flanagan and the Cohen Defendants assert, preemptively offer facts to overcome the defenses as part of their case in chief.

At the heart of the waiver/estoppel argument of both Flanagan and the Cohen Defendants is the Virginia State Corporation Commission ("SCC") investigation of Premier. Plaintiffs do not dispute that the SCC investigation resulted in a settlement agreement whereby Premier offered to rescind certain contracts for Xentex stock sales. Flanagan and the Cohen Defendants assert that, because the Plaintiffs turned down the rescission offer from Premier, they cannot pursue Flanagan and the Cohen Defendants for damages that would have been recovered. In support, they cite to general cases on the issue of mitigation, the application of which may reduce damages to the point where liability is foreclosed. *See, e.g.*, *Savino v. C.P. Hall Co.*, 199 F.3d 925, 934-35 (7th Cir. 1999) (discussing the "avoidable consequences" doctrine). They do not cite to any case that holds that a rejected rescission offer made by a third-party (who itself is a plaintiff) bars claims. Nor do they provide sufficient facts to allow the court to determine whether the rescission offer would have made at least some of the Plaintiffs whole. To meet their burden of proof and prevail on an affirmative defense at summary judgment, Flanagan and the Cohen Defendants must do more than simply make a conclusory statement that Plaintiffs have no damages.

Flanagan and the Cohen Defendants also argue that Plaintiffs cannot establish loss causation because Xen's loss was caused by KDS going into bankruptcy and becoming unable to produce computers for Xentex. Plaintiffs do not dispute that KDS filed for bankruptcy, but counter that Xentex failed because of technical problems with the Voyager computer and the fact that Xentex could not afford to pay vendors to make the computers. The statements that the Cohen Defendants rely on to support their argument show nothing more than: (1) Xentex was having financial difficulties; (2) KDS went bankrupt. *See* Cohen Defs.' Statement of Facts ¶¶ 140, 142; *see also* Flanagan Statement of Facts ¶ 139 (discussing KDS receivership). The Cohen Defendants infer that the KDS bankruptcy was the cause of Xentex's ultimate demise. However, the court draws inferences in favor of the *non-movant* and neither the Cohen Defendants nor Flanagan produce sufficient facts to meet their burden of proof.

Summary judgment is denied as to both Flanagan and the Cohen Defendants for both affirmative defenses.

**C.      Claims Under The Virginia Securities Act, Va. Code Ann. § 13.1-522(C)**

Flanagan and the Cohen Defendants merge their arguments on liability under the Virginia Securities Act, Va. Code Ann. § 13.1-501 *et seq.* (the "VSA") with those under the 1933 Act. However, because the court agrees with Plaintiffs that legal distinctions exist between the two statutes, it is treating them separately. Plaintiffs allege that Flanagan and the Cohen Defendants are liable under provisions of the VSA that parallel control person liability under the 1933 Act. In response, Flanagan argues (as he did for the 1933 Act claims) that: (1) he is not a control person; (2) even if he is, he acted in good faith; and (3) there was no primary violation of the

security laws by Xentex.[13]

1. Control Person Status: Flanagan, Cohen, Kim, and Turcotte

The court concluded that a material question of fact existed as to Flanagan and Kim's control person statuses under the 1933 Act, but granted summary judgment as to Turcotte. No federal claim was brought against Cohen. Flanagan and the Cohen Defendants argue,[14] for the same reasons as they did under the 1933 Act, that they not control persons within the meaning of the VSA. Plaintiffs argue that an officer or director is *automatically* a control person under the VSA. If Plaintiffs are correct, then certain defendants' control person status is undisputed for the purposes of trial.

The relevant sections of the VSA provide:

Any person who: (i) sells a security [in violation of the VSA], or (ii) sells a security by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were [sic] made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him . . . .

Every person who directly or indirectly controls[15] a person liable under [§ 13.1-522], *including every partner, officer, or director* of such a person, every person

---

[13]Flanagan offers the statute of limitations and public offering affirmative defenses only in regard to the 1933 Act.

[14]Flanagan makes additional arguments in regard to TMB's claims. *See* II(D), *infra*. The Cohen Defendants do not and, absent argument to the contrary, the court accepts Plaintiffs' contention that "[i]n short, [the Cohen Defendants] are liable to TMB for the same reasons they are liable to Xen . . . because the same representations were made to both Plaintiffs." Pls.' Resp. in Opp'n to Cohen Defs.' Mot. for Summ. J. at 31.

[15]The VSA defines "control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." Va. Code Ann. § 13.1-501.

occupying a similar status or performing similar functions, every employee of such a person who materially aids in the conduct giving rise to the liability, and every broker-dealer, investment advisor, investment advisor representative or agent who materially aids in such conduct shall be liable jointly and severally with and to the same extent as such person, unless able to sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution as in cases of contract among the several persons so liable.

Va. Code Ann. § 13.1-522(A); *id.* § 522(C) (emphasis added).  Flanagan argues that the phrase "including every partner, officer, or director" is simply meant to provide examples of persons who *may* qualify as controlling persons, but that there is no presumption of control person status for the enumerated persons.  Flanagan Reply at 11.  (The Cohen Defendants do not make such an explicit statutory interpretation argument, but they do argue that the test for a "control person" under the VSA is the same as that under the 1933 Act, thus implicitly agreeing with Flanagan's position.  *See* Cohen Defs.' Reply at 10-11.)

Flanagan argues that Virginia courts agree with his interpretation of § 522(C) and points to *Atocha Ltd. P'ship v. Witness Tree, LLC*, 65 Va. Cir. 213 (Va. Cir. Ct. 2004), as proof.   *See* Flanagan Reply at 12.  However, he seriously misreads this case.  To begin with, he incorrectly states it is an appellate court case, whereas in fact it is a letter opinion from a trial court.  He argues that it "specifically held that a 'director is not automatically liable as a controlling person' under the VSA." *Id.*  However, the purported "holding" is merely dicta in a prefatory section of the court's analysis, a quote from a non-binding Ninth Circuit case that discussed control person liability under federal law.  In fact, the *Atocha* court did not even discuss "directors" because the case involved an LLC's members, a category of persons *not* specifically enumerated in § 522(C), which is likely why the court performed a parallel analysis to that required under federal law; the

court specifically noted the limited case law interpreting the VSA and the "informative" nature of federal cases to aid statutory construction. *Atocha Ltd. P'ship*, 65 Va. Cir. at 225. After completing the analysis, the court concluded that the members of the LLC who shared control of the company were controlling persons and observed that a contrary result "would not be in keeping with [§ 522(C)], which specifically names partners, officers, and directors as control persons, whether they are directly in control or not." *Id.* at 225-26, *id.* 226 n.48.

The plain language of § 522(C) and dicta in opinions of Virginia courts indicate that directors are *per se* liable as control persons under Virginia law. *See also Williams v. Chamer*, 32 Va. Cir. 12, 21 (Va. Cir. Ct. 1993) (noting that the liability of a defendant "arises, if at all, by virtue of his status as a director and therefore a controlling person . . . pursuant to Section 13.1-522(C)"). There is no ambiguity here: a director is a control person under the VSA and Flanagan, Cohen, and Kim admit they were directors. *See* Cohen Defs.' Statement of Facts ¶ 29 (Cohen was a member of the Board); *id.* ¶ 37 (Kim was a member of the Board and Executive Committee); Flanagan Statement of Facts ¶ 40 (Flanagan elected to the Board).

The court now turns to Turcotte, for whom it granted summary judgment under the 1933 Act. Turcotte admits he was an "officer and employee," but fails to clarify when he became an officer. Pls.' Statement of Facts (Cohen Defs.) ¶ 54; *id.* Tab 102 (employment contract for "Controller" starting in April 1999); *id.* Tab 103 (contract for "Executive Vice President of Accounting and Control" starting in April 2000); *id.* Tab 104 (contract for "Vice President of Finance and Chief Financial Officer" starting in April 2001). Xentex's Bylaws enumerate officers as: "the Chief Strategic Officer, the Chief Executive Officer, the President, the Executive Vice President, the Secretary, and any other individual performing functions similar to

those performed by the foregoing persons, including any Officer designated by the Board as performing such functions." Cohen Defs. Statement of Facts, Tab L at 9. None of Turcotte's job titles are specifically enumerated and his job description does not appear to have changed over the course of his tenure (other than his title and compensation package). Absent contradictory evidence from Turcotte, a reasonable inference is that Turcotte became an officer no later than April 2000, upon adoption of the "Executive Vice President" title. Thus, as an officer at the time the alleged misrepresentations occurred in November 2000, Turcotte is a "control person" under the VSA.

Summary judgment is denied and Flanagan, Cohen, Kim, and Turcotte's status as control persons is an undisputed fact for the purposes of trial.

2.      Affirmative Defenses

Flanagan argues that he cannot be held liable as a control person because he did not know about the Information Statement or meetings and he acted in good faith. The Cohen Defendants argue that they reasonably relied on Tucker to oversee the sale of stock, they had no role in the creation of the Information Statement, and they could not control the oral representations made by Batio and Tucker.

The language of the VSA control person statute is very similar to that of the 1933 Act, both imposing a burden on the defendant to show an absence of actual knowledge and an absence of negligence in failing to gain such knowledge. *Compare* 15 U.S.C. § 77o (imposing liability "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist"), *with* § 522(C) (imposing liability "unless [the defendant is] able to sustain the burden of

proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist") *and Dellastatious v. Williams*, 242 F.3d 191, 195 (4th Cir. 2001) (finding that the control persons had satisfied the "affirmative defense under both [15 U.S.C. § 78t] and Virginia's allegedly more-exacting standard"). Therefore, the court concludes that: (1) the burden is on the defendants to establish an affirmative defense; and (2) the applicable standard is negligence, not recklessness. For the reasons stated in its analysis of § 77o, *supra*, Flanagan and Kim have failed to meet their burden. Because the court did not address Turcotte or Cohen's arguments under the 1933 Act, a few additional words of analysis are needed.

Like Flanagan, Cohen was a member of the Board who claims he had no control over the Information Statement or Batio and Tucker's actions. For the same reasons as for Flanagan, there is a triable issue of material fact regarding whether it was reasonable for Cohen to rely on the Executive Committee to ensure that the offerings complied with the law or whether, as a director on a small corporate board, he had an obligation personally to review documents and oversee communications (Tucker's alleged expertise notwithstanding).

Turcotte was not a Board member, but he admits that he was himself an investor and "was also responsible for bringing other investors into Xentex." Cohen Defs. Statement of Facts ¶¶ 47, 54. A reasonable inference is that he had access to the information being used to sell stock. Also, his job at Xentex included preparation of financial materials for the Board. *Id.* ¶ 46. Thus, there is an issue of material fact as to whether Turcotte "did not know, and in the exercise of reasonable care could not have known" that Xentex was using materially misleading financial information to solicit sales.

Therefore, summary judgment on this basis is denied as to all defendants.

3.      Whether There Was A Primary Violation of Securities Laws by Xentex

Flanagan and the Cohen Defendants repeat the arguments they made for the 1933 Act, namely: (1) Plaintiffs cannot survive summary judgment because of cautionary statements in the Information Statement and a lack of disputed facts regarding the truthfulness of statements; (2) Plaintiffs suffered no economic loss; (3) Plaintiffs cannot establish loss causation.

The court has already addressed the first argument and sees no basis for changing its conclusion here:[16] the "bespeaks caution" doctrine does not apply here because the Plaintiffs raise questions of material (hard) fact which are not cancelled out by cautionary statements.  The third argument is easily dispensed with because loss causation is not an affirmative defense to claims under the VSA.[17]  *See Dunn v. Borta*, 369 F.3d 421, 432-33 (4th Cir. 2004) (declining to read the elements of reliance and causation into § 13.1-522(A) of the VSA); *see also* 12 Joseph C. Long, Blue Sky Law § 9:117.41 (2007) (concluding that the Uniform Securities Act § 410(a)(2), on which § 13.1-522(A) is modeled, does not require loss causation).

In addition to the common law arguments about economic loss made by the Cohen Defendants and already dispensed with in § II(B)(3)(c), *supra*, Flanagan makes an additional statutory argument that requires further analysis.  Flanagan argues that Plaintiff's "claim is expressly barred by § 13.1-522(D)" because Xen rejected Premier's rescission offer.  Flanagan

---

[16]The parties do not fully address whether the doctrine is applicable to the VSA, under Virginia law, as well as to the 1933 Act.  The court declines to decide the issue given the lack of briefing.

[17]Even if it was, the affirmative defense here would fail for the same reasons as it did under the 1933 Act claim.

Reply at 13.  Section 13.1-522(D) provides that:

> No suit shall be maintained to enforce any liability created under this section unless brought within two years after the transaction upon which it is based; provided, that, *if any person liable* by reason of subsection A, B or C of this section *makes a written offer, <u>before suit is brought</u>, to refund the consideration paid and any loss due to any investment advice provided by such person*, together with interest thereon at the annual rate of six percent, less the amount of any income received on the security or resulting from such advice, or to pay damages if the purchaser no longer owns the security, *no purchaser or user of the investment advisory service shall maintain a suit under this section who has refused or failed to accept such offer within thirty days of its receipt.*

Va. Code Ann. § 13.1-522(D) (emphasis added).  Thus, the intent of the statute – plain on its face – is to bar investors from filing suit *after* they have rejected a settlement offer.  Flanagan's argument is specious in light of the undisputed fact that this case was filed two and a half years *before* the November 2004 settlement and at least three months before the SCC investigation even began.  *See* Pls.' Resp. to Flanagan Statement of Facts ¶ 141; Pls.' Statement of Facts (Flanagan), Tab 80.  Summary judgment is denied on this ground.

**D.  Plaintiffs' Claims Under The VSA For "Materially Aiding" Xentex**

In addition to seeking to hold Flanagan liable as a "control person" in Count VIII, Plaintiffs also allege in Count IX that Flanagan is not only a control person but that he also "directly and indirectly controlled Xentex" and that he "materially aided" Xentex in making the purported misrepresentations.  3d Am. Compl. ¶¶ 31-32, 127.  Count VIII (*see* § II(C) *supra*) alleges a violation of the VSA in regard to Xen's initial stock purchase and Count IX, at issue here, alleges a violation in regard to TMB's purchase of the promissory note and Xen's additional stock purchases.  Both claims are made pursuant to § 13.1-522(C).

Flanagan argues that Plaintiffs cannot state a claim under § 13.1-522(C) because Flanagan is not an "employee, investment advisor, or agent" of Xentex.  Flanagan is correct that,

under the plain language of § 13.1-522(C), he does not hold a position where he can be held liable for "materially aid[ing]" a seller of securities. *See* § 13.1-522(C) ("Every person who . . . controls a person liable . . ., including every . . . director of such a person, . . ., every employee . . . *who materially aids* in the conduct giving rise to the liability, and every broker-dealer, investment advisor, investment advisor representative or agent *who materially aids* in such conduct shall be liable . . . ." (emphasis added)).  Therefore, Plaintiffs may not hold him liable for material misstatements on that basis.

However, that does not end the matter of liability.  Flanagan is a director, and, as explained in § II(C)(1), he is liable as a control person for the alleged illegal conduct of Xentex, whether or not he "materially aid[ed]" Xentex in its conduct.[18]  Therefore, the court extends its holding that Plaintiffs have raised a triable issue of fact as to Flanagan's control person status and that Flanagan has failed to meet his burden for an affirmative defense to these claims also and denies summary judgment as to Count IX.

## E.     Breach of Fiduciary Duty[19]

Plaintiffs allege that Flanagan, Kim and Turcotte breached their fiduciary duty to Xen and TMB.  Flanagan argues that: (1) he did not owe a fiduciary duty to either company at the

---

[18]In a previous opinion in this case, while discussing the existence of a right of contribution under the VSA, this court noted that it read § 13.1-522(C) "to mean that liability . . . is created as to two groups: (i) persons who control (directly or indirectly) a person (Xentex) liable under § 13.1-522(A) or (B), including, among others, officers and directors of the liable person; and/or (ii) employees, brokers, investment advisors and other agents who aid the person liable under § 13.1-522(A) or (B) in the violative conduct."  *Premier Capital Mgmt., LLC v. Cohen*, 02 C 5368, 2005 WL 1564926, *3 (N.D. Ill. July 1, 2005).

[19]Flanagan asserts, and Plaintiffs do not dispute, that under Illinois choice of law principles, this claim is governed by the law of the state of incorporation of the allegedly culpable corporation, in this case Delaware.

time of the alleged fraud; (2) Plaintiffs have suffered no unique harm; and (3) the exculpatory clause in Xentex's certificate of incorporation insulates him from liability. The Cohen Defendants similarly argue that Kim and Turcotte: (1) had no fiduciary duty to Plaintiffs until after the alleged fraud; (2) did not knowingly make any false representations; and (3) are insulated by the exculpatory clause. The court has already held that "to the extent that [P]laintiffs' breach of fiduciary duty claims are based on defendants' conduct prior to [P]laintiffs' purchase of Xentex stock [or on derivative harm], those claims must be dismissed." *See Premier Capital Mgmt., LLC*, 2004 WL 2203419 at *16-17. Thus, Plaintiffs' claims may be based on Flanagan, Kim and Turcotte's conduct only as it relates to their actions *after* a director-shareholder relationship had been established between Plaintiffs and Xentex.

    1.   <u>TMB's Claims</u>

It is undisputed that TMB invested only once with Xentex, making a $650,000 loan in exchange for a promissory note that could be exchanged for stock. Flanagan argues that summary judgment should be granted because: (1) no duty was owed to TMB before it made the loan and it made no further investments in Xentex; and (2) Flanagan never owed a fiduciary duty to TMB itself because its members held shares in Xentex and TMB held only the promissory note. Similarly, the Cohen Defendants contend that TMB cannot maintain a claim against them based on a fiduciary relationship established through Xen.

Plaintiffs attempt to establish that Flanagan, Turcotte and Kim owed a fiduciary duty to TMB *before* TMB made the loan, arguing that because Todd Copeland was a principal of both Xen and TMB, defendants' fiduciary duty attached to both Xen and TMB as soon as Xen purchased stock. The court has already addressed Plaintiffs' argument at length in its companion

order that deals with the summary judgment motion made by Northview and Robinson and it refers the parties to § II(B)(1) of that opinion for further details.  *See* Memorandum Opinion and Order at 5-7 (March XX, 2008).  Suffice it to say here that Plaintiffs fail to provide any basis under Delaware law that changes the court's conclusion, reached pursuant to Illinois law, that a fiduciary duty does not attach to a company before it has formed its *own* director-shareholder relationship simply because a member of that company has a pre-existing fiduciary relationship through a *different* LLC.  Therefore, Flanagan, Kim and Turcotte's motion for summary judgment on TMB's claim is granted.

   2. <u>Xen's Claims</u>

   It is well-established that under Delaware law, directors of corporations stand in a fiduciary relationship to the stockholders and owe them the duties of due care, good faith, and loyalty.  *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).  In their response brief, Plaintiffs rely on *Johnson v. Shapiro*, Civ. A. 17651, 2002 WL 31438477, *4 (Del. Ch. Oct. 18, 2002), for the proposition that a director has an obligation to make previously omitted information available to shareholders.  It is true that "[t]he duty of disclosure obligates directors to provide stockholders with accurate and complete information material to a transaction [and] the director['s] fiduciary duties include the duty to deal with their stockholders honestly."  *Malone,* 722 A.2d at 10.  However, this duty of disclosure arises only in the context of a request for shareholder action.  *Id.*; *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 388-89 (Del. Ch. 1999) (noting that "the duty of disclosure is merely a specific application of the more general fiduciary duty of loyalty that applies only in the setting of a transaction or other corporate event that is being presented to the stockholders for action"); *Johnson*, 2002 WL 31438477 at *4 (discussing

information presented to shareholders considering a buyout and self-tender offer). Where there is no such request, a director's actions may breach the more general fiduciary duty of care or loyalty only where he or she "knowingly disseminate[s] false information that results in corporate injury or damage to an individual stockholder." *Malone*, 722 A.2d at 9; *Jackson Nat'l Life Ins. Co.*, 741 A.2d at 390 (reasoning that omission of material information constituted a similar breach of the duty of loyalty).

Plaintiffs' reliance on the duty of disclosure is misplaced in light of the fact they allege no vote, no transaction requiring shareholder approval, no need for ratification of an investment decision, and nothing that constitutes "shareholder action." They simply allege Xen made additional purchases of stock, which is not "shareholder action" for the purposes of disclosure requirements. Thus, Plaintiffs' claim arises under the more general breach of the duty of care or loyalty, and, to survive summary judgment, they must raise a question of material fact regarding whether Flanagan, Kim and Turcotte knowingly disseminated false information to them.

a.   <u>Flanagan</u>

In the Third Amended Complaint, Plaintiffs allege that "Flanagan allowed Xentex to make . . . misrepresentations" and that he "had the ability to prevent Xentex from making . . . misrepresentations." 3d Am. Compl. ¶ 134-35. These allegations and the disputed facts underlying them are discussed in § II(B)(3) *supra*. A review of the record shows that the only dishonest action Plaintiffs directly attribute to Flanagan occurred during several telephone conversations. *See* 3d Am. Compl. ¶31(e); Pls.' Resp. to Flanagan Statement of Facts ¶¶ 111 (calls to Robert Copeland), 113 (calls to Todd Copeland); 114 (calls to Reyna). It is undisputed that Flanagan's call to Todd Copeland took place before Xen decided to invest. Pls.' Resp. to

Flanagan Statement of Facts ¶ 113. Another call was between Flanagan and Reyna and Robert Copeland in late May 2001. The parties dispute whether Flanagan misrepresented various facts about the finances and production schedule of Xentex during this conversation. *See* Pls.' Statement of Facts (Flanagan) ¶ 39(d) (outlining details from a "phone conversation with Reyna on May 30, 2001"). However, the call could not have influenced Xen's investment decisions because it is undisputed that the last time Xen purchased Xentex stock was in February 2001, at least three months before the conversation. Flanagan Statement of Facts ¶ 95. The only call (for which Plaintiffs provide details) upon which a breach of duty claim *could* rest is the call with Robert Copeland in late November 2000. However, Copeland himself said that he was unaware of any misrepresentations being made during that call. *See* Flanagan Statement of Facts, Ex. 7 at 133:12-18 (Copeland's March 2005 deposition). Thus, Plaintiffs present no evidence to show that Flanagan "knowingly disseminate[d] false information" after his fiduciary duty attached.

Plaintiffs also incorporate the arguments they used to refute Flanagan's federal affirmative defense under § 77o (*see* § II(B)(3)(b) *supra*). However, their reliance is misplaced. This section of Plaintiffs' brief focuses on events before Flanagan's fiduciary duty attached, and also, as we discussed, *supra*, the scienter required here is higher because liability attaches under § 77o for *negligent* conduct, but only attaches for a breach of care or loyalty for *knowing* conduct. *See Malone*, 722 A.2d at 14 ("When the directors are not seeking shareholder action, but are *deliberately* misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty." (emphasis added)). Although Plaintiffs raised a sufficient question of fact as to Flanagan's negligence to survive summary judgment for their § 77o claim, they have produced insufficient evidence to establish

knowing conduct.[20]  Given Flanagan's limited direct contact with the Plaintiffs, a rational fact-finder could not conclude that Flanagan deliberately withheld or misrepresented known negative information.  Summary judgment is granted as to Xen's claims for breach of fiduciary duty also.

   b.   Kim and Turcotte

   Plaintiffs allege that Turcotte and Kim "allowed Xentex to make each of the misrepresentations" in the Information Statement and oral representations, had the "ability to prevent Xentex from making the misrepresentations," and "continu[ed] to conceal the false nature of [Xentex's] earlier misrepresentations."  3d Am. Compl. ¶¶ 89-92, 187-90.

   As discussed above, Plaintiffs' incorporation of arguments made under § 77o and the VSA is misplaced because defendants may be held liable for negligent conduct under the securities laws, but only for knowing conduct under these common law claims.  Plaintiffs also point to Turcotte's involvement in preparing the Information Statement and his failure to disclose errors and omissions and argue that Kim had an obligation to correct misstatements from the meeting he had with them in early November 2000.  However, both of these allegations implicate the duty of disclosure and, as discussed above, no shareholder action exists upon which to base such a breach.  Plaintiffs do not allege a single conversation or communication with either Kim or Turcotte after November 22, 2000, the date on which their fiduciary duty to Xen

---

[20]It is also unclear that a state law claim that so closely parallels a federal claim would be allowed by Delaware courts.  *See, e.g.*, *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996) (declining to create a "new cause of action which would replicate, by state decisional law, the provisions of . . . the 1934 Act"); *In re Oracle Corp.*, 867 A.2d 904, 931 (Del. Ch. 2004) (observing that holdings such as that in *Malone* threaten that "a narrow and fixed 'Delaware carve-out' [allowing state shareholder class actions] for traditional fiduciary duty claims [will become] an expanding excavation site that unsettles the structure of federal securities law").

first arose.  Therefore, there is no material issue of fact in dispute and summary judgment is granted on Counts VI and XV.

**F.      Claims For Common Law Fraud/Actual Fraud and Constructive Fraud**

1.      <u>Actual Fraud</u>[21]

Under Virginia law, "[t]he elements of actual fraud are: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled."  *Winn v. Aleda Constr. Co.*, 315 S.E.2d 193, 195 (Va. 1984).  The false representation or concealment must be of an existing fact because "fraud cannot be predicated upon what amounts to a mere expression of an opinion."  *Poe v. Voss*, 86 S.E.2d 47, 49 (Va. 1955) (internal citations and quotation marks omitted).  In determining whether a statement is of opinion or fact, "the subject matter, the form of the statement, the attendant circumstances, and the knowledge of the parties must be considered."  *Id.*

a.      <u>Flanagan</u>

Flanagan argues that Plaintiffs cannot meet their burden to show he falsely represented a material fact to TMB because he was simply expressing opinions and, even if he was expressing facts, he did not know they were untrue and did not intend to mislead.  Flanagan also argues that TMB did not rely on his statements because it had already made its decision and initial preparations to invest in Xentex before Reyna spoke to Flanagan.  Finally, he argues that Plaintiffs have no evidence that he intentionally concealed anything from them.

Here, the parties dispute what was said during a phone call between Flanagan and Reyna

_____

[21]The parties agree that Virginia law applies to the actual fraud claims.

on May 30, 2001, the day after a Board meeting and before TMB made its investment in Xentex. They dispute the circumstances and events relating to each element of a claim for actual fraud. For example, Plaintiffs (citing to interrogatory answers) allege that Flanagan told Reyna that Xentex was able to pay its bills and was not in financial difficulties. Flanagan says Reyna's evasive answers during his deposition, where he simply referred back to his interrogatory answers and provided very little additional information, show that he did not discuss such matters with Flanagan. Flanagan argues that TMB did not rely on the phone call because it had already placed funds in escrow before that. Plaintiffs say the phone call with Flanagan was a determinative factor in their decision to go forward. However, determining whether Flanagan said what Reyna claims and how much TMB relied on what Reyna was told requires a weighing of credibility, which is an inappropriate task when considering a summary judgment motion. *See, e.g.*, *JPM, Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996) (observing that the need for a credibility determination does not preclude summary judgment where the disputed fact is not material to the outcome). Thus, summary judgment is denied.

b. <u>Turcotte</u>

Turcotte argues that Plaintiffs cannot make out a *prima facie* case against him because: (1) there is no evidence he knew his internal accounting statements would be used in the Information Statement: (2) he did not know that the information he put in the documents was false; and (3) Plaintiffs do not establish reasonable reliance where they had their own accountant to review the financial information.

Plaintiffs rely exclusively on the financial information contained in the Information Statement they received in November 2000 as the basis for their actual fraud claim against

Turcotte. Therefore, the evidence they offer regarding conversations, letters, discoveries, and affidavits from 2001-02 have no relevance as it, at most, proves knowledge *after* the alleged misrepresentation. Discarding those, the only facts that remain concern the manner in which Turcotte disclosed Batio's use of company funds on financial documents and the accuracy of the tooling figure in the Information Statement. Pls.' Statement of Facts (Cohen Defs.) ¶¶ 3-4. The issues, therefore, are: (1) whether Turcotte knew Batio was misappropriating funds and knowingly covered it up on balance sheets; and (2) whether Turcotte knew that the correct tooling figure was $1.45 million, not $4.25 million, at the time he prepared the balance sheet.

Plaintiffs attempt to truncate Turcotte's deposition testimony so that it reads otherwise, but a close review shows that he stated that did *not* know that his entries in the financial statements were false or misleading at the time he made them. In regard to Batio's misappropriations, he stated that, although he knew Batio was using company funds for personal use, he treated the expenses as loans (which was his understanding of what they were), included them on Xentex's balance sheets, and "absolutely" believed Batio would repay the money to Xentex once it became profitable. *Id.*, Tab 13 at 101:23-102:16. In regard to the tooling figures, Turcotte stated that he included a tooling figure of $4.25 million on the balance sheet because he understood that was what the agreement with KDS provided and that he corrected the statement after he was informed that the number was actually $1.45 million. *Id.* at 86:17-87:9, 259:10-261:1.

Plaintiffs argue that Turcotte must have made the alleged misrepresentations knowingly, but they offer no evidence in support of this. Their argument rests on nothing more than a "hindsight is twenty-twenty" inference, which is backward looking and does not show Turcotte's

knowledge of falsity at the time the representations were made. A reasonable jury could not, based on his deposition testimony and nothing more, conclude that Turcotte made a knowing misrepresentation. Summary judgment is granted.

c.    Kim

Plaintiffs rest their actual fraud claim against Kim on the allegation that he "told Todd Copeland and Reyna that the development of Voyager was complete and that mass production of the computers would occur shortly." Pls.' Resp. in Opp'n to Cohen Defs.' Mot. for Summ. J. at 29. Kim argues that Plaintiffs cannot prevail in their actual fraud claim against him because what he told them during the meeting in early November 2000 was factually true, and even if it was not, Plaintiffs cannot establish reasonable reliance and offer no facts to show that Kim intended to mislead them. Thus, the content of the conversation is undisputed; at issue is its truthfulness.

Plaintiffs point to three paragraphs in their Statement of Facts to show that Kim knew that his statements were untrue when he said them. The first paragraph discusses KDS funding and Xentex's debts to vendors, neither of which are at issue here, and events that post-date the meeting with Kim. *See* Pls.' Statement of Facts (Cohen Defs.) ¶ 8 (discussing revelations in meetings and memoranda after early November 2000). Another paragraph, rather than presenting additional facts, presents inferences and legal argument that are almost identical to those in Plaintiffs' brief. *See id.* ¶ 14 (making, among others, the conclusory statement that "Kim told [Plaintiffs] that the development of the computer was complete and that mass production was going to occur shortly."). Neither paragraph helps Plaintiffs defeat summary judgment. The remaining "paragraph" discusses Kim's interactions with Xentex and its

suppliers and various production glitches before November 2000. *See id.* ¶ 10. The Cohen

Defendants dispute that, even cumulatively, these events and problems negate the truthfulness of

Kim's statements. They argue that "[t]he design of the Voyager computer was completed even

though improvements still needed to be made," and "Plaintiffs could not have expected mass

production to begin for at least four months." Cohen Defs.' Reply at 13-14.

Drawing inferences in favor of the Plaintiffs, it is possible that the numerous problems

and delays identified, which Kim knew about at the time of the meeting, were significant enough

that the Voyager could not have been complete and/or that mass production of the computers

could not have been imminent. Thus, a reasonable jury could conclude that Kim knowingly

misrepresented the status of production at the meeting. Summary judgment is denied.

2. Constructive Fraud[22]

Flanagan argues that he is entitled to summary judgment because he did not make any of

the representations in the initial offering and had limited contacts with the Plaintiffs. Under

Virginia law, a constructive fraud claim requires the plaintiff to "prove . . . by clear and

convincing evidence: that there was a material false representation, that the hearer believed it to

be true, that it was meant to be acted on, that it was acted on, and that damage was sustained."

*Nationwide Ins. Co. v. Patterson*, 331 S.E.2d 490, 492 (Va. 1985). Concealment gives rise to

constructive fraud only where there is a duty to disclose the concealed fact. *Cohn v. Knowledge

Connections, Inc.*, 585 S.E.2d 578, 581 n.2 (Va. 2003). "Constructive fraud differs from actual

fraud in that the misrepresentation of material fact is not made with the intent to mislead, but is

made innocently or negligently although resulting in damage to the one relying on it." *Id.* at 582

---

[22]The parties agree that Virginia law applies to the constructive fraud claim.

(internal citations and quotations omitted).

Plaintiffs' Third Amended Complaint and response to the motion for summary judgment allege that Flanagan is liable for constructive fraud based on the content of the Information Statement and associated financial disclosures presented at the November 2000 meeting. However, Plaintiffs do not dispute that Flanagan did not personally attend the meeting and did not personally present Plaintiffs with an offer to invest. Pls.' Resp. to Flanagan Statement of Facts ¶ 65. Thus, the sole remaining potentially tortious act is Flanagan's alleged negligent oversight of the preparation of the Information Statement. This does not constitute a representation for purposes of a fraud claim. *See, e.g.*, *Atocha Ltd. P'ship*, 65 Va. Cir. at 227 (finding for defendants on a claim for actual fraud where there was no evidence that the individual directors had made any direct representations to investors). Thus, Flanagan's motion for summary judgment based on these allegations is granted.

Plaintiffs also allege that certain material facts were omitted from the Information Statement and subsequent communications. In *Atocha Ltd. P'ship*, the court found that a "duty to reveal . . . omitted facts was imposed by provisions of the VSA." 65 Va. Cir. at 227. To prevail, Plaintiffs must provide sufficient evidence for the inference that there was a causal connection between Flanagan's actions and their injury. *See Cohn*, 585 S.E.2d at 369 (discussing the need for evidence on causation that is "sufficient to take the question out of the realm of mere conjecture, or speculation, and into the realm of legitimate inference."). However, notwithstanding his possible liability as a control person, the evidence does not show that Flanagan's role in the Xentex board was sufficiently central to allow such an inference. Given that Plaintiffs had little contact with Flanagan, especially compared to other Xentex directors,

and that Flanagan was not a member of the Executive Committee that made most of the decisions regarding stock sales, a reasonable jury could not find that Flanagan's personal actions were the reason that Plaintiffs invested in Xentex to their detriment.  Therefore, summary judgment as to these allegations is also granted.

The only direct contact upon which Plaintiffs bring their constructive fraud claims is the May 30, 2001 phone call between Flanagan and Reyna.  As discussed in § II(F)(1) *supra*, these claims hang on a credibility determination.  Therefore, summary judgment is denied as to the parts of this count that parallel TMB's actual fraud claim.

3.      Negligent Misrepresentation/Constructive Fraud[23]

Plaintiffs allege that Turcotte negligently made false financial disclosures in the Information Statement regarding the quantity of tooling assets, Batio's misappropriation of corporate funds, and Xentex's underfunding.  3d Am. Compl. ¶¶ 80-85.   The Cohen Defendants assert that: (1) the facts Turcotte included in his financial reports were true; (2) as an employee of Xentex, Turcotte owed Plaintiffs no duty; and (3) Turcotte was not in the business of providing information to shareholders such as Plaintiffs because his job was to prepare financial statements for Xentex's internal use only.  Plaintiffs devote two scant paragraphs to this claim in their response, citing to *First Midwest Bank* to establish the elements of the claim, and arguing, in conclusory terms, that the issue of Turcotte's duty to Plaintiffs "is a disputed issue of fact because, according to Tucker, it was part of Turcotte's job to prepare financial statements for Xentex to tender to prospective investors."  Pls.' Resp. in Opp'n to Cohen Defs.' Mot. for Summ. J. at 29.

---

[23]The parties agree that Illinois law applies to this claim.

Under Illinois law, a claim of negligent misrepresentation requires a plaintiff to prove: "(1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information." *First Midwest Bank, N.A. v Stewart Title Co.*, 843 N.E.2d 327, 334-35 (Ill. 2006) (citing *Bd. of Educ. of the City of Chi. v. A, C. & S, Inc.*, 546 N.E.2d 580, 591 (Ill. 1989)). Where a plaintiff seeks purely economic damages, there is no duty on a party to avoid negligently conveying false information unless "the party is in the business of supplying information for the guidance of others in their business transactions." *Id.* at 335 (citing *Brogan v. Mitchell Int'l, Inc.*, 692 N.E.2d 276, 278 (Ill. 1998); *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 442, 452 (Ill. 1982)). "[I]f the intended end result of the plaintiff-defendant relationship is for the defendant to create a product, a tangible thing, then the defendant will not fit into the 'business of supplying information' negligent misrepresentation exception." *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 297 (Ill. App. 1999).

The case law regarding negligent misrepresentation under the "supplying information" exception indicates that no claim can be brought if the defendant is not in the business of purely supplying information or where the information is "merely ancillary to the sale of a product." *First Midwest Bank*, 843 N.E.2d at 334-35, 341 (concluding that a title insurance company is not in the business of supplying information). *Compare 2314 Lincoln Park West Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346 (Ill. 1990) (no claim against an architect because, although an architect supplies information, "the character of that function should not be

overstated"), *and Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246 (Ill. 1986) (no claim possible against a contractor who installed electrical units), *with Perschall v. Raney*, 484 N.E.2d 1286 (Ill. 1985) (claim possible against a home inspector), *and Duhl v. Nash Realty Inc.*, 429 N.E.2d 1267 (Ill. 1981) (claim possible against an appraiser).

Illinois courts have recognized that between the "pure" information providers (such as accountants and attorneys) and the obvious tangible good providers (such as computer software manufacturers) lie a range of businesses that do both. *See Tolan & Son, Inc.*, 719 N.E.2d at 296-97. Xentex's sale of stock seems to be an obvious example of something in between the two extremes: stock is a product that can be sold, yet information on the value of the stock is a key component. Despite the obvious ambiguity over the legal status of the product in this case, Plaintiffs offer no argument as to why Xentex and Turcotte are in the business of supplying financial information to them and no facts to support such a conclusion.

Even if the court were to conclude that Xentex was in the business of selling information, which it declines to do in the absence of briefing on the issue, Plaintiffs' challenges do not end there. Plaintiffs seek not only to extend the reach of Illinois tort liability to a new type of product, but they also seek to extend it to a new type of defendant. Here, Plaintiffs do not seek to impose liability on the person who allegedly misrepresented facts to them, namely Xentex. Rather they seek to impose liability on Xentex's employee for making allegedly negligent misrepresentations to Xentex, which then allegedly passed them on to Plaintiffs. Yet, they offer no legal argument on why this court should extend tort liability to breach the protective shell of incorporation and impose liability on an employee in the absence of any direct tortious contact between the employee and the Plaintiffs. Absent a compelling argument and citation to

52

controlling Illinois authority, the court declines to extend the reach of the doctrine of negligent representation this far. Summary judgment is granted.

## G.    Premier's Claims

Plaintiffs argue that Flanagan and the Cohen Defendants waived their arguments against Premier because they did not move for summary judgment as to any claims filed by Premier. Pls.' Resp. in Opp'n to Flanagan Mot. for Summ. J. at 35 (citing to this court's opinion in *Koren v. Eagle Ins. Agency, Inc.*, 03 C 4261, 2005 WL 589755, *3 n.3 (N.D. Ill. Mar. 11, 2005), which itself cites to *Duncan v. State of Wis. Dep't of Health and Family Servs.*, 166 F.3d 930, 934 (7th Cir. 1999)); Pls.' Resp. in Opp'n to the Cohen Defs.' Mot. for Summ. J. at 35 (same).

In a footnote, the Cohen Defendants assert that they "except Premier . . . from the definition of 'Plaintiffs' and further, seek summary judgment as to all claims asserted against them by Premier, as Premier neither purchased any stock in Xentex nor engaged in any transaction with Xentex or [the Cohen Defendants] which may be deemed as involving a sale of 'securities.'" Cohen Defs.' Mem. in Supp. of Mot. for Summ. J. at 8-9 n.1.  No further argument on Premier's status is offered in the 25-page brief.  Flanagan, again in a footnote but this time in a reply brief, does not contend that he raised any arguments as to Premier but notes that "the claims against Premier necessarily would fail for the same reasons as those set forth above, and for the additional reasons set forth in Section J of the Reply of [the Cohen Defendants] . . . ." Flanagan Reply at 15 n.17.  (Section J sets out the factual bases for the Cohen Defendants' earlier conclusory argument.  *See* Cohen Defs.' Reply at 22.)

Even if Premier's claims could fail on the basis of the law and facts asserted, Flanagan and the Cohen Defendants denied Premier the opportunity to respond to the arguments and to

gather facts to defend against summary judgment by failing to brief the issue in their over-sized memoranda in support of their motions for summary judgment. Additionally, Flanagan and the Cohen Defendants specifically sought summary judgment against either Xen or TMB in certain counts. Raising arguments and asserting facts against Premier in a reply is simply too late. *See Gold v. Wolpert*, 876 F.2d 1327, 1331 n.6 (7th Cir. 1989) ("It is well-settled that new arguments cannot be made for the first time in reply. This goes for new facts too." (internal citations omitted)). Therefore, the court finds that Flanagan and the Cohen Defendants have waived all arguments as to Premier for summary judgment purposes and that Premier may proceed, on its own behalf, with any of the original claims for which it can establish independent standing.

## III. CONCLUSION

As to Flanagan's motion, the court: denies summary judgment on Counts VII-IX (violations of the 1933 Act and the VSA) and on TMB, LLC's claims in Count XI (fraud); and grants summary judgment on Count X (breach of fiduciary duty) and Zen Investors, LLC's claims in Count XI (fraud). As to the Cohen Defendants' motion, the court: denies summary judgment on Counts II-III (VSA/Turcotte), XII (1933 Act/Kim), XIII-XIV (VSA/Kim), XVI (actual fraud/Kim), and XIX-XX (VSA/Cohen); and grants summary judgment on Counts I (1933 Act/Turcotte), IV (actual fraud/Turcotte), V (negligent misrepresentation/Turcotte), VI (fiduciary duty/Turcotte), and XV (fiduciary duty/Kim). Premier Capital Management, LLC may pursue, on its own behalf, any of the original claims for which it can establish independent standing. Finally, Plaintiff is ordered to show cause, within 14 days of this order, why defendant Jung Koh (Counts XVII-XVIII) should not be dismissed.

ENTER:

_____/s/_____

JOAN B. GOTTSCHALL
United States District Judge

DATED: March 24, 2008